ACCEPTED
14-14-00706-cv
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
4/6/2015 11:22:02 PM
CHRISTOPHER PRINE
CLERK

NO. 14-14-00706-CV

_____

IN THE

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
4/6/2015 11:22:02 PM
CHRISTOPHER A. PRINE
Clerk

FOURTEENTH COURT OF APPEALS

_____


ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC.
and ANGLO-DUTCH (TENGE) L.L.C.,
Appellants/Cross-Appellees,


v.


GREENBERG PEDEN, P.C. and GERARD J. SWONKE,
Appellees/Cross-Appellants.


_____

**BRIEF OF CROSS-APPELLANTS
GREENBERG PEDEN, P.C. and GERARD J. SWONKE**
_____


RUSTY HARDIN & ASSOCIATES, LLP
Joe Roden
State Bar No. 00794549
Rusty Hardin
State Bar No. 08972800
1401 McKinney Street, Suite 2250
Houston, Texas   77010
Telephone:  713-652-9000
Facsimile:  713-652-9800

**ATTORNEYS FOR
CROSS-APPELLANTS**

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

*Appellants/Cross-Appellees*:
Anglo-Dutch Petroleum International, Inc. and
Anglo-Dutch (Tenge) L.L.C.

*Appellate Counsel for Appellants/Cross-Appellees*
Christopher S. Johns
State Bar No. 24044849
805 West 10th Street, Suite 400
Austin, Texas  78701
Telephone:  (512) 215-4078
Facsimile:  (512) 628-7169
cjohns@jmehlaw.com

Joseph R. Marrs
State Bar No. 24037029
Leah Lanier
State Bar No. 24080068
Johns, Marrs, Ellis & Hodge, LLP
500 Dallas Street, Suite 1350
Houston, Texas  77002
Telephone:  (713) 609-9503
Facsimile:  (713) 583-5825
jmarrs@jmehlaw.com
llanier@jmehlaw.com

Ryan P. Bates
State Bar No. 24055152
Bates PLLC
3300 Harris Park Avenue
Austin, Texas  78705
Telephone:  (512) 694-5268
rbates@batespllc.com

*Trial and Appellate Counsel for Appellants/Cross-Appellees:*
Kenneth R. Breitbeil
State Bar No. 02947690
David L. Louie
State Bar No. 24074621
McFall, Breitbeil & Eidman, P.C.
1331 Lamar Street
1250 Four Houston Center
Houston, Texas 77010-3027
Telephone: (713) 590-9300
Facsimile: (713) 590-9399
kbreitbeil@mcfall-law.com
dlouie@mcfall-law.com


*Appellees/Cross-Appellants:*
Gerard J. Swonke and Greenberg Peden, P.C.

*Trial and Appellate Counsel for Appellees/Cross-Appellants:*
Joe Roden
State Bar No. 00794549
Rusty Hardin
State Bar No. 08972800
Ryan Higgins
State Bar No. 24007362
Rusty Hardin & Associates, LLP
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800
jroden@rustyhardin.com
rhardin@rustyhardin.com
rhiggins@rustyhardin.com

# TABLE OF CONTENTS

IDENTITY OF THE PARTIES AND COUNSEL ................................... ii

TABLE OF CONTENTS ................................................................. iv

INDEX OF AUTHORITIES ............................................................ x

STATEMENT OF THE CASE ........................................................ xiv

STATEMENT REGARDING ORAL ARGUMENT ........................... xviii

ISSUES PRESENTED .................................................................. xix

I.   Did the trial court misconstrue the numerator and rounding provisions of the Fee Agreement and erroneously order Anglo-Dutch to pay Swonke $306,000 instead of $1,530,000?[1]

II.  Did the trial court err by rendering judgment against— and refusing to render judgment for—Swonke on his attorneys' fees claims?[2]

III. Did the trial court err by rendering judgment against— and refusing to render judgment for—Swonke on his breach of contract claim?[3]

IV.  Did the trial court err by rendering a judgment on prejudgment interest, post-judgment interest, and costs that conflicts with its 2007 Judgment, which remains in force and effect on those issues?[4]

---

[1] This issue attacks judgment decrees 2, 4, 5, 6, and 9 in the 2014 Judgment.

[2] This issue attacks judgment decrees 8, 11, and 12 in the 2014 Judgment.

[3] This issue attacks judgment decree 7 in the 2014 Judgment.

[4] This issue attacks judgment decrees 13, 15, and 16 in the 2014 Judgment.

STATEMENT OF FACTS ........................................................ 1

I.    The Underlying Dispute .................................................. 1

II.   The Trial Court—Part I ................................................ 9

III.  The Fourteenth Court of Appeals .................................. 12

IV.   The Texas Supreme Court ........................................... 15

V.    The Trial Court—Part II ............................................. 17

SUMMARY OF THE ARGUMENT ....................................... 19

ARGUMENT .................................................................... 21

I.    The Trial Court Erred By Misconstruing The
      Numerator And Rounding Provisions Of The Fee
      Agreement, And By Ordering Anglo-Dutch To Pay
      Swonke $306,000 Instead Of $1,530,000 Under The
      Fee Agreement. ......................................................... 21

      A.    Anglo-Dutch Waived The Declarations Regarding
            The Numerator And Rounding Provisions
            Because The Trial Court's 2007 Judgment Denied
            That Relief And That Denial Was Not Appealed. ............. 23

      B.    The Trial Court Misconstrued The Fee
            Agreement By Rewriting Its Plain Language In
            Violation Of The Supreme Court's Opinion. ....................... 26

            1.    The Supreme Court's Opinion Requires
                  Enforcement Of The Unambiguous Fee
                  Agreement As Written. ............................................. 27

                  a.    The Plain Language Of The Fee
                        Agreement Makes Swonke's Hours The
                        Numerator In The Fee Formula. ......................... 28

v

b.   The Plain Language Of The Fee Agreement Requires Rounding Up To The Next Whole Percentage After The Hours Ratio Is Multiplied By 20%. ...................... 29

2.   The Supreme Court's Opinion Prohibits Rewriting The Fee Agreement Or Adding To Its Language. ............................................. 30

a.   The Trial Court Rewrote The Hours Ratio In The Fee Formula At Anglo-Dutch's Request. .................................... 31

b.   The Trial Court Rewrote The Rounding Provision. ............................................. 33

3.   The Supreme Court's Opinion Requires The Fee Agreement To Be Construed As A Reasonable Person In Anglo-Dutch's Circumstances Would Have Construed It, Not As Anglo-Dutch Construes It. ............................ 35

a.   A Reasonable Person In Anglo-Dutch's Circumstances Would Have Recognized That The Numerator Is Swonke's Hours, Not Greenberg Peden's Hours. ................ 35

i.   The Text Of The Fee Agreement Plainly States That The Numerator Of The Hours Ratio Is Swonke's Hours. .......................................... 35

ii.   The Circumstances Surrounding The Execution Of The Fee Agreement Do Not Alter Its Plain Language. .................................... 36

iii. The Post-Fee Agreement Circumstances Do Not Alter The Plain Language Of The Fee Agreement. ...................................... 37

b. A Reasonable Person In Anglo-Dutch's Circumstances Would Have Recognized That The Rounding To The Next Whole Percentage Occurs After, Not Before, Multiplying The Hours Ratio By 20%. ................................ 41

i. The Text Of The Fee Agreement Plainly Shows That The Rounding Occurs After, Not Before, Multiplying The Hours Ratio By 20%. ............................. 41

ii. Neither The Circumstances Surrounding The Execution Of The Fee Agreement Nor Post-Fee Agreement Circumstances Alter Its Plain Language That Requires Rounding After Multiplying The Hours Ratio By 20%. ................................... 42

C. Conclusion ...................................... 42

II. The Trial Court Erred By Rendering Judgment Against—And Refusing To Render Judgment For— Swonke On His Attorneys' Fees Claims. ................................... 44

A. The Trial Court Erred By Granting Summary Judgment Against Swonke On His Attorneys' Fees Claims. ...................................... 46

1.    Anglo-Dutch's Waiver Of All Complaints About The 2007 Judgment's Award Of Attorneys' Fees To Swonke Prohibited The Trial Court From Altering The Award On Remand. .................................................... 47

2.    Alternatively, Even If Not Waived, Anglo-Dutch's Grounds For Summary Judgment On Swonke's Attorneys' Fees Claims Lack Merit. .......................................................... 50

    a.    Notwithstanding The Supreme Court's Opinion, Swonke Had Standing And Capacity To Sue For Breach Of The Fee Agreement. .......................................... 50

    b.    Anglo-Dutch's Grounds For Summary Judgment On Swonke's Claim For Attorneys' Fees Under The Declaratory Judgment Act Lack Merit. .................................. 53

        i.    Swonke May Recover Attorneys' Fees Under The Declaratory Judgment Act Because He Defended Against Anglo-Dutch's Declaratory Judgment Action. .................... 53

        ii.    Swonke's Breach Of Contract Claim Did Not Fail. ................................................ 54

        iii.    Anglo-Dutch Waived Its Complaint That Swonke's Attorneys' Fee Award Was Not Equitable And Just And, In Any Event, The Award Was Equitable And Just. ...................................... 55

B. The Trial Court Erred By Refusing To Render Judgment Of $427,892.50 For Swonke On His Attorneys' Fees Claims. ...................................... 58

III. The Trial Court Erred By Rendering Judgment Against—And Refusing To Render Judgment For—Swonke On His Breach Of Contract Claim. ............................... 62

A. The Trial Court Erred By Granting Summary Judgment To Anglo-Dutch On Swonke's Breach Of Contract Claim. ............................. 62

B. Alternatively, The Trial Court Erred By Refusing To Render Judgment For Swonke On His Breach Of Contract Claim. ............................. 63

IV. The Trial Court Erred By Rendering A Judgment On Prejudgment Interest, Post-Judgment Interest, And Costs That Conflicts With Its 2007 Judgment, Which Remains In Force And Effect On Those Issues. .......................... 69

A. Anglo-Dutch Waived Any Complaints About The Trial Court's 2007 Judgment On Prejudgment Interest, Post-Judgment Interest, And Costs. ................... 69

B. The 2007 Judgment's Awards Of Prejudgment Interest, Post-judgment Interest, And Costs Remain In Force And Effect. ............................. 71

C. The Trial Court Erred By Altering Its Prior Awards Of Prejudgment Interest, Post-judgment Interest, And Costs, And Refusing To Render Judgment Consistent With Its 2007 Judgment. ................. 72

PRAYER ....................................................................................... 73

CERTIFICATE OF COMPLIANCE ................................................... 74

CERTIFICATE OF SERVICE ............................................................ 75

# INDEX OF AUTHORITIES

Cases:

*Allright, Inc. v. Pearson*,
    735 S.W.2d 240 (Tex. 1987) ........................................................ 70

*American Mfrs. Mut. Ins. Co. v. Schaefer*,
    124 S.W.3d 154 (Tex. 2003) .............................................. 30, 31, 33

*Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*,
    193 S.W.3d 87 (Tex. App.—Houston [1st Dist.]
    2007, pet. denied) ...................................................................... 10

*Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*,
    267 S.W.3d 454 (Tex. App.—Houston [14th Dist.]
    2008, *rev'd*, 352 S.W.3d 445 (Tex. 2011) .............................. *passim*

*Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*,
    352 S.W.3d 445 (Tex. 2011) ................................................. *passim*

*Anglo-Dutch Petroleum Int'l, Inc. v. Littlemill Ltd.*,
    No. 14-06-00921-CV, 2007 WL 2826900 (Tex.
    App.—Houston [14th Dist.] Oct. 2, 2007, pet. denied) .................. 10

*Anglo-Dutch Petroleum Int'l, Inc. v. Smith*,
    243 S.W.3d 776 (Tex. App.—Houston [14th Dist.]
    2007, pet. denied) ...................................................................... 10

*Bramlett v. Phillips*,
    359 S.W.3d 304 (Tex. App.—Amarillo 2012, *aff'd*,
    *Phillips v. Bramlett*, 407 S.W.3d. 229 (Tex. 2013) ...... 59, 60, 61, 71

*Brown v. Mesa Distributors, Inc.*,
    414 S.W.3d 279 (Tex. App.—Houston [1st Dist.]
    2013, no pet.) ........................................................................ 51, 53

*City of Temple v. Taylor,*
  268 S.W.3d 852 (Tex. App.—Austin 2008, pet. denied) ............... 48

*Guitar Holding Co., L.P. v. Hudspeth County Underground
  Water Conservation Dist. No. 1,*
  263 S.W.3d 910 (Tex. 2008) ........................... 59, 60, 61, 67, 68, 71

*Hoover Slovaceck, L.L.P. v. Walton,*
  206 S.W.3d 557 (Tex. 2006) ....................................................... 58

*Hudspeth County Underground Water Conservation
  Dist. No. 1 v. Guitar Holding Co., L.P.,*
  355 S.W.3d 428 (Tex. App.—El Paso 2011,
  pet. denied) .................................................. 25, 47, 49, 52, 63, 72

*Jacobs v. Satterwhite,*
  65 S.W.3d 653 (Tex. 2001) ...................................................... 24, 51

*JGR, Inc. v. Thomasville Furniture Indus., Inc.,*
  550 F.3d 529 (6th Cir. 2008) ................................. 49, 67, 68, 72, 73

*Medical Ctr. Pharmacy v. Holder,*
  634 F.3d 830 (5th Cir. 2011) ............................................ 25, 48, 72

*Montemayer v. Ortiz,*
  208 S.W.3d 627 (Tex. App.—Corpus Christi 2006,
  pet. denied) .......................................................................... 54, 58

*Ontiveros v. Flores,*
  218 S.W.3d 70 (Tex. 2007) ...................................................... 24, 51

*Pagosa Oil and Gas, L.L.C. v. Marrs and Smith Partnership,*
  323 S.W.3d 203 (Tex. App.—El Paso 2010, pet. denied) ........ 51, 52

*Phillips v. Bramlett,*
  407 S.W.3d 229 (Tex. 2013) ............................................ 60, 61, 71

*David J. Sacks, P.C. v. Haden,*
266 S.W.3d 447 (Tex. 2008) ............................................. 29, 32, 40

*San Jacinto River Authority v. Duke,*
783 S.W.2d 209 (Tex. 1990) ............................................. 24, 51, 71

*Sims v. Fitzpatrick,*
No. 01-13-00176-CV, 2014 WL 1004410
(Tex. App.—Houston [1st. Dist.] March 13,
2014, pet. denied) ....................................................................... 64

*Southwestern Bell Telephone Co. v. Marketing on Hold, Inc.,*
308 S.W.3d 909 (Tex. 2010) .................................................. 51, 64

*State v. Anderson Courier Serv.,*
222 S.W.3d 62 (Tex. App.—Austin 2005, pet. denied)...... 26, 49, 73

*State v. Biggar,*
873 S.W.2d 11 (Tex. 1994) ......................................... 24, 51, 67, 68

*Thomas v. Bilby-Knight,*
No. 09-03-370CV, 2003 WL 22213590 (Tex. App.—
Beaumont 2003, no pet.) ......................................................... 70-71

*United Resources, L.P. v. Sepco Tubulars, Inc.,*
No. 04-12-00663-CV, 2014 WL 3339537 (Tex.
App.—San Antonio July 9, 2014, no pet.) .................. 25, 48, 49, 72

*Wohlfahrt v. Holloway,* 172 S.W.3d 630 (Tex. App.–
Houston [14th Dist.] 2005, pet. denied) ....................................... 70

**Statutes:**

Restatement (Third) of The Law Governing Lawyers
§ 18(2) (2000) ............................................................................ 35

## Rules:

TEX. R. CIV. P. 301 .......................................................................... 68-69

| | |
|---|---|
| *Nature of the original case:* | Declaratory judgment and breach of fiduciary duty action brought by Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge) L.L.C. (collectively "Anglo-Dutch") against their attorney, Gerard Swonke, and Greenberg Peden, P.C., the law firm to which he was formerly "of counsel." Swonke counterclaimed for a declaratory judgment, breach of contract, and fraud. Swonke also sued Scott Van Dyke, the president of Anglo-Dutch, for fraud. |
| *Original trial court:* | 61st District Court, Harris County, Judge John Donovan |
| *Original jury verdict:* | The jury found that Swonke was, and Greenberg Peden was not, a party to a contingent fee agreement ("Fee Agreement") with Anglo-Dutch, and that Anglo-Dutch breached the Fee Agreement.[5] The jury awarded damages of $1,000,000. The jury also found that Swonke complied with his fiduciary duties to Anglo-Dutch.[6] |
| *Original trial court disposition:* | Judgment rendered for Swonke on the jury's verdict for actual damages, attorneys' fees, pre- and post-judgment interest, and costs of court.[7] |

---

[5] A copy of the Fee Agreement is attached as Appendix A.

[6] A copy of the original jury verdict is attached to the original final judgment which is attached as Appendix B.

[7] A copy of the trial court's January 22, 2007 final judgment ("2007 Judgment") is attached as Appendix B.

| | |
|---|---|
| *Court of Appeals:* | Fourteenth Court of Appeals, panel consisting of Justice Boyce (author), Justice Fowler, and Senior Justice Hudson |
| *COA disposition:* | Affirmed. |
| *COA opinion:* | *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 267 S.W.3d 454 (Tex. App.—Houston [14th Dist.] Aug. 26, 2008, pet. filed) ("*Anglo-Dutch*").[8] |
| *Supreme Court disposition:* | Reversed and remanded to the trial court for further proceedings in accordance with the opinion. |
| *Supreme Court opinion:* | *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445 (Tex. 2011).[9] |
| *Nature of the case on remand:* | Declaratory judgment and breach of contract action regarding the fee owed under the Fee Agreement. |
| *Trial court on remand:* | 61st District Court, Harris County, Judge Al Bennett |
| *Course of proceedings on remand:* | The trial court construed the Fee Agreement as a matter of law and applied those rulings to stipulated facts.[10] The trial court also granted an interlocutory summary judgment against Swonke |

---

[8] A copy of *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 267 S.W.3d 454 (Tex. App.—Houston [14th Dist.] Aug. 26, 2008), *rev'd*, 352 S.W.3d 445 (Tex. 2011) is attached as Appendix C.

[9] A copy of *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445 (Tex. 2011) is attached as Appendix D.

on his claims for breach of contract, declaratory judgment, and attorneys' fees.[11]  Finally, the trial court held a jury trial on Anglo-Dutch's claims for trial, appellate, and post-remand attorneys' fees and costs.[12]

*Jury verdict on remand:* The jury found that Anglo-Dutch's reasonable and necessary attorneys' fees and costs for trial, appellate, and post-remand work was "$0" with two exceptions.  1 CR 957-968.  The jury found that a reasonable fee for the necessary services of Anglo-Dutch's attorneys for the prior appeal to the Supreme Court of Texas was $50,000.  1 CR 962.  The jury also found that reasonable and necessary costs for the appeals to this Court and the Texas Supreme Court was $12,000.  1 CR 965.

*Trial court disposition on remand:* The trial court rendered declaratory judgments construing the Fee Agreement in favor of Anglo-Dutch and awarded Anglo-Dutch court costs.  The trial court also rendered a take-nothing judgment against Swonke on his claims for breach of contract, declaratory judgment, and attorneys' fees.  The trial court rendered judgment for Swonke and against Anglo-Dutch for $306,000, plus pre- and post-judgment interest.  The trial court disregarded the two jury findings in favor of Anglo-Dutch and rendered a take-nothing

---

[10] A copy of the trial court's order construing the Fee Agreement as a matter of law and applying that construction to stipulated facts is attached as Appendix E.

[11] A copy of the trial court's order granting interlocutory summary judgment against Swonke on his claims for breach of contract, declaratory judgment, and attorneys' fees is attached as Appendix F.

[12] A copy of the jury verdict in the second trial is attached to the trial court's final judgment which is attached as Appendix G.

judgment against Anglo-Dutch on its claims for trial, appellate, and post-remand attorneys' fees.[13]

---

[13] A copy of the trial court's May 13, 2014 judgment ("2014 Judgment") is attached as Appendix G.

# STATEMENT REGARDING ORAL ARGUMENT

The cross-appellants request oral argument. The lengthy procedural history of this case and numerous defects in the judgment may be better explored with the parties' advocates available to address the Court's questions that are sure to arise in this complex case.

# ISSUES PRESENTED

I.    Did the trial court misconstrue the numerator and rounding provisions of the Fee Agreement and erroneously order Anglo-Dutch to pay Swonke $306,000 instead of $1,530,000?[14]

II.   Did the trial court err by rendering judgment against—and refusing to render judgment for—Swonke on his attorneys' fees claims?[15]

III.  Did the trial court err by rendering judgment against—and refusing to render judgment for—Swonke on his breach of contract claim?[16]

V.    Did the trial court err by rendering a judgment on prejudgment interest, post-judgment interest, and costs that conflicts with its 2007 Judgment, which remains in force and effect on those issues?[17]

---

[14] This issue attacks judgment decrees 2(1), 4, 5, 6, and 9 in the 2014 Judgment.

[15] This issue attacks judgment decrees 8, 11, and 12 in the 2014 Judgment.

[16] This issue attacks judgment decree 7 in the 2014 Judgment.

[17] This issue attacks judgment decrees 13, 15, and 16 in the 2014 Judgment.

## STATEMENT OF FACTS

### I.    The Underlying Dispute

Gerard Swonke has been a lawyer for 41-years who was "of counsel" to Greenberg Peden, P.C. or its predecessor from 1987 until November 2001.  1 CR 248-250, 1 CR 258.  Scott Van Dyke worked for Van Dyke Energy Company (later Vanco Energy Company), his father's oil company, where he spent 50% of his time negotiating and preparing contracts.  Swonke first met Van Dyke in 1987 through Van Dyke's father.  1 CR 251-253.  Soon thereafter, Swonke began to represent Van Dyke's father's company.  1 CR 253.

In 1989, Van Dyke and his mother formed Anglo-Dutch Petroleum International, Inc., an exploration company.  1 CR 168-171.  Van Dyke served as its president.  1 CR 185-186.  Beginning in 1993, Van Dyke became the chief architect and negotiator of an elaborate limited liability agreement that brought together disparate investor interests from several countries to pursue a license in Kazakhstan for the development of the Tenge oil and gas field.  1 CR 230, 257.  Swonke drafted the formal documents and obtained the assistance of Skip Naylor, a Greenberg Peden shareholder, to help document the

1

transaction. 1 CR 231, 257. Anglo-Dutch (Tenge) L.L.C. was the entity formed to complete the transaction. *See* 1 CR 231.

In 1997, Swonke negotiated and drafted confidentiality agreements that Halliburton and Ramco executed in order to view Anglo-Dutch's confidential data regarding the Tenge field to assess a proposed buyout of Anglo-Dutch's existing partners. 1 CR 172-175. In February 2000, Anglo-Dutch requested that Swonke examine the viability of a potential lawsuit against Halliburton and Ramco for breaching the confidentiality agreements. 1 CR 187, 260-261. Swonke concluded a lawsuit was viable and so advised Anglo-Dutch. 1 CR 188, 262.

Although Anglo-Dutch wished to pursue the lawsuit, it did not have the financial resources to do so on an hourly basis. 1 CR 176. Anglo-Dutch owed Greenberg Peden a large sum of money. 1 CR 221. For that reason, Greenberg Peden previously had decided and told Van Dyke that it would no longer represent Anglo-Dutch in any matters. 1 CR 208-209, 225-226, 258-259, 232-234. Nevertheless, as required under Swonke's "of counsel" agreement with Greenberg Peden, Swonke first approached Greenberg Peden and asked if it would represent

Anglo-Dutch against Halliburton and Ramco. 1 CR 232-233, 217, 235 ¶ 8. Greenberg Peden flatly refused. 1 CR 218-220, 222-226, 232-233, 235, 237-238, 241-242. Swonke and David Peden, a named shareholder of Greenberg Peden, both informed Van Dyke that Greenberg Peden would not represent it against Halliburton and Ramco, a fact even Van Dyke concedes. 1 CR 188, 208-209, 225-226, 233, 237-238, 241-243.

Swonke then referred the case to McConn & Williams without seeking a referral fee. 1 CR 263. McConn & Williams signed a fee agreement with Anglo-Dutch on March 25, 2000 and filed *Anglo-Dutch (Tenge) L.L.C., et al. v. Ramco Oil & Gas, Ltd., et al.;* in the 61st Judicial District Court of Harris County, Texas, Cause No. 2000-22588 ("Halliburton Lawsuit") on May 2, 2000. 1 CR 318-325, 177-178. McConn & Williams later associated with John O'Quinn to try the case. 1 CR 236.

After Anglo-Dutch hired McConn & Williams, Van Dyke and McConn & Williams' lawyers frequently asked Swonke for advice and to perform tasks on the Halliburton Lawsuit even though at that time Swonke had no agreement with Anglo-Dutch or McConn & Williams by which he would be paid for his efforts. 1 CR 264-266. After several

3

months of such requests, Swonke finally concluded that he had to be compensated if he was going to continue to work on the Halliburton Lawsuit. 1 CR 266.

Van Dyke called Swonke and specifically asked to retain him, not Greenberg Peden, to work on the Halliburton Lawsuit on a contingent fee because he could not afford to pay Swonke by the hour. 1 CR 267-268. Van Dyke suggested a contingency fee based on a formula. 1 CR 268. Swonke and Anglo-Dutch agreed to Van Dyke's terms, which Swonke dictated into a Dictaphone. 1 CR 269-271. Swonke then asked his secretary to transcribe his dictation and finalize the document. 1 CR 272.

The body of the Fee Agreement never mentions Greenberg Peden. 1 CR 312. Instead, the body of the Fee Agreement exclusively uses the personal pronouns "I", "me", and "my" twelve times in a nine-sentence contract to refer to Swonke, individually, and his rights and obligations under the Fee Agreement. 1 CR 312-313.

Swonke's secretary inadvertently put the Fee Agreement on Greenberg Peden letterhead and inserted "GREENBERG PEDEN, P.C." into the signature block. 1 CR 272. Swonke then signed the Fee

Agreement on October 16, 2000, never noticing the references to Greenberg Peden in the letterhead and in the signature block. 1 CR 273, 312. Van Dyke signed the Fee Agreement the next day for Anglo-Dutch. 1 CR 313.

Swonke had no intention to, did not, and could not—because of Greenberg Peden's prohibition on doing work for Anglo-Dutch—act for Greenberg Peden by signing the Fee Agreement. 1 CR 207. Instead, Swonke signed the contract for himself individually. 1 CR 282. Swonke has never signed a contingency fee contract on behalf of Greenberg Peden. 1 CR 215. Indeed, when Greenberg Peden signs a contingency fee contract with a client, a Greenberg Peden attorney executes the fee agreement. 1 CR 211. Greenberg Peden had flatly refused to represent Anglo-Dutch in the Halliburton Lawsuit and told Van Dyke so—thus, Swonke had no authority to sign the Fee Agreement on behalf of Greenberg Peden, a fact known by Van Dyke. 1 CR 188, 208-209, 218-220, 222-226, 232-233, 235, 237-238, 241-243. Naylor, Greenberg Peden's managing shareholder, agreed that Swonke did not execute the Fee Agreement on behalf of Greenberg Peden. 1 CR 239-240.

5

After signing the Fee Agreement, Swonke worked on the Halliburton Lawsuit for 277 hours while physically present at Greenberg Peden's offices. 1 CR 216. On October 26, 2001, Swonke became "of counsel" to McConn & Williams. 1 CR 347-350. Swonke informed Anglo-Dutch that he was taking its files, including the Halliburton Lawsuit, with him to his "of counsel" position at McConn & Williams unless Anglo-Dutch objected. 1 CR 354. Anglo-Dutch did not object. 1 CR 193-194. Because Swonke was to be compensated for his work on the Halliburton Lawsuit under the Fee Agreement, Swonke's "of counsel" agreement with McConn & Williams provided that McConn & Williams would not share any fees with Swonke that it derived from the Halliburton Lawsuit. *See* 1 CR 349. With Anglo-Dutch's knowledge, Swonke then worked 1,022 hours on the Halliburton Lawsuit while "of counsel" at McConn & Williams. 1 CR 206.

On May 7, 2002, six months after Van Dyke learned that Swonke had physically left Greenberg Peden to become "of counsel" to McConn & Williams, Van Dyke was deposed in the Halliburton Lawsuit. Van Dyke expressly testified that Anglo-Dutch had a fee agreement with Swonke. 1 CR 195, 247. Van Dyke did not remotely suggest during his

6

deposition that Anglo-Dutch had a fee agreement with Greenberg Peden. 1 CR 195.

The jury in the Halliburton Lawsuit rendered a $70,500,000 verdict for Anglo-Dutch against Halliburton and Ramco. 1 CR 179. Halliburton and Ramco then stipulated that Anglo-Dutch incurred reasonable and necessary attorneys' fees of $9,800,000. 1 CR 192. The attorneys' time for which Anglo-Dutch recovered attorneys' fees included the 1,022 hours that Swonke worked on the Halliburton Lawsuit while "of counsel" to McConn & Williams. 1 CR 204, 216.

Anglo-Dutch eventually settled with Halliburton for $51,000,000 on April 1, 2004, and Halliburton funded the settlement on April 15, 2004. 1 CR 180, 378. During this period, Swonke repeatedly emailed Van Dyke about the calculation of his fee, directed Van Dyke's attention to the fact that Swonke's wiring instructions were not included with those of other attorneys who received their fees directly from Halliburton, and asked Van Dyke to promptly address "my contract." 1 CR 364, 368, 373, 383. Van Dyke never suggested in response to these communications that he believed Swonke was not a party to the Fee Agreement. *See* 1 CR 205, 279. Instead, Van Dyke expressed concern

7

that Greenberg Peden may make a claim for a fee because the Fee Agreement was on Greenberg Peden letterhead. To address Van Dyke's concern and at his request, on April 16, 2004, before this lawsuit was filed, Swonke obtained an assignment from Greenberg Peden of any rights it had under the Fee Agreement. *See* 1 CR 385.

On April 20, 2004, Van Dyke met with a lawyer and discussed issues related to Swonke. 1 CR 183. On April 22, 2004, Swonke met with Van Dyke and, for the first time, Van Dyke asserted that the Fee Agreement is between Anglo-Dutch and Greenberg Peden, shocking Swonke. 1 CR 274-275, 280. Swonke left the meeting, telling Van Dyke "I can't believe you're going to do this to me and my family." 1 CR 281. Several hours later, Anglo-Dutch sued Swonke, asserting that Anglo-Dutch's Fee Agreement was with Greenberg Peden, not Swonke. 1 CR 286.

Like it did with Swonke's Fee Agreement, Anglo-Dutch also attempted to avoid numerous other contracts that required it to share the settlement from the Halliburton Lawsuit. For example, Anglo-Dutch executed 33 contracts that would have required it to pay approximately $11,000,000 of the settlement to investors in the

Halliburton Lawsuit. 1 CR 196-199. However, Van Dyke did not pay any of the investors the amount they contracted for, thereby saving $4-5 million. 1 CR 198, 200. Like Swonke, at least eight of the investors successfully sued Anglo-Dutch for breach of contract. *See, e.g., Anglo-Dutch Petroleum Int'l, Inc. v. Smith*, 243 S.W.3d 776 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *Anglo-Dutch Petroleum Int'l, Inc. v. Littlemill Ltd.*, No. 14-06-00921-CV, 2007 WL 2826900 (Tex. App.—Houston [14th Dist.] Oct. 2, 2007, pet. denied); *Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

## II. The Trial Court—Part I

Anglo-Dutch sued Swonke and Greenberg Peden for a declaratory judgment, negligence, gross negligence, fraud, and breach of fiduciary duty. 1 CR 286-290. Anglo-Dutch sought the following seven declarations regarding the Fee Agreement:

- the Fee Agreement is between Anglo-Dutch and Greenberg Peden, and not between Anglo-Dutch and Swonke, individually;

- Greenberg Peden's April 16, 2004 assignment of its rights and interest in the Fee Agreement to Swonke is illegal and unenforceable against Anglo-Dutch;

9

- the numerator in the hours ratio in the fee formula in the Fee Agreement is the hours Greenberg Peden worked on the Halliburton Lawsuit and does not include the hours Swonke worked on the Halliburton Lawsuit while of counsel to McConn & Williams;

- the hours Swonke worked on the Halliburton Lawsuit while of counsel to McConn & Williams are included in the denominator in the fee formula in the Fee Agreement;

- the rounding up to the next whole percentage that is required by the Fee Agreement occurs after the hours ratio is determined and before, not after, the hours ratio is multiplied by 20%.

- the contingency fee owed under the Fee Agreement shall remain in direct correlation to McConn & Williams' contingency fee percentage—whether the McConn & Williams contingency fee percentage increases or decreases; and

- neither Swonke nor Greenberg Peden can recover any contingency fee under the Fee Agreement from any future recovery against Ramco.

*See* 1 CR 286-287. In addition, Anglo-Dutch sought fee forfeiture, actual damages, exemplary damages, and attorneys' fees. 1 CR SUPP 114. Swonke counterclaimed for a declaratory judgment, for breach of contract against Anglo-Dutch, and for fraud against both Anglo-Dutch and Van Dyke. 1 CR 293-294. Swonke sought actual damages and attorneys' fees. 1 CR SUPP 100.

After two weeks of testimony, the jury found in response to Question 1 that the Fee Agreement with Anglo-Dutch was entered into on behalf of Swonke, individually, and not on behalf of Greenberg Peden. *See* 1 CR 303. In response to Question 2, the jury found that Anglo-Dutch breached the Fee Agreement. 1 CR 304. The jury found in response to Question 3 that $1,000,000 would fairly and reasonably compensate Swonke for his damages that resulted from Anglo-Dutch's breach of the Fee Agreement. 1 CR 305. In response to Question 5, the jury found that Swonke complied with his fiduciary duty to Anglo-Dutch. 1 CR 306. Finally, the jury found in response to Question 9 that Van Dyke did not commit fraud against Swonke. 1 CR 307.

The trial court rendered judgment on the jury's verdict on January 22, 2007 (the "2007 Judgment"). 1 CR 298. That judgment ordered Anglo-Dutch to take nothing from Swonke and Greenberg Peden. 1 CR 298. The judgment also ordered Anglo-Dutch to pay Swonke $1,000,000 and prejudgment interest on that amount of $226,924.50. 1 CR 299. Finally, the judgment also ordered Anglo-Dutch to pay Swonke the following attorneys' fees for the prosecution of his breach of contract and declaratory judgment claims, and his defense

11

of Anglo-Dutch's declaratory judgment claims: $352,892.50 for trial; $75,000 if Anglo-Dutch unsuccessfully appealed to the court of appeals; and $50,000 if Anglo-Dutch unsuccessfully appealed to the Texas Supreme Court. 1 CR 299.

## III.   The Fourteenth Court of Appeals

On appeal to this Court, Anglo-Dutch complained only that: (1) the Fee Agreement was unambiguously between Anglo-Dutch and Greenberg Peden, and should have been construed that way as a matter of law; (2) any ambiguity in the Fee Agreement should have been construed against Swonke; (3) the evidence was legally and factually insufficient to support the jury's finding in Question 1 that the Fee Agreement with Anglo-Dutch was entered into on behalf of Swonke, individually, and not on behalf of Greenberg Peden; (4) the evidence was legally and factually insufficient to support the jury's finding in Question 5 that Swonke complied with his fiduciary duty; (5) the trial court erroneously instructed the jury; and (6) the trial court erroneously admitted evidence. *See Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*, 267 S.W.3d 454, 464 (Tex. App.—Houston [14th Dist.] 2008); 1 CR SUPP 124-183.

12

Anglo-Dutch did **not** complain in this Court about the trial court's take-nothing judgment rejecting Anglo-Dutch's request for the following declarations, among others:

- the numerator in the hours ratio in the fee formula in the Fee Agreement is the hours Greenberg Peden worked on the Halliburton Lawsuit and does not include the hours Swonke worked on the Halliburton Lawsuit while of counsel to McConn & Williams; and

- the rounding up to the next whole percentage that is required by the Fee Agreement occurs after the hours ratio is determined and before, not after, the hours ratio is multiplied by 20%.

1 CR SUPP 124-183.

Finally, Anglo-Dutch did **not** attack in this Court: (1) the jury's finding in Question 2 that Anglo-Dutch breached the Fee Agreement; (2) the jury's finding in Question 3 that $1,000,000 would fairly and reasonably compensate Swonke for his damages resulting from Anglo-Dutch's breach of the Fee Agreement; (3) the trial court's award of $226,924.50 in prejudgment interest; (4) the trial court's award of attorneys' fees to Swonke; (5) the trial court's finding that an award of attorneys' fees to Anglo-Dutch would not be equitable or just; (6) the trial court's award of court costs to Swonke and Greenberg Peden; or (7) the trial court's award of post-judgment interest at 8.25%, compounded

annually, from the date of the judgment until paid. 1 CR SUPP 124-183; *Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*, 267 S.W.3d 454, 464 n.5 (Tex. App.—Houston [14th Dist.] 2008), *rev'd*, 352 S.W.3d 445 (Tex. 2011) ("Anglo-Dutch does not challenge on appeal the jury's finding that it breached the fee agreement; the amount of contract damages awarded for that breach; or the separate statutory fee award for litigating Swonke's contract claim under the disputed fee agreement, which the parties opted to try to the Court. Anglo-Dutch also does not challenge the rendition of a take-nothing judgment in favor of Greenberg Peden.").

This Court unanimously affirmed the trial court's judgment. *See Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*, 267 S.W.3d 454 (Tex. App.—Houston [14th Dist.] 2008), *rev'd*, 352 S.W.3d 445 (Tex. 2011). 1 CR SUPP 8-52. Specifically, this Court stated:

> We hold that the October 16, 2000 fee agreement was ambiguous with respect to whether Anglo–Dutch contracted with Swonke individually or with Greenberg Peden. The trial court properly refused to construe the ambiguous fee agreement against Swonke and properly submitted this issue to the jury. Legally and factually sufficient evidence supports the jury's finding that Swonke individually is a party to the fee agreement with Anglo–Dutch, and that Greenberg Peden is not. Legally and factually sufficient evidence supports the jury's finding that Swonke complied

14

with his fiduciary duty to Anglo–Dutch. Anglo–Dutch's charge and evidentiary complaints provide no basis for reversal. We affirm the trial court's judgment.

*See* 1 CR SUPP 52.

## IV. The Texas Supreme Court

In the Texas Supreme Court, Anglo-Dutch complained only that: (1) the Fee Agreement was unambiguously between Anglo-Dutch and Greenberg Peden; (2) any ambiguity in the Fee Agreement should be construed against Swonke; and (3) the trial court erroneously instructed the jury. *See* 1 CR SUPP 226-269.

Anglo-Dutch did **not** complain in the Texas Supreme Court about the trial court's take-nothing judgment rejecting Anglo-Dutch's request for the following declarations, among others:

- the numerator in the hours ratio in the fee formula in the Fee Agreement is the hours Greenberg Peden worked on the Halliburton Lawsuit and does not include the hours Swonke worked on the Halliburton Lawsuit while of counsel to McConn & Williams; and

- the rounding up to the next whole percentage that is required by the Fee Agreement occurs after the hours ratio is determined and before, not after, the hours ratio is multiplied by 20%.

1 CR SUPP 134-183.

Moreover, Anglo-Dutch did not challenge in the Texas Supreme Court: (1) the jury's finding in Question 2 that Anglo-Dutch breached the Fee Agreement; (2) the jury's finding in Question 3 that $1,000,000 would fairly and reasonably compensate Swonke for his damages resulting from Anglo-Dutch's breach of the Fee Agreement; (3) the trial court's award of $226,924.50 in prejudgment interest; (4) the trial court's award of attorneys' fees to Swonke; (5) the trial court's conclusion that an award of attorneys' fees to Anglo-Dutch would not be equitable or just; (6) the trial court's award of court costs to Swonke and Greenberg Peden; or (7) the trial court's award of post-judgment interest at 8.25% on the award, compounded annually, from the date of the judgment until paid. *See* 1 CR SUPP 197-213; 1 CR SUPP 226-296.

In a 5-4 decision, the Texas Supreme Court held that the Fee Agreement was unambiguously between Anglo-Dutch and Greenberg Peden. *See Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 453 (Tex. 2011). The Texas Supreme Court's opinion states: "The judgment of the court of appeals is reversed, and the case is remanded to the trial court for further proceedings." *Id.*

## V. The Trial Court—Part II

Upon remand, the trial court declared as a matter of law, among other declarations, that: (1) the rounding up to the next whole percentage that is required by the Fee Agreement occurs before the hours ratio is multiplied by 20%; (2) the numerator in the fee formula is the hours Greenberg Peden spent on the Halliburton Lawsuit; and (3) Anglo-Dutch owed Swonke $306,000 under the Fee Agreement. 1 CR 524-525.

The trial court also rendered an interlocutory summary judgment ordering, among other things, that: (1) Swonke take nothing on his breach of contract counterclaim; (2) Swonke take nothing on his request for attorneys' fees under chapter 38 of the Texas Civil Practice and Remedies Code; (3) Swonke take nothing on his declaratory judgment counterclaim; and (4) Swonke is precluded from recovering attorneys' fees under section 37.009 of the Texas Civil Practice and Remedies Code. 1 CR 668-669.

Finally, the Court held a three-day jury trial on the issues of Anglo-Dutch's trial, appellate, and post-remand attorneys' fees and costs. 1 CR 1302. The jury answered "$0" nine times in response to

17

eleven subquestions in the jury charge. 1 CR 1309-1314. However, the jury also found that $50,000 was a reasonable fee for the necessary services of Anglo-Dutch's attorneys for representation for the prior appeal to the Texas Supreme Court and that $12,000 was the reasonable and necessary costs that Anglo-Dutch incurred in its appeal to this Court and the Texas Supreme Court. 1 CR 1311, 1314. The trial court granted Swonke's motion to disregard the jury's findings on those two questions and also ruled that an award of attorneys' fees or costs to Anglo-Dutch would not be equitable or just. 1 CR 1302.

## SUMMARY OF THE ARGUMENT

Eleven years ago, Anglo-Dutch settled a lawsuit for $51,000,000 and then refused to pay one of its lawyers, Swonke, the amount it had agreed to pay him. Adding insult to injury, Anglo-Dutch then sued Swonke. Thus began this litigation odyssey.

A jury, a trial court (now Fourteenth Court of Appeals) judge, three court of appeals justices, and four Texas Supreme Court justices found that the parties' Fee Agreement was between Anglo-Dutch and Swonke. However, five justices on the Texas Supreme Court held that—notwithstanding Greenberg Peden's express refusal to represent Anglo-Dutch, and Van Dyke's testimony that Anglo-Dutch had a fee agreement with Swonke—the Fee Agreement was between Anglo-Dutch and Greenberg Peden, not Swonke, as a matter of law.

On remand, Anglo-Dutch treated the Supreme Court's declaration regarding the parties to the Fee Agreement as a panacea despite its insignificance. Although the Supreme Court did not address or decide how much money was owed under the Fee Agreement because Anglo-Dutch did not appeal the take-nothing judgment on the declarations that would have presented that issue, at Anglo-Dutch's invitation the

19

trial court literally rewrote the Fee Agreement in contravention of its plain language and the Supreme Court's opinion. The trial court's mistaken construction of the Fee Agreement resulted in a judgment for Swonke of $306,000 instead of the $1,530,000 the parties agreed he would be paid.

The remainder of the trial court's errors on remand resulted primarily from its failure to acknowledge and apply a fundamental rule of appellate practice: issues decided in a judgment that are not appealed are waived and not remanded for a second bite at the apple, even if the judgment is reversed and the case is remanded. In other words, a trial court errs by rendering a judgment on remand that alters its own or a higher court's prior judgment on an issue that was not appealed because the waived judgment on the issue remains in force and effect. This waiver doctrine serves judicial economy by forcing parties to raise issues whose resolution might spare the courts and parties successive rounds of remands and appeals.

The trial court ran afoul of the waiver doctrine by rendering declarations on remand which had previously been sought, refused by the 2007 Judgment, and not appealed. Similarly, the trial court

awarded Swonke attorneys' fees, pre- and post-judgment interest, and costs in its 2007 Judgment that were not appealed. Nevertheless, the trial court erroneously eliminated or altered those awards on remand.

Despite the trial court's errors, Swonke had decided to forego an appeal to allow this litigation to end until forced to cross-appeal by Anglo-Dutch's perfection of its appeal. A proper construction of the Fee Agreement and application of the waiver doctrine will allow a lawyer who helped enrich his client to get paid the agreed amount for his services and end this litigation once and for all.

## ARGUMENT

I. The Trial Court Erred By Misconstruing The Numerator And Rounding Provisions Of The Fee Agreement, And By Ordering Anglo-Dutch To Pay Swonke $306,000 Instead Of $1,530,000 Under The Fee Agreement.

On remand, the trial court construed the Fee Agreement as a matter of law and ruled, among other things, that: (1) the numerator in the fee formula is the hours Greenberg Peden spent on the Halliburton Lawsuit, and does not include the hours Swonke worked on the Halliburton Lawsuit while of counsel to McConn & Williams; and (2) the rounding up to the next whole percentage that is required by the Fee Agreement occurs after the hours ratio is determined and before,

21

not after, the hours ratio is multiplied by 20%. *See* 1 CR 524-525; 1 CR 1303. The trial court then applied its rulings in light of the parties' stipulations that: (a) Anglo-Dutch's gross recovery in the Halliburton Lawsuit was $51,000,000, (b) Swonke worked on the Halliburton Lawsuit for 277 hours while of counsel to Greenberg Peden; and (c) McConn & Williams' attorneys, and Swonke while of counsel to McConn & Williams, worked on the Halliburton Lawsuit for a total of 11,652 hours. *See* 1 CR 524-525; 1 CR 1303-1304.

Based on its construction of the Fee Agreement and the parties' stipulations, the trial court rendered judgment: (A) declaring the numerator in the fee formula to be Greenberg Peden's hours and not Swonke's hours; (B) declaring that the rounding up required by the Fee Agreement occurs before the hours ratio is multiplied by 20%; and (C) ordering Anglo-Dutch to pay Swonke $306,000 under the Fee Agreement. *See* 1 CR 525; 1 CR 1303-1304. As shown below, the trial court erred by rendering judgment on Anglo-Dutch's requested numerator and rounding declarations because Anglo-Dutch waived any entitlement to the declarations and, in any event, the declarations misconstrue the Fee Agreement by rewriting its plain language in

violation of the Supreme Court's opinion. These mistakes resulted in the rendition of an incorrect judgment ordering Anglo-Dutch to pay Swonke $306,000 instead of $1,530,000 under the Fee Agreement.

## A. Anglo-Dutch Waived The Declarations Regarding The Numerator And Rounding Provisions Because The Trial Court's 2007 Judgment Denied That Relief And That Denial Was Not Appealed.

The trial court decreed in its final judgment: "As requested in Plaintiffs' First Amended Petition at 7 ¶ 23(c), the Court DECLARES that . . . the numerator in the hours ratio in the fee formula in the Fee Agreement is the hours Greenberg Peden worked on the Halliburton Lawsuit and does not include the hours Swonke worked on the Halliburton Lawsuit while of counsel to McConn & Williams . . . ." 1 CR 1303 ¶ 2. The trial court also decreed in its final judgment: "As requested in Plaintiffs' First Amended Petition at 7-8 ¶ 23(d), the Court DECLARES that the rounding up to the next whole percentage that is required by the Fee Agreement occurs after the hours ratio is determined [and] before, not after, the hours ratio is multiplied by 20%." *See* 1 CR 1303 ¶ 4.

However, Anglo-Dutch sought these same declarations in the first trial, 1 CR SUPP 110-111 ¶¶ 23(c), 23(d), the trial court rendered a

take-nothing judgment on these requested declarations in its 2007 Judgment, 1 CR SUPP 120, and Anglo-Dutch did not complain about the take-nothing judgment on these declaratory judgment claims in its appeal to this Court or the Texas Supreme Court. 1 CR SUPP 124-183, 185-214, 216-269.

Consequently, Anglo-Dutch waived its claims seeking these declarations. *See Ontiveros v. Flores*, 218 S.W.3d 70, 71 (Tex. 2007) (holding that a party waived any error as to claims by not complaining on appeal about the summary judgment on those claims); *Jacobs v. Satterwhite*, 65 S.W.3d 653, 655-56 (Tex. 2001) (holding that a party waived any error as to a claim by not complaining on appeal about the summary judgment on the claim); *State v. Biggar*, 873 S.W.2d 11, 14-15 (Tex. 1994) (holding that a party waived all complaints about a damage awarded affirmed by the court of appeals by not complaining in the Texas Supreme Court about the damage award); *San Jacinto River Authority v. Duke*, 783 S.W.2d 209, 209-210 (Tex. 1990) (stating that it is a "well-established rule that grounds of error not asserted by points of error or argument in the court of appeals are waived).

Anglo-Dutch's waiver of all complaints about the take-nothing judgment on its numerator and rounding declarations prohibited the trial court from reversing on remand its prior take-nothing judgment on those requested declarations.[18] *See Medical Ctr. Pharmacy*, 634 F.3d at 834 (holding that the district court erred by reversing on remand its prior ruling granting declaratory relief which had been waived on appeal); *United Resources, L.P. v. Sepco Tubulars, Inc.*, No. 04-12-00663-CV, 2014 WL 3339537, at *3 (Tex. App.—San Antonio July 9, 2014, no pet.) (holding that the trial court erred on remand by modifying its prior take-nothing judgment on cross-claims because no party had attacked that part of the trial court's judgment in an earlier appeal); *Hudspeth County Underground Water Conservation Dist. No. 1 v. Guitar Holding Co., L.P.*, 355 S.W.3d 428, 434-35 (Tex. App.—El Paso 2011, no pet.) (holding that the trial court erred on remand by making a finding on prevailing-party status for attorneys' fees purposes

---

[18] This rule is called the waiver doctrine. "[T]he waiver doctrine . . . holds that an issue that could have been but was not raised on appeal is forfeited and may not be revisited by the district court on remand." *Medical Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011). "The waiver doctrine . . . serves judicial economy by forcing parties to raise issues whose resolution might spare the court and parties later rounds of remands and appeals." *Medical Ctr. Pharmacy*, 634 F.3d at 834 (quotes omitted). "[I]t arises as a consequence of a party's inaction, not as a consequence of a decision on [the court of appeals] part." *Id.*

that conflicted with the court of appeals' prior decision on the issue which had been waived on appeal to the Texas Supreme Court); *State v. Anderson Courier Serv.*, 222 S.W.3d 62, 66-67 (Tex. App.—Austin 2005, pet. denied) (holding that the trial court erred by awarding attorneys' fees under the declaratory judgment act on remand when any complaint that the trial court's original judgment failed to award attorneys' fees was waived on appeal).

Because Anglo-Dutch waived any complaint about the prior take-nothing judgment on its requested numerator and rounding declarations by not appealing that judgment, and Anglo-Dutch's waiver prohibited the trial court from reversing the take-nothing judgment on remand, the trial court erred by rendering judgment declaring that the numerator in the fee formula is Greenberg Peden's hours and that the rounding up required by the Fee Agreement occurs after the hours ratio is multiplied by 20%.

### B. The Trial Court Misconstrued The Fee Agreement By Rewriting Its Plain Language In Violation Of The Supreme Court's Opinion.

Even if not waived, the trial court's numerator and rounding declarations, and its order that Anglo-Dutch pay $306,000 instead of

26

$1,530,000, are erroneous because the trial court misconstrued the Fee Agreement by rewriting its plain language in violation of the Supreme Court's opinion. In *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 452-53 (Tex. 2011), the Supreme Court did not directly address how much Anglo-Dutch owes under the Fee Agreement largely because Anglo-Dutch did not appeal the take-nothing judgment on its numerator and rounding declarations. However, the Supreme Court discussed interpretive principles which, when applied, compel rejection of the trial court's rulings that: the numerator in the fee formula is Greenberg Peden's hours; the rounding up to the next whole percentage occurs before the hours ratio is multiplied by 20%; and Anglo-Dutch owes Swonke $306,000 instead of $1,530,000 under the Fee Agreement.

1.    **The Supreme Court's Opinion Requires Enforcement Of The Unambiguous Fee Agreement As Written.**

The Texas Supreme Court concluded that the Fee Agreement was unambiguous. *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 452 ("Given our conclusion that the agreement was not ambiguous . . . ."). The Supreme Court also required the Fee Agreement to be enforced as

27

written. *See id.* ("An unambiguous contract will be enforced as written .

. . .").

a. The Plain Language Of The Fee Agreement
Makes Swonke's Hours The Numerator In The
Fee Formula.

As written, the unambiguous Fee Agreement twice states that the

numerator in the hours ratio in the fee formula is Swonke's hours,

without any location-dependent limitation or restriction on those hours:

- "[T]he proportions under which my fees shall be calculated will be **the ratio of the hours <u>I</u> have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend** after the date the lawsuit was filed. . . ." (emphasis added);

- For example, if McConn & Williams' attorneys spend 1,000 hours on the lawsuit after the date the lawsuit was filed and **I spend 90 hours of <u>my</u> <u>time</u>** towards the lawsuit, then by rounding up to the nearest whole number, I would be entitled to receive from you 2% (10% of 20%) of the gross revenues and other benefits recovered, if any, from this lawsuit.

1 CR 312.

The Supreme Court confirmed this plain language interpretation

of the Fee Agreement by expressly recognizing that the numerator in

the hours ratio is Swonke's hours:

> Since the fee was contingent on recovery and therefore not
> based on any attorney's hourly rate, it would presumably

28

make no difference to Anglo-Dutch who besides Swonke worked on the case **as long as the fee was computed on <u>his hours</u>**. . . . Nor does the fee calculation, **<u>based solely on the hours Swonke spent individually</u>**, suggest that others at Greenberg Peden were excluded from the work. Taking **<u>Swonke's time</u>** into account provided a way of limiting the fee.

*Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 452 (emphasis added).

For these reasons, the numerator in the hours ratio is the 1,299 hours Swonke worked on the Halliburton Lawsuit. *See id.*; *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450-51 (Tex. 2008) (enforcing the plain language of an unambiguous attorneys' fee agreement and refusing to impose a limitation on fees not expressed in the agreement).

> b. **The Plain Language Of The Fee Agreement Requires Rounding Up To The Next Whole Percentage After The Hours Ratio Is Multiplied By 20%.**

As written, the unambiguous Fee Agreement also states that the fee is a proportion of 20%, rounded up to the next whole percentage:

> I agree to assist Anglo–Dutch and that firm with this lawsuit for proportionately the same percentage (20%) of any benefit to McConn & Williams reflected in such agreement. . . . Further, **the proportions under which my fees shall be calculated will be** the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, **rounded to the next whole percentage. For example, if McConn & Williams' attorneys spend 1,000**

> hours on the lawsuit after the date the lawsuit was filed and I spend 90 hours of my time towards the lawsuit, then by rounding up to the nearest whole number, I would be entitled to receive from you **2%** (10% of 20%) of the gross revenues and other benefits recovered, if any, from this lawsuit.

1 CR 312.

For clarity, the Fee Agreement contains an example that shows when the rounding to the next whole percentage occurs. In the example, the hours ratio (90/1000) is multiplied by 20% resulting in a fee of 1.8%, which is then rounded up to 2%. Expressed algebraically, the example is: 90/1000 x 20% = 1.8% = 2% when rounded up to the next whole percentage. Thus, the plain language of the Fee Agreement shows that the rounding up to the next whole percentage that is required occurs after, not before, the hours ratio is multiplied by 20%.

### 2. The Supreme Court's Opinion Prohibits Rewriting The Fee Agreement Or Adding To Its Language.

The corollary to the Texas Supreme Court's mandate that unambiguous fee agreements be enforced as written is its prohibition on courts rewriting or adding language to unambiguous contracts. *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 452; *American Mfrs. Mut.*

*Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) (Courts "may neither rewrite the parties' contract nor add to its language.").

### a. The Trial Court Rewrote The Hours Ratio In The Fee Formula At Anglo-Dutch's Request.

Incredibly, notwithstanding the Supreme Court's prohibition on rewriting or adding language to the unambiguous Fee Agreement, Anglo-Dutch expressly invited the trial court to "re-write" the Fee Agreement:

> Since the Supreme Court of Texas ruled that the Fee Agreement was with GP and not Swonke, it is clearer, for analytical purposes, to **re-write** the Fee Agreement and replace the pronouns with the term GP . . . ."

1 CR 415 (emphasis added). Specifically, Anglo-Dutch asked the trial court to re-write the key phrase regarding the numerator in the hours ratio from "the ratio of the hours I have spent or will spend on this matter" to "the ratio of the hours GP has spent or will spend on this matter":

> Further, the proportions under which GP's fees shall be calculated will be **the ratio of the hours GP has spent or will spend on this matter** relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage.

31

*Id.* at 416 (emphasis added); *accord id.* ("One need simply determine the hours **GP** spent on the matter and divide them by the hours that MW spent on the matter . . . .") (emphasis added).

The trial court accepted Anglo-Dutch's invitation and held that "the numerator in the hours ratio in the fee formula in the Fee Agreement is the hours Greenberg Peden worked on the Halliburton Lawsuit," 1 CR 1303 ¶¶ 2-4, or, in another instance, simply inserted "Greenberg Peden Hours" into the hours ratio in the fee formula. 1 CR 524-525. But the Fee Agreement does not state, as the trial court held, that the numerator in the hours ratio in the fee formula is "Greenberg Peden's hours" or only the hours Swonke worked "while at Greenberg Peden."

Without any support in the language of the Fee Agreement, the trial court rewrote the fee formula by: (1) substituting "Greenberg Peden" in two places for "I" in the Fee Agreement; and/or (2) adding "while at Greenberg Peden" to restrict Swonke's hours in the numerator of the fee formula to those hours he worked while at Greenberg Peden. In doing so, the trial court erred by enforcing an agreement the parties did not make. *See David J. Sacks, P.C.*, 266 S.W.3d at 450-51

(enforcing the plain language of an unambiguous attorneys' fee agreement and refusing to impose a limitation on fees not expressed in the agreement); *American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 162 (Courts "may neither rewrite the parties' contract nor add to its language.").

### b. The Trial Court Rewrote The Rounding Provision.

Similarly, the trial court rewrote the rounding provision of the Fee Agreement. The trial court declared that "the rounding up to the next whole percentage that is required by the Fee Agreement occurs after the hours ratio is determined [and] before, not after, the hours ratio is multiplied by 20%." 1 CR 1303 ¶ 4. The trial court expressed its view of the rounding provision algebraically as follows:

> Greenberg Peden Hours/McConn Williams Hours = X (**rounded up to the next whole percentage**) (X1). X1 x 20% = X2.
>
> * * *
>
> 277 Hours/11,652 Hours = 2.37% (**rounded to 3%**). 3% x 20% = .006%. .006 x $51,000,000.00 = $306,000.00

1 CR 525.

However, this rewritten rounding provision does not comport with the Fee Agreement's plain language. This is readily apparent because, utilizing the figures in the Fee Agreement's rounding example and applying the trial court's holding that any rounding to the next whole percentage occurs **before** the hours ratio is multiplied by 20%, the fee owed is 1.8%, not the 2% set forth in the example.[19] Since the fee owed after applying the trial court's holding to the figures in the example (1.8%) does not match the fee owed in the example (2%), the trial court's holding cannot be correct.

On the other hand, utilizing the figures in the example and applying Swonke's interpretation that rounding to the next whole percentage occurs **after** the hours ratio is multiplied by 20%, the fee owed is 2%, precisely that fee set forth in the example.[20] Consequently, Swonke's interpretation is correct and is necessarily the agreement that Swonke and Anglo-Dutch made in the Fee Agreement.

---

[19] 90/1,000 = .09 = 9%. Because 9% is a whole percentage, no rounding up occurs. 9% x 20% = 1.8%.

[20] 90/1,000 = .09. .09 x 20% = 1.8% = 2% when rounded to the next whole percentage.

3. **The Supreme Court's Opinion Requires The Fee Agreement To Be Construed As A Reasonable Person In Anglo-Dutch's Circumstances Would Have Construed It, Not As Anglo-Dutch Construes It.**

The Texas Supreme Court stated that "a tribunal should construe a contract between client and lawyer as a reasonable person in the circumstances of the client would have construed it." *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 451 (quoting Restatement (Third) of The Law Governing Lawyers § 18(2) (2000)). The Supreme Court applied this standard first to the text of the Fee Agreement and then to the surrounding circumstances. *See id.* at 449, 452-53.

a. **A Reasonable Person In Anglo-Dutch's Circumstances Would Have Recognized That The Numerator Is Swonke's Hours, Not Greenberg Peden's Hours.**

i. **The Text Of The Fee Agreement Plainly States That The Numerator Of The Hours Ratio Is Swonke's Hours.**

As previously noted, the text of the Fee Agreement, which Anglo-Dutch proposed,[21] twice refers to the numerator in the hours ratio as Swonke's hours, without any location-dependent limitation or

---

[21] *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 452 ("Van Dyke was not an unsophisticated client; indeed, it was he, not Swonke, who proposed the terms of the Fee Agreement.").

35

restriction on those hours. And, as previously noted, the Supreme Court has already construed this language to mean that the fee calculation was based solely on Swonke's individual hours because it provided a way of limiting Anglo-Dutch's fee. *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 452 (emphasis added). Thus, a reasonable person in Anglo-Dutch's circumstances would have recognized from the text of the Fee Agreement that the numerator of the hours ratio is Swonke's hours.

> ## ii. The Circumstances Surrounding The Execution Of The Fee Agreement Do Not Alter Its Plain Language.

In the words of the Texas Supreme Court, "the circumstances in which the Fee Agreement was executed do not suggest that the parties must have intended something different from what they plainly stated." *Id.* at 453. The Fee Agreement resulted from Anglo-Dutch's desire to have Swonke's—not Greenberg Peden's—assistance in the Halliburton Lawsuit:

> But Swonke's continued counsel, based on his involvement in the events leading up to the litigation, was still needed and Van Dyke asked him to assist McConn & Williams, again for a contingent fee.

*Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 447. And Greenberg Peden,

to whom Swonke had presented the potential representation in

compliance with his of counsel arrangement, had declined to represent

Anglo-Dutch in the Halliburton Lawsuit because Anglo-Dutch had not

paid its outstanding bills to Greenberg Peden. *Id.*

Under these circumstances, when Anglo-Dutch sought Swonke's

help and Greenberg Peden had refused to represent Anglo-Dutch in the

Halliburton Lawsuit, it would be utterly illogical to construe the

personal pronouns defining the hours ratio as referring to anyone other

than Swonke. The circumstances surrounding the execution of the Fee

Agreement certainly "do not suggest that the parties must have

intended something different from what they plainly stated." *Id.* at 453.

### iii. The Post-Fee Agreement Circumstances Do Not Alter The Plain Language Of The Fee Agreement.

Again in the words of the Supreme Court, "[e]vents following the

Fee Agreement do not cast the situation in a different light." *Id.* at 453.

When Swonke relocated from Greenberg Peden to McConn & Williams,

Swonke informed Anglo-Dutch that Greenberg Peden was going to

dissolve and that, absent objection (which was never made), he would

37

continue to represent Anglo-Dutch in matters, including the Halliburton Lawsuit, in his new position as of counsel to McConn & Williams:

> But a year later, Greenberg Peden dissolved, and Swonke moved to McConn & Williams, again in an "of counsel" relationship. In a letter to Van Dyke, Swonke wrote that he would not take the Anglo-Dutch files with him if Van Dyke objected. Van Dyke did not.

*Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 448-49; 1 CR 193-194, 354.

At this point in time, Anglo-Dutch could have limited the fees owed under the Fee Agreement to the hours Swonke spent on the Halliburton Lawsuit while of counsel to Greenberg Peden, as it now attempts to do, by requiring that the file stay at Greenberg Peden and not allowing Swonke to take it with him to his of counsel position at McConn & Williams. But Anglo-Dutch chose to continue working with Swonke because it needed his help. Because Anglo-Dutch's decision to permit Swonke to take the Halliburton Lawsuit file with him to his of counsel position at McConn & Williams without objection created the situation about which it now complains, Anglo-Dutch's complaint about compensating Swonke for the time he worked on the Halliburton Lawsuit while there must fall on deaf ears.

38

With Anglo-Dutch's knowledge, Swonke worked 1,022 hours on the Halliburton Lawsuit while of counsel at McConn & Williams. *See* 1 CR 206. Included in those hours was time Swonke spent attending Van Dyke's three-day deposition, which occurred **six months after** Swonke relocated from Greenberg Peden to McConn & Williams. 1 CR 206. In his deposition, Van Dyke testified in the present tense that he had a fee agreement with Swonke, and noted through his testimony that his fee agreement with Swonke was separate and distinct from his other attorneys' fee agreements:

Q:      The attorney's fees, the written contract that you made reference to a moment ago?

Van Dyke: Yes.

* * *

Q:      Who is it with?

Van Dyke: It is with – there's actually – there are two contracts in existence, one is with a contract with Mr. O'Quinn, Mr. McConn and Mr. Williams, and the second contract is with Mr. Swonke.

1 CR 247.

Finally, Swonke received no fees from McConn & Williams or any other source for any of the hours he spent on the Halliburton Lawsuit,

including the 1,022 hours that he spent on the Halliburton Lawsuit after relocating from Greenberg Peden to McConn & Williams. 1 CR 206.

The post-Fee Agreement circumstances reflect that Swonke worked on the Halliburton Lawsuit for more than one thousand hours after relocating from Greenberg Peden to McConn & Williams with the expectation to be paid under the Fee Agreement by Anglo-Dutch, which knew both that Swonke was actively working on the Halliburton Lawsuit and that the Fee Agreement, the numerator in which is based on Swonke's unrestricted and unlimited hours, was still in full force and effect. These post-Fee Agreement circumstances only bolster Swonke and the Supreme Court's interpretation that the numerator in the hours ratio is Swonke's hours. *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 452; *David J. Sacks, P.C.*, 266 S.W.3d at 450-51 (enforcing the plain language of an unambiguous attorneys' fee agreement and refusing to impose a limitation on fees not expressed in the agreement).

Based on its text and the surrounding circumstances, a reasonable person in Anglo-Dutch's circumstances would have recognized that the numerator in the hours ratio is Swonke's hours.

b. **A Reasonable Person In Anglo-Dutch's Circumstances Would Have Recognized That The Rounding To The Next Whole Percentage Occurs After, Not Before, Multiplying The Hours Ratio By 20%.**

i. **The Text Of The Fee Agreement Plainly Shows That The Rounding Occurs After, Not Before, Multiplying The Hours Ratio By 20%.**

As previously noted, the text of the Fee Agreement plainly states that the fee is a proportion of 20%, rounded up to the next whole percentage. And, as previously stated, Anglo-Dutch's method of rounding does not comport with the Fee Agreement's plain language because Anglo-Dutch's method produces an answer different than that in the Fee Agreement's example. Anglo-Dutch's rounding method produces an answer of 1.8% for the example while the Fee Agreement plainly shows that proper rounding results in an answer of 2% for the example. Thus, a reasonable person in Anglo-Dutch's circumstances would have recognized from the text of the Fee Agreement that the rounding up to the next whole percentage occurs after, not before, multiplying the hours ratio by 20%.

41

ii. Neither The Circumstances Surrounding The Execution Of The Fee Agreement Nor Post-Fee Agreement Circumstances Alter Its Plain Language That Requires Rounding After Multiplying The Hours Ratio By 20%.

Swonke and Van Dyke discussed the rounding feature before the Fee Agreement was signed and it was clear that Van Dyke understood the rounding feature as Swonke did. 9 RR 247-48. Van Dyke never suggested during this discussion that the rounding would occur before the hours ratio was multiplied by 20%. 9 RR 249. Anglo-Dutch first asserted that the rounding should occur before the hours ratio was multiplied by 20% once the lawsuit was filed. *Id.* Consequently, "the circumstances in which the Fee Agreement was executed do not suggest that the parties must have intended something different from what they plainly stated" regarding when rounding occurs. *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 453.

C. Conclusion

As explained above, the trial court erred by rendering judgment on Anglo-Dutch's requested numerator and rounding declarations because Anglo-Dutch waived any entitlement to the declarations and, in any event, the declarations misconstrue the Fee Agreement by

42

rewriting its plain language in violation of the Supreme Court's opinion. These mistakes resulted in the rendition of an incorrect judgment for Swonke of $306,000 based on the parties' stipulated facts.

Applying the trial court's erroneous rounding declaration, but changing its numerator declaration to include in the numerator all of the hours Swonke worked on the Halliburton Lawsuit without limitation or restriction, results in a fee owed under the Fee Agreement of $1,224,000, calculated as follows:

$(1,299/11,652) = .11148301 = 11.148301\% = 12\%$ rounded up to the next whole percentage

$12\% \times 20\% = 2.4\%$

$2.4\% \times \$51,000,000 = \$1,224,000$

Applying the trial court's numerator declaration, but changing its rounding declaration by rounding up to the next whole percentage **after** the hours ratio is multiplied by 20%, results in a fee owed of $510,000, calculated as follows:

$(277/11,652) \times 20\% = .475455\% = 1\%$ when rounded up to the next whole percentage

$1\% \times \$51,000,000 = \$510,000$

Changing both the trial court's erroneous numerator and rounding declarations by including all of Swonke's hours in the numerator and rounding to the next whole percentage after the hours ratio is multiplied by 20%, results in a fee owed of $1,530,000, calculated as follows:

$$1{,}299/11{,}652 = .11148301$$

$$.11148301 \times 20\% = 2.22966\% = 3\% \text{ when rounded up to the next whole percentage}$$

$$3\% \times \$51{,}000{,}000 = \$1{,}530{,}000$$

Based on the parties' stipulated facts, the amount owed under the Fee Agreement when properly construed is $1,530,000. The trial court erred by refusing to render judgment for Swonke in that amount.

II. **The Trial Court Erred By Rendering Judgment Against—And Refusing To Render Judgment For—Swonke On His Attorneys' Fees Claims.**

The trial court's 2007 Judgment ordered Anglo-Dutch to pay to Swonke attorneys' fees of $352,892.50 for representation in the trial court and $75,000 for representation in the court of appeals. *See* 1 CR supp 121. The trial court found those attorneys' fees to be reasonable, necessary, equitable, and just for the prosecution of Swonke's breach of

contract and declaratory judgment claims, and Swonke's defense of Anglo-Dutch's declaratory judgment claims. *Id.*

As Anglo-Dutch has previously conceded, Anglo-Dutch did not appeal Swonke's attorneys' fees award: "Anglo-Dutch did not raise a separate and distinct appeal point concerning the award of attorneys' fees to Swonke." *See* 1 CR SUPP 394; *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 267 S.W.3d 454, 464 n.5 (Tex. App.—Houston [14th Dist.] 2008) ("Anglo–Dutch does not challenge on appeal . . . the separate statutory fee award for litigating Swonke's contract claim under the disputed fee agreement, which the parties opted to try to the court."), *rev'd*, 352 S.W.3d 445 (Tex. 2011); 2 CR SUPP 766-815; 3 CR SUPP 817-846, 848-901.

On remand, Swonke and Anglo-Dutch cross-moved for summary judgment on Swonke's attorneys' fees claims. 1 CR SUPP 77; 1 CR 271. The trial court ruled for Anglo-Dutch and interlocutorily ordered that Swonke take nothing on his attorney fees' claims. *See* 1 CR 668-669. Based on that order, the trial court ultimately rendered a take-nothing judgment against Swonke on his attorneys' fees claims. See 1 CR 1304.

## A. The Trial Court Erred By Granting Summary Judgment Against Swonke On His Attorneys' Fees Claims.

Anglo-Dutch sought summary judgment on Swonke's claim for attorneys' fees under Texas Civil Practice and Remedies Code chapter 38 on the sole ground that Swonke did not prevail on his breach of contract claim. *See* 1 CR SUPP 281-282. Anglo-Dutch argued that Swonke did not prevail on his breach of contract claim because the Texas Supreme Court ruled that the Fee Agreement was between Anglo-Dutch and Greenberg Peden, not Swonke. *See* 1 CR SUPP 282.

Anglo-Dutch sought summary judgment on Swonke's claim for attorneys' fees under Texas Civil Practice and Remedies Code section 37.009 on three grounds: (1) Swonke's declaratory judgment claim raised only issues already raised by Anglo-Dutch's original claim; (2) Swonke did not prevail on his breach of contract claim; and (3) it would not be equitable or just to award attorneys' fees to Swonke. *See* 1 CR SUPP 282-284.

As shown below, none of Anglo-Dutch's arguments support the trial court's summary judgment against Swonke on his attorneys' fees claims because: (1) Anglo-Dutch waived all complaints about Swonke's attorneys' fees award; (2) notwithstanding the Supreme Court's opinion,

46

Swonke had standing and capacity to sue for breach of the Fee Agreement; (3) Swonke may recover Declaratory Judgment Act attorneys' fees defending against against declaratory judgment claims; and (4) Swonke's award of attorneys' fees was equitable and just and Anglo-Dutch waived any complaint that it was not.

1. Anglo-Dutch's Waiver Of All Complaints About The 2007 Judgment's Award Of Attorneys' Fees To Swonke Prohibited The Trial Court From Altering The Award On Remand.

As previously noted, Anglo-Dutch did not complain on appeal about the 2007 Judgment's award of attorneys' fees to Swonke. *See* 1 CR SUPP 394 ("Anglo-Dutch did not raise a separate and distinct appeal point concerning the award of attorneys' fees to Swonke."); *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 267 S.W.3d 454, 464 n.5 (Tex. App.—Houston [14th Dist.] 2008); 2 CR SUPP 756-815; 3 CR SUPP 817-846; 3 CR SUPP 848-901.

Anglo-Dutch's failure to complain on appeal about the 2007 Judgment's award of attorneys' fees to Swonke waived all complaints about that award. *See Hudspeth County Underground Water Conservation Dist. No. 1 v. Guitar Holding Co., L.P.*, 355 S.W.3d 428 (Tex. App.—El Paso 2011, pet. denied) (holding that a party waived its

complaint about the court of appeals' decisions regarding entitlement to attorneys' fees and prevailing-party status by not appealing those issues to the Texas Supreme Court); *City of Temple v. Taylor*, 268 S.W.3d 852, 858 (Tex. App.—Austin 2008, pet. denied) (holding that, even though a party prevailed on appeal in a declaratory judgment action, that party waived all complaints regarding a trial court's award of attorney's fees to the prevailing party in the trial court because the attorneys' fee award was not challenged on appeal). The complaints waived by Anglo-Dutch include all of the grounds that Anglo-Dutch asserted in its motion for summary judgment on Swonke's attorneys' fees claims.

Anglo-Dutch's waiver of all complaints about the 2007 Judgment's award of attorneys' fees to Swonke prohibited the trial court from altering the attorneys' fees award on remand because a trial court errs by rendering a judgment on remand that alters its own or a higher court's prior judgment on an issue that was not appealed. *See Medical Ctr. Pharmacy*, 634 F.3d at 834 (holding that the district court erred by reversing on remand its prior ruling granting declaratory relief which had been waived on appeal); *United Resources, L.P.*, 2014 WL 3339537,

48

at *3 (holding that the trial court erred on remand by modifying its prior take-nothing judgment on cross-claims because no party had attacked that part of the trial court's judgment in an earlier appeal); *Hudspeth County Underground Water Conservation Dist. No. 1*, 355 S.W.3d at 434-35 (holding that the trial court erred on remand by making a finding on prevailing-party status for attorneys' fees purposes that conflicted with the court of appeals' prior decision on the issue which had been waived on appeal to the Texas Supreme Court); *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 533 (6th Cir. 2008) (holding that a district court erred on remand by rendering judgment on a jury's $3.3 million lost profits finding because the district court's previously-rendered judgment on a $0 lost profits finding had been waived on appeal); *Anderson Courier Serv.*, 222 S.W.3d at 66-67 (holding that the trial court erred by awarding attorneys' fees under the declaratory judgment act on remand when any complaint that the trial court's original judgment failed to award attorneys' fees was waived on appeal).

Because Anglo-Dutch waived any complaint about Swonke's attorneys' fees award in the 2007 Judgment by not appealing that

award, and Anglo-Dutch's waiver prohibited the trial court from altering the award on remand, the trial court erred by granting a take-nothing summary judgment to Anglo-Dutch on Swonke's attorneys' fees claims.

> 2. Alternatively, Even If Not Waived, Anglo-Dutch's Grounds For Summary Judgment On Swonke's Attorneys' Fees Claims Lack Merit.

Alternatively, even if not waived, Anglo-Dutch's grounds for summary judgment on Swonke's attorney's fees claims lack merit because, as shown below, Anglo-Dutch did not conclusively negate any element of Swonke's attorneys' fees claims and genuine issues of material fact remain on those claims.

> a. Notwithstanding The Supreme Court's Opinion, Swonke Had Standing And Capacity To Sue For Breach Of The Fee Agreement.

Anglo-Dutch argued that Swonke was not entitled to attorneys' fees under chapter 38 on the sole ground that Swonke had not prevailed on his breach of contract claim since the Texas Supreme Court ruled that the Fee Agreement was between Anglo-Dutch and Greenberg Peden, not Swonke. *See* 1 CR SUPP 282. Two flaws infect this argument.

First, the Texas Supreme Court's holding that Swonke was not a party to the Fee Agreement was not dispositive of Swonke's breach of contract claim because Swonke need not have been a party to the Fee Agreement to sue for its breach; assignees and third-party beneficiaries also have standing and capacity to sue for breach of contract. *See Southwestern Bell Telephone Co. v. Marketing on Hold, Inc.*, 308 S.W.3d 909, 916 (Tex. 2010) ("Because [assignee] holds contractually valid assignments, [assignee] steps into the shoes of the claimholders and is considered under the law to have suffered the same injury as the assignors and have the same ability to pursue the claims."); *Brown v. Mesa Distributors, Inc.*, 414 S.W.3d 279, 281-82 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("In order to establish standing to maintain a breach of contract action, a plaintiff must show either third-party-beneficiary status or privity. Privity is established by proof that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff."); *Pagosa Oil and Gas, L.L.C. v. Marrs and Smith Partnership*, 323 S.W.3d 203, 210 (Tex. App.—El Paso 2010, pet. denied) (parties,

assignees, and third-party beneficiaries have standing to sue for breach of contract).

Anglo-Dutch did not argue—much less conclusively prove—that Swonke lacked standing or capacity to sue for breach of the Fee Agreement, or that Swonke was not an assignee or third-party beneficiary of the Fee Agreement. Consequently, Anglo-Dutch was not entitled to summary judgment on Swonke's breach of contract claim.

Second, the summary judgment evidence affirmatively showed that Swonke had capacity and standing to sue for breach of the Fee Agreement as an assignee and a third-party beneficiary of the Fee Agreement. On April 16, 2004, before this lawsuit was ever filed, Greenberg Peden assigned all of its interest in and under the Fee Agreement to Swonke. *See* 2 CR SUPP 723. Indeed, on remand, the trial court recognized the validity of that assignment in its May 15, 2012 Order: "[U]nder the Fee Agreement the Court determines that the attorneys' fees due to Greenberg Peden **(and now Swonke by way of assignment)** are $306,000." 2 CR SUPP 734. That assignment also identifies Swonke as the "third party beneficiary" of the Fee Agreement. *See id.* At a minimum, the assignment and designation of Swonke as a

52

third-party beneficiary raised genuine issues of material fact that precluded summary judgment for Anglo-Dutch on Swonke's breach of contract claim. *See Brown*, 414 S.W.3d at 285-86 (holding that legally sufficient evidence supported the standing of an assignee to sue for breach of contract when the contract that was assigned and the assignment were introduced into evidence).

### b. Anglo-Dutch's Grounds For Summary Judgment On Swonke's Claim For Attorneys' Fees Under The Declaratory Judgment Act Lack Merit.

Anglo-Dutch argued that Swonke was not entitled to attorneys' fees under section 37.009 of the Declaratory Judgment Act for three reasons: (1) Swonke's declaratory judgment claim only raised issues already raised by Anglo-Dutch's original claim; (2) Swonke's breach of contract claim failed; and (3) it would not be equitable or just to award attorneys' fees to Swonke. 1 CR SUPP 282-284.

### i. Swonke May Recover Attorneys' Fees Under The Declaratory Judgment Act Because He Defended Against Anglo-Dutch's Declaratory Judgment Action.

Anglo-Dutch argued that Swonke was not entitled to attorneys' fees under the Declaratory Judgment Act because his declaratory judgment claim only raised issues already raised by Anglo-Dutch's

original claim. *See* 1 CR SUPP 282. Anglo-Dutch relied on *Montemayor v. Ortiz*, 208 S.W.3d 627, 666 (Tex. App.—Corpus Christi 2006, pet. denied), but *Montemayor* itself defeats Anglo-Dutch's argument. In *Montemayor*, the court of appeals held that the trial court did not abuse its discretion by awarding attorneys' fees to a defendant under the Declaratory Judgment Act because the plaintiff's original claim was for a declaratory judgment. *See Montemayor*, 208 S.W.3d at 666-67. Indeed, *Montemayor* expressly states that the rule upon which Anglo-Dutch relied "does not apply where a defendant is defending against a plaintiff's declaratory judgment action." *Id.*

Here, Anglo-Dutch originally brought declaratory judgment claims and Swonke defended against them. *See* 1 CR SUPP 300; 1 CR SUPP 392 ("Anglo-Dutch filed suit against Greenberg Peden, P.C. . . . and Swonke, seeking relief pursuant to the Uniform Declaratory Act . . . ."). Consequently, Swonke was entitled to recover attorneys' fees under the Declaratory Judgment Act. *See Montemayor*, 208 S.W.3d at 666-67.

ii. **Swonke's Breach Of Contract Claim Did Not Fail.**

Anglo-Dutch also argued that Swonke could not recover attorneys' fees under the Declaratory Judgment Act because Swonke's breach of

contract claim purportedly failed due to the Texas Supreme Court's holding that Swonke was not a party to the Fee Agreement. *See* 1 CR SUPP 283. However, for the reasons set forth in section II.A.2.a. above, which are incorporated herein by reference, Anglo-Dutch's argument that Swonke did not prevail on his breach of contract claim lacks merit.

### iii. Anglo-Dutch Waived Its Complaint That Swonke's Attorneys' Fee Award Was Not Equitable And Just And, In Any Event, The Award Was Equitable And Just.

Anglo-Dutch finally argued that Swonke could not recover attorneys' fees under the Declaratory Judgment Act because it would not be equitable and just to award attorneys' fees to Swonke. *See* 1 CR SUPP 283-284. In its 2007 Judgment, the trial court expressly found that Swonke's award of attorneys' fees was equitable and just. *See* 1 CR 299. But Anglo-Dutch did not attack that conclusion of law on appeal. *See* 1 CR SUPP 394 ("Anglo-Dutch did not raise a separate and distinct appeal point concerning the award of attorneys' fees to Swonke."); *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 267 S.W.3d 454, 464 n.5 (Tex. App.—Houston [14th Dist.] 2008) ("Anglo–Dutch does not challenge on appeal . . . the separate statutory fee award for litigating Swonke's contract claim under the disputed fee

agreement, which the parties opted to try to the court."), *rev'd*, 352 S.W.3d 445 (Tex. 2011); 1 CR SUPP 124-183, 185-214, 216-269. Thus, Anglo-Dutch's attack on the equitable and just nature of Swonke's attorneys' fees award has been waived and could not have been properly revisited on remand by the trial court.

In any event, it was equitable and just to award attorneys' fees to Swonke under the Declaratory Judgment Act given the circumstances of this case. Swonke has thus far defeated three of Anglo-Dutch's seven declaratory judgment claims and, when this Court reverses the trial court's numerator and rounding declarations, Anglo-Dutch will have succeeded on only two of seven requested declarations. And neither of those declarations are significant to the ultimate issue in this case— what does Anglo-Dutch owe Swonke under the Fee Agreement? The declaration that Greenberg Peden is a party to the Fee Agreement is of no moment because, as explained above, it is not dispositive of Swonke's breach of contract claim. The declaration that Swonke's hours at McConn & Williams are included in the denominator in the fee formula is insignificant and was agreed to by Swonke because it does not change the fee owed to Swonke under the Fee Agreement. 1 CR 460.

Moreover, the facts contained in the Statement of Facts in this brief, which are incorporated herein by reference, also demonstrate that it was equitable and just to award Swonke attorneys' fees for his defense of Anglo-Dutch's declaratory judgment claims. Specifically, Van Dyke's company, Anglo-Dutch, settled the Halliburton Lawsuit for $51,000,000 and then stiffed Swonke on his fee. Anglo-Dutch then sued Swonke for a judicial declaration that it owed him nothing for the 1,022 hours he had worked on the lawsuit while at McConn & Williams even though:

- Greenberg Peden had expressly refused to represent Anglo-Dutch in the Halliburton Lawsuit and told Van Dyke so;

- Van Dyke, not Swonke, proposed the disputed terms in the Fee Agreement;

- Greenberg Peden is not mentioned in the body of the Fee Agreement;

- The Fee Agreement uses personal pronouns twelve times in nine sentences to refer to Swonke;

- Van Dyke himself testified in the Halliburton Lawsuit that Anglo-Dutch had a fee agreement with Swonke;

- Swonke worked 1,022 hours on the Halliburton Lawsuit without compensation while "of counsel" at McConn & Williams because he knew he would be compensated under the Fee Agreement with Anglo-Dutch;

- Although Anglo-Dutch seeks to avoid paying Swonke attorneys' fees for the 1,022 hours he worked on the Halliburton Lawsuit while of counsel to McConn & Williams, Anglo-Dutch's verdict that resulted in the $51,000,000 settlement actually included attorneys' fees for those same hours;

- After settling the Halliburton Lawsuit for $51,000,000, Anglo-Dutch began a concerted effort to avoid its contractual obligations to numerous others who helped it prevail; and

- Swonke has not been compensated by anyone for any of his 1,299 hours of work on the Halliburton Lawsuit that helped Anglo-Dutch recover $51,000,000.

These facts demonstrate that an award of attorneys' fees to Swonke is equitable and just. *See Hoover Slovacek, L.L.P. v. Walton*, 206 S.W.3d 557, 563 (Tex. 2006) ("[A]ttorneys are entitled to protection from clients who would abuse the contingent fee arrangement and avoid duties owed under contract.").

### B. The Trial Court Erred By Refusing To Render Judgment Of $427,892.50 For Swonke On His Attorneys' Fees Claims.

As previously noted, Swonke moved for a partial summary judgment on his attorneys' fees claims. 1 CR SUPP 77-270. The trial court denied that motion by ordering that Swonke take-nothing on his attorneys' fees claims. 1 CR 668. Swonke also moved the Court to render judgment on his attorneys' fees claims. 3 CR SUPP 1014. The

trial court's final judgment denied that requested relief by rendering judgment that Swonke take nothing on his attorneys' fees claims. 3 CR SUPP 1304. As shown below, the trial court erred by refusing to render judgment for Swonke on his attorneys' fees claims.

A lower court's judgment remains in force and effect as to any issue it decides that is not appealed. *See Guitar Holding Co., L.P. v. Hudspeth County Underground Water Conservation Dist. No. 1*, 263 S.W.3d 910, 918 (Tex. 2008); *Bramlett v. Phillips*, 359 S.W.3d 304, 311 (Tex. App.—Amarillo 2012), *aff'd*, *Phillips v. Bramlett*, 407 S.W.3d 229 (Tex. 2013).

In *Guitar Holding*, the Supreme Court reversed the court of appeals' judgment and declared certain water transfer permits and rules relating thereto invalid. *See id.* On motion for rehearing, the losing party argued that it had prevailed on several other issues in the court of appeals which were unchallenged—and therefore waived—in the Supreme Court. *See id.* The Supreme Court agreed that those issues were waived and held that "the court of appeals' judgment remains in effect as to these abandoned issues." *Id.* In *Bramlett*, the court of appeals succinctly stated the rule:

> [A]s to issues not addressed by the Supreme Court, the opinions and judgments of this Court [of Appeals] remain in force and effect. Similarly, as to those issues not addressed by either the Supreme Court or this Court [of Appeals], the [original] judgment of the trial court remains in force and effect.

*Bramlett*, 359 S.W.3d at 311.

Indeed, a lower court's judgment remains controlling on issues it decided that were waived on appeal even when that judgment is "reversed" by a higher court. *See Phillips v. Bramlett*, 407 S.W.3d 229, 233, 237 (Tex. 2013); *Guitar Holding Co., L.P.*, 263 S.W.3d at 918. In *Phillips*, the Supreme Court held that the portion of a court of appeals' judgment that reversed punitive damages was ***not*** reversed—but instead was "approved"—in the Supreme Court, even though the Supreme Court's opinion, judgment, and mandate stated that the court of appeals' judgment was reversed, because that issue went unchallenged in the Supreme Court and unaddressed in its opinion. *See id.* at 233, 237. Similarly, in *Guitar Holding*, the Supreme Court held that its reversal of the court of appeals' judgment did not actually reverse issues decided by the court of appeals that were not appealed to the Texas Supreme Court. *Guitar Holding Co., L.P.*, 263 S.W.3d at 918.

As previously noted, Anglo-Dutch did not appeal to any court the trial court's award of attorneys' fees to Swonke in the 2007 Judgment. Consequently, the 2007 Judgment's award of attorneys' fees remains in force and effect. *See Guitar Holding Co.*, 263 S.W.3d at 918; *Bramlett*, 359 S.W.3d at 311.

In *Phillips*, the Texas Supreme Court concluded that, "[b]y remanding the case to the trial court for entry of a judgment consistent with our opinion, we permitted the trial court to enter a final judgment that reflected this [Supreme] Court's holdings **and the court of appeals' holding** . . . ." *Phillips*, 407 S.W.3d at 237 (emphasis added). Like *Phillips*, by remanding this case to the trial court for entry of a judgment in accordance with its opinion, the Supreme Court in this case permitted the trial court to render a final judgment that reflected the Supreme Court's holding—that Greenberg Peden was unambiguously a party to the Fee Agreement—and the prior decisions of the trial court and this Court that were waived on appeal, including the trial court's award of $427,892.50 to Swonke on his attorneys' fee claims. *See id.* The trial court's refusal to render such a judgment for Swonke on his attorneys' fees claims was error.

61

III. The Trial Court Erred By Rendering Judgment Against—And Refusing To Render Judgment For—Swonke On His Breach Of Contract Claim.

A. The Trial Court Erred By Granting Summary Judgment To Anglo-Dutch On Swonke's Breach Of Contract Claim.

On remand, Anglo-Dutch sought summary judgment on Swonke's breach of contract claim on the sole ground that the Texas Supreme Court had ruled that Swonke did not have a contract with Anglo-Dutch. *See* 1 CR SUPP 280-281. The trial court granted Anglo-Dutch's motion and ordered that Swonke take nothing on his breach of contract claim. 1 CR 668.

However, for the reasons stated in detail in section II.A.2.a. above, which are incorporated herein by reference, Anglo-Dutch was not entitled to summary judgment on Swonke's breach of contract claim because: Anglo-Dutch did not conclusively negate Swonke's standing or capacity to sue for breach of the Fee Agreement as an assignee or third-party beneficiary; and the April 16, 2004 assignment from Greenberg Peden to Swonke of Greenberg Peden's interest in the Fee Agreement raised a genuine issue of material fact about whether Swonke had standing and capacity to sue for breach of the Fee Agreement as an assignee or third-party beneficiary. For those reasons, the trial court

erred by granting summary judgment to Anglo-Dutch on Swonke's breach of contract claim.

### B. Alternatively, The Trial Court Erred By Refusing To Render Judgment For Swonke On His Breach Of Contract Claim.

As explained above, the trial court erred by misconstruing the Fee Agreement and refusing to render judgment that Anglo-Dutch owes Swonke $1,530,000 under the Fee Agreement. In the alternative to that recovery, the trial court erred by refusing to render judgment for Swonke on his breach of contract claim.

Swonke moved the trial court to render judgment for him on his breach of contract claim. 3 CR SUPP 1014. The trial court denied Swonke's request and rendered a take-nothing judgment against Swonke on his breach of contract claim. 1 CR 1304. As shown below, the trial court erred by refusing to render judgment for Swonke on his breach of contract claim because conclusive evidence and undisturbed jury findings from the original trial entitle Swonke to the rendition of a judgment for $1,000,000 on his breach of contract claim.

Swonke sued Anglo-Dutch for breach of the Fee Agreement. 1 CR SUPP 294-307. The elements of a breach of contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance

by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained as a result of the breach." *Sims v. Fitzpatrick*, No. 01-13-00176-CV, 2014 WL 1004410, at *4 (Tex. App.—Houston [1st. Dist.] March 13, 2014, pet. denied).

The first element of Swonke's breach of contract claim—the existence of a contract—is undisputed and was conclusively proved in the original trial. The Fee Agreement is the contract. 1 CR 312-313; *Anglo Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 453 (Tex. 2011) ("We hold that the agreement was between Anglo-Dutch and Greenberg Peden.").

Moreover, the evidence conclusively proved that Swonke had standing and capacity to sue for breach of the Fee Agreement as an assignee and a third-party beneficiary of the Fee Agreement. *See Southwestern Bell Telephone Co. v. Marketing on Hold, Inc.*, 308 S.W.3d 909, 916 (Tex. 2010) ("Because [assignee] holds contractually valid assignments, [assignee] steps into the shoes of the claimholders and is considered under the law to have suffered the same injury as the assignors and have the same ability to pursue the claims."). On April 16, 2004, before this lawsuit was ever filed, Greenberg Peden assigned

64

all of its interest in and under the Fee Agreement to Swonke. *See* 1 CR 385 ("Greenberg Peden, P.C. hereby . . . ASSIGNS all of its interest in and under the [Fee Agreement] to Swonke."); [additional cite]. Indeed, the trial court recognized the validity of that assignment as a matter of law in its May 15, 2012 Order: "[U]nder the Fee Agreement the Court determines that the attorneys' fees due to Greenberg Peden **(and now Swonke by way of assignment)** are $306,000." (emphasis added). That assignment also identifies Swonke as the "third party beneficiary" of the Fee Agreement. *See id.* For these reasons, the April 16, 2004 assignment conclusively proves that Swonke had standing and capacity to sue for breach of the Fee Agreement.

The second element of Swonke's breach of contract claim—performance by the plaintiff—is also undisputed and conclusively proved. Swonke promised in the Fee Agreement "to assist Anglo-Dutch and that firm [McConn & Williams, LLP] in this lawsuit [the Halliburton Lawsuit] . . . ." The evidence at trial conclusively proved that Swonke assisted Anglo-Dutch and McConn & Williams in the Halliburton Lawsuit, by working on the lawsuit for 277 hours while of counsel to Greenberg Peden and 1,022 hours while of counsel at

McConn & Williams. 1 CR 164, 184, 206, 216. Indeed, the trial court recognized in its May 15, 2012 order that Anglo-Dutch had conceded that Swonke assisted Anglo-Dutch on the Halliburton Lawsuit for 277 hours while at Greenberg Peden ("In addition, the parties have agreed that Swonke spent 277 hours on the representation while at Greenberg Peden . . . .").[22] For these reasons, Swonke's performance of the Fee Agreement has been conclusively proved.

The third element of Swonke's breach of contract claim—Anglo-Dutch's breach of the Fee Agreement—was proved in the original trial. The jury found in response to Question 2 that Anglo-Dutch failed to comply with the Fee Agreement. 1 CR 304. The trial court incorporated the finding of breach into the 2007 Judgment. 1 CR 298. And Anglo-Dutch did not attack that finding on appeal: "Anglo-Dutch does not challenge on appeal the jury's finding that it breached the fee agreement . . . ." *See Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.,* 267 S.W.3d 454, 464 n.5 (Tex. App.—Houston [14th Dist.] 2008), *rev'd,* 352 S.W.3d 445 (Tex. 2011). Consequently, Anglo-Dutch waived any attack on the jury's breach finding and it remains undisturbed and

---

[22] It is significant that Anglo-Dutch neither sought nor obtained a finding that Swonke did not comply with the Fee Agreement. *See* 1 CR 312-313.

in effect. *See Guitar Holding Co., L.P.*, 263 S.W.3d at 918 (holding that a lower court's judgment remains in force and effect as to any issue it decides that is not appealed); *Biggar*, 873 S.W.2d at 14-15 (holding that a party waived all complaints about a damage award affirmed by the court of appeals by not complaining about it in the Texas Supreme Court); *see also JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 533 (6th Cir. 2008) (holding that a district court erred on remand by rendering judgment on a jury's $3.3 million lost profits finding because the district court's previously-rendered judgment on a $0 lost profits finding had been waived on appeal).

The fourth element of Swonke's breach of contract claim—damages resulting from the breach—was also proved in the original trial. The jury found in response to Question 3 that $1,000,000 would fairly and reasonably compensate Swonke for his damages resulting from Anglo-Dutch's breach. 1 CR 305. The trial court incorporated the $1,000,000 damage finding into the 2007 Judgment. 1 CR 298. And Anglo-Dutch did not challenge that finding on appeal: "Anglo-Dutch does not challenge on appeal the amount of contract damages awarded for that breach . . . ." *See Anglo-Dutch Petroleum Int'l v. Greenberg*

*Peden, P.C.*, 267 S.W.3d 454, 464 n.5 (Tex. App.—Houston [14th Dist.] 2008), *rev'd*, 352 S.W.3d 445 (Tex. 2011). Consequently, Anglo-Dutch waived any attack on the jury's damage finding and it remains undisturbed and in effect. *See Guitar Holding Co., L.P.*, 263 S.W.3d at 918 (holding that a lower court's judgment remains in force and effect as to any issue it decides that is not appealed); *Biggar*, 873 S.W.2d at 14-15 (holding that a party waived all complaints about a damage award affirmed by the court of appeals by not complaining about it in the Texas Supreme Court); *see also JGR, Inc.*, 550 F.3d at 533 (holding that a district court erred on remand by rendering judgment on a jury's $3.3 million lost profits finding because the district court's previously-rendered judgment on a $0 lost profits finding had been waived on appeal).

Having established all four elements of his breach of contract claim either through undisturbed jury findings or conclusive evidence, Swonke is entitled to the rendition of a judgment on that claim in the amount of $1,000,000. *See* TEX. R. CIV. P. 301 ("The judgment of the court shall conform to the pleadings, the nature of the case proved and

68

the verdict, if any, and shall be so framed as to give the party all the relief to which he may be entitled either in law or equity.").

IV. **The Trial Court Erred By Rendering A Judgment On Prejudgment Interest, Post-Judgment Interest, And Costs That Conflicts With Its 2007 Judgment, Which Remains In Force And Effect On Those Issues.**

A. **Anglo-Dutch Waived Any Complaints About The Trial Court's 2007 Judgment On Prejudgment Interest, Post-Judgment Interest, And Costs.**

The trial court has ordered Anglo-Dutch to pay Swonke $42,127.40 in prejudgment interest. *See* 1 CR 1304 at ¶ 13. However, the trial court's 2007 Judgment awarded Swonke $226,924.50 in prejudgment interest. 1 CR 299. Anglo-Dutch did not complain about the trial court's award of $226,924.50 in prejudgment interest in its appeal to this Court or the Texas Supreme Court. 1 CR SUPP 124-183, 185-214, 216-269.

The trial court has also ordered Anglo-Dutch to pay Swonke post-judgment interest on $348,127.40. *See* 1 CR 1305 at ¶ 16. However, the trial court's 2007 Judgment ordered Anglo-Dutch to pay Swonke post-judgment interest on "this judgment and the amounts awarded herein," *i.e.*, $1,654,817. 1 CR 300. Anglo-Dutch did not complain in its appeal to this Court or the Texas Supreme Court about the trial court's

69

order to pay Swonke post-judgment interest on the 2007 Judgment and the $1,654,817 awarded therein. 1 CR SUPP 124-183, 185-214, 216-269.

Finally, the trial court also ordered Swonke and Greenberg Peden to pay all court costs. *See* 1 CR 1304 at ¶ 15. However, the trial court's 2007 Judgment ordered Anglo-Dutch to pay all court costs. 1 CR 299. Anglo-Dutch did not complain about the trial court's order to pay all court costs in its appeal to this Court or the Texas Supreme Court. 1 CR SUPP 124-183, 185-214, 216-269.

Anglo-Dutch's failure to complain on appeal about the 2007 Judgment's orders to pay $226,924.50 in prejudgment interest, post-judgment interest on $1,654,817, and costs waived any complaints about those awards. *See Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240-41 (Tex. 1987) (holding that a complaint about prejudgment interest is waived if not made in the court of appeals); *Wohlfahrt v. Holloway*, 172 S.W.3d 630, 639-40 (Tex. App.–Houston [14th Dist.] 2005, pet. denied) (holding that a complaint about an award of post-judgment interest must be properly preserved or it is waived); *Thomas v. Bilby-Knight*, No. 09-03-370CV, 2003 WL 22213590, at *1 (Tex. App.—Beaumont

2003, no pet.) ("An issue relating to judgment for costs must be brought in a regular appeal."); *see also San Jacinto River Authority*, 783 S.W.2d at 209-210 (stating that it is a "well-established rule that grounds of error not asserted by points of error or argument in the court of appeals are waived).

**B.** **The 2007 Judgment's Awards Of Prejudgment Interest, Post-judgment Interest, And Costs Remain In Force And Effect.**

As previously noted, a lower court's judgment remains in force and effect as to any issue it decides that is not appealed. *See Guitar Holding Co., L.P.*, 263 S.W.3d at 918; *Bramlett*, 359 S.W.3d at 311. And a lower court's judgment remains controlling on issues it decided that were waived on appeal even when that judgment is "reversed" by a higher court. *See Phillips*, 407 S.W.3d at 233, 237 (Tex. 2013); *Guitar Holding Co., L.P.*, 263 S.W.3d at 918. Because Anglo-Dutch did not appeal to any court the 2007 Judgment's awards of prejudgment interest, post-judgment interest, or costs, those awards remain in force and effect. *See Guitar Holding Co.*, 263 S.W.3d at 918; *Bramlett*, 359 S.W.3d at 311.

C. **The Trial Court Erred By Altering Its Prior Awards Of Prejudgment Interest, Post-judgment Interest, And Costs, And Refusing To Render Judgment Consistent With Its 2007 Judgment.**

Anglo-Dutch's waiver of all complaints about the 2007 Judgment's awards of prejudgment interest, post-judgment interest, and costs prohibited the trial court from altering those awards on remand because a trial court errs by rendering a judgment on remand that alters its own or a higher court's prior judgment on an issue that was not appealed. *See Medical Ctr. Pharmacy*, 634 F.3d at 834 (holding that the district court erred by reversing on remand its prior ruling granting declaratory relief which had been waived on appeal); *United Resources, L.P.*, 2014 WL 3339537, at *3 (holding that the trial court erred on remand by modifying its prior take-nothing judgment on cross-claims because no party had attacked that part of the trial court's judgment in an earlier appeal); *Hudspeth County Underground Water Conservation Dist. No. 1*, 355 S.W.3d at 434-35 (holding that the trial court erred on remand by making a finding on prevailing-party status for attorneys' fees purposes that conflicted with the court of appeals' prior decision on the issue which had been waived on appeal to the Texas Supreme Court); *JGR, Inc.*, 550 F.3d at 533 (holding that a

district court erred on remand by rendering judgment on a jury's $3.3 million lost profits finding because the district court's previously-rendered judgment on a $0 lost profits finding had been waived on appeal); *Anderson Courier Serv.*, 222 S.W.3d at 66-67 (holding that the trial court erred by awarding attorneys' fees under the declaratory judgment act on remand when any complaint that the trial court's original judgment failed to award attorneys' fees was waived on appeal). Therefore, the trial court erred by rendering a judgment inconsistent with the 2007 Judgment's awards of $226,924.50 in prejudgment interest, post-judgment interest on $1,654,817, and costs, and refusing to render a judgment consistent with the 2007 Judgment on those issues.

## PRAYER

For these reasons, Swonke requests that this Court reverse the trial court's 2014 Judgment decrees 2(1), 4, 5, 6, 7, 8, 9, 11, 12, 13, 15, and 16. Swonke also requests that this Court render judgment that Anglo-Dutch pay Swonke $1,530,000 under the Fee Agreement, $427,892.50 in attorneys' fees, $226,924.50 in prejudgment interest,

post-judgment interest on $1,654,817, and court costs. Swonke also requests all other relief to which he is entitled.

Respectfully submitted,

**RUSTY HARDIN & ASSOCIATES, LLP**


___/s/ Joe Roden_____
Rusty Hardin
State Bar No. 08972800
Joe Roden
State Bar No. 00794549
Ryan Higgins
State Bar No. 24007362
1401 McKinney Street, Suite 2250
Houston, Texas   77010
Telephone:  713-652-9000
Facsimile:  713-652-9800

**ATTORNEYS FOR APPELLEES**


## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because it contains conventional typeface no smaller than 14-point for text and 12-point for footnotes. The document also complies with the word-count limitations of Texas Rule of Appellate Procedure 9.4(i), as it contains 14,426 words, excluding any parts exempted by Texas Rule of Appellate Procedure Rule 9.4(i)(1).


___/s/ Joe Roden_____
Joe Roden

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of Appellees' Merits Brief has been served via electronic service on Mr. Kenneth Breitbeil, Mr. David Louie, McFall, Sherwood & Eidman, P.C., 1331 Lamar Street, 1250 Four Houston Center, Houston, Texas 77010-3027 and Christopher S. Johns, Johns, Marrs, Ellis & Hodge, LLP, 805 W. 10th Street, Suite 400, Austin, Texas 78701 on April 6, 2015.


_/s/ Joe Roden_____

Joe Roden

NO. 14-14-00706-CV

IN THE

FOURTEENTH COURT OF APPEALS

ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC.
and ANGLO-DUTCH (TENGE) L.L.C.,
Appellants/Cross-Appellees,

v.

GREENBERG PEDEN, P.C. and GERARD J. SWONKE,
Appellees/Cross-Appellants.

## CROSS-APPELLANTS' APPENDIX

A.   Fee Agreement dated October 16, 2000

B.   Final Judgment dated January 22, 2007

C.   *Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*,
     267 S.W.3d 454 (Tex. App.—Houston [14th Dist.] 2008)

D.   *Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*,
     352 S.W.3d 445 (Tex. 2011)

E.   Trial Court's May 15, 2012 order construing the Fee
     Agreement as a matter of law and applying that construction
     to stipulated facts

F.    Trial Court's May 23, 2013 order granting interlocutory summary judgment against Swonke on his claims for breach of contract, declaratory judgment, and attorneys' fees

G.    Trial Court's May 13, 2014 Final Judgment

# APPENDIX A

# GREENBERG PEDEN P.C.

### ATTORNEYS AND COUNSELORS AT LAW

TELEPHONE: (713) 627-2720
FACSIMILE: (713) 627-7057
WEBSITE: www.gpsolaw.com

TENTH FLOOR, 12 GREENWAY PLAZA
HOUSTON, TEXAS 77046

October 16, 2000

Mr. Scott V. Van Dyke
Anglo-Dutch Petroleum International, Inc.
Eight Greenway Plaza, Suite 900
Houston, Texas 77046

     Re:    Cause No. 2000-22588; *Anglo-Dutch (Tenge) et aL vs. Ramco, et aL;* In the 151st Judicial District of Harris County, Texas.

Dear Scott:

This letter memorializes our agreement with respect to me assisting you and/or the companies which you control (Anglo-Dutch) and the law firm of McConn & Williams, LLP regarding the above-referenced matter.

In that regard, you have executed a Fee Agreement with the law firm of McConn & Williams on March 25, 2000, which is incorporated herein by reference. I agree to assist Anglo-Dutch and that firm in this lawsuit for proportionately the same percentage (20%) of any benefit to McConn & Williams reflected in such agreement. However, I will not be responsible for any expenses other than those I may personally incur. Further, the proportions under which my fees shall be calculated will be the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage. For example, if McConn & Williams' attorneys spend 1,000 hours on the lawsuit after the date the lawsuit was filed and I spend 90 hours of my time towards the lawsuit, then by rounding up to nearest whole number, I would be entitled to receive from you 2% (10% of 20%) of the gross revenues and other benefits recovered, if any, from this lawsuit. In addition, should the Fee Agreement be amended, you agree that I shall be entitled to the benefit of such amendment.

If this comports with your understanding of our agreement, please indicate by signing below and returning this letter to me.

If you have any questions, please contact me.

Very truly yours,

GREENBERG PEDEN P.C.

GERARD J. SWONKE

EXHIBIT

Jackson 3

HENJUM GOUCHER

EXHIBIT NO. 1
3/28/05
ANN M. STAFFORD


PLAINTIFF'S
EXHIBIT
1

ANG203I2\031\179795_1
JWORD 10/17/00

GJS 000928

312

Mr. Scott V. Van Dyke
Page 2


AGREED TO:

SCOTT V. VAN DYKE, PRESIDENT OF
ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC.
DATED: _10/17/00_

# APPENDIX B

CAUSE NO. 2004-20712

| | | |
|---|---|---|
| ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. and ANGLO-DUTCH (TENGE), LLC *Plaintiffs,* | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| vs. | §<br>§ | HARRIS COUNTY, TEXAS |
| GREENBERG PEDEN, P.C. and GERARD J. SWONKE *Defendants* | §<br>§<br>§ | 61st JUDICIAL DISTRICT |

## FINAL JUDGMENT

On November 27, 2006, this case was called for trial.

### I.      Plaintiffs

Anglo-Dutch Petroleum International, Inc., and Anglo-Dutch (Tenge), LLC, appeared through its corporate representative and its attorneys and announced ready for trial. Scott Van Dyke appeared in person and through his attorneys and announced ready for trial.

### II.      Defendants

Defendant Gerard J. Swonke appeared in person and through his attorneys and announced ready for trial.

Defendant Greenberg Peden, P.C. appeared though its attorneys and announced ready for trial.

### III.      Trial

Before testimony began, all parties agreed that all issues regarding attorneys' fees would not be submitted to the jury, but would be separately determined by the Court after the jury returned a verdict.

000800

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

297

After a jury was impaneled and sworn, it heard the evidence and arguments of counsel. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record on December 11, 2006. The questions submitted to the jury and the jury's findings are attached as Exhibit A and incorporated by reference.

## IV. Attorneys' Fees

Defendants sought an award of attorneys' fees. On January 12, 2007, the Court held an evidentiary hearing on the issue of attorneys' fees. Plaintiffs and Defendants appeared through counsel and presented evidence regarding attorneys' fees. At the conclusion of the hearing, the Court determined the amounts of the Defendants' reasonable and necessary, equitable and just attorneys' fees incurred and to be incurred in the defense and prosecution of this case. Those amounts are set forth below. The Court also determined that an award of attorney's fees to Plaintiff would not be equitable or just.

## V. Judgment Decrees

Because the jury's verdict was for Defendants and against Plaintiffs, judgment should be and is now hereby RENDERED on the verdict in favor of Defendants Gerard J. Swonke and Greenberg Peden, P.C., and against Plaintiffs Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC and Counter-defendant Scott Van Dyke.

1. <u>Take-Nothing Judgment Against Plaintiffs.</u>

The Court ORDERS that Plaintiffs Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC and Counter-defendant Scott Van Dyke TAKE NOTHING from Defendants Gerard J. Swonke and Greenberg Peden, P.C.

2. <u>Partial Take-Nothing Judgment Against Defendants On Fraud and Exemplary Damages Claims.</u>

000801

2

The Court ORDERS that Defendants Gerard J. Swonke and Greenberg Peden, P.C. take nothing from Plaintiffs Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC and Counter-defendant Scott Van Dyke on Defendants' fraud and exemplary damages claims.

### 3. Judgment For Defendant Gerard J. Swonke.

The Court ORDERS Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC, jointly and severally, to pay Gerard J. Swonke the sum of $ 1,000,000.00 and prejudgment interest on the amount totaling $ 226,924.50.

### 4. Attorneys' Fees.

The Court further ORDERS Plaintiffs Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge) LLC, jointly and severally, to pay Defendant Gerard J. Swonke the following reasonable and necessary, equitable and just amounts as attorneys' fees for the prosecution of Defendant Gerard J. Swonke's breach of contract and declaratory judgment claims, and Defendant Gerard J. Swonke's defense of the declaratory judgment claim of Plaintiffs Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge) LLC:

(A) $ _352,892.50_ -- from April 22, 2004 to rendition of this final judgment;

(B) $ _75,000.00_ -- in the event Anglo-Dutch Petroleum International, Inc. and/or Anglo-Dutch (Tenge), LLC unsuccessfully appeals to a court of appeals; and

(C) $ _50,000.00_ -- in the event Anglo-Dtuch Petroleum International, Inc. and/or Anglo-Dutch (Tenge), LLC unsuccessfully appeals to the Texas Supreme Court.

### 5. Costs of Court.

The Court ORDERS Plaintiffs Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC, jointly and severally, to pay all costs of court expended or incurred in this action by Defendants Gerard J. Swonke and Greenberg Peden, P.C.

000802

3

6. **Post-Judgment Interest.**

The Court ORDERS Plaintiffs Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC, jointly and severally, to pay post-judgment interest on this judgment and the amounts awarded herein at the rate of eight and one-quarter (8.25%) per annum, compounded annually, from the date of this judgment until paid.

7. **Writs.**

The Court ORDERS execution to issue for this judgment.

VI. **Finality of Judgment**

This judgment is final, disposes of all claims and parties, and is appealable.

SIGNED this _____ day of _____ JAN 2 2 2007 _____, 2007.

_____
JUDGE PRESIDING

JOHN DONOVAN

CAUSE NO. 2004-20712

| | | |
|---|---|---|
| ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. and ANGLO-DUTCH (TENGE), LLC *Plaintiffs,* | § § § § § | IN THE DISTRICT COURT |
| vs. | § § § | HARRIS COUNTY, TEXAS FILED CHARLES BACARISSE District Clerk |
| GREENBERG PEDEN, P.C. and GERARD J. SWONKE *Defendants* | § § § | DEC - 7 2006 61st JUDICIAL DISTRICT County, Texas By_____ Deputy |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1. Do not let bias, prejudice or sympathy play any part in your deliberations.

2. In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the court, that is, what you have seen and heard in this courtroom, together with the law as given you by the court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3. Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

4. You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5. You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

-1-

**Exhibit A**

000826

6.     You may render your verdict upon the vote of ten or more members of the jury. The same ten or more of you must agree upon all of the answers made and to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority or any other vote of less than ten jurors. If the verdict and all of the answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict, those jurors who agree to all findings shall each sign the verdict.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." The term "preponderance of the evidence" means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless otherwise instructed.

- 2 -

000827

## GENERAL INSTRUCTIONS

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

The "Fee Agreement" means Plaintiffs' Exhibit 1.

"Halliburton Lawsuit" means the lawsuit brought by Anglo-Dutch against Halliburton, Ramco Oil & Gas et. al. and styled Cause No. 2000-22588, *Anglo-Dutch (Tenge) LLC, et al. v. Ramco Oil & Gas, Ltd., et al.*

"Anglo-Dutch" means Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge) LLC.

"Greenberg Peden" means Greenberg Peden, P.C.

"Swonke" means Gerard J. Swonke.

"Van Dyke" means Scott Van Dyke.

-3-

000826

## QUESTION 1

Do you find that the Fee Agreement with Anglo-Dutch (Plaintiffs' Exhibit 1) was entered into on behalf of Greenberg Peden, or on behalf of Swonke, individually?

You must decide the agreement's meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

As to your two choices below, you must answer "YES" as to only one, and "NO" as to the other.

Answer:

_No_ On behalf of Greenberg Peden

_Yes_ On behalf of Swonke, individually

-4-

000829

# QUESTION NO. 2

Did Anglo-Dutch fail to comply with the Fee Agreement?

Answer "Yes" or "No": ___Yes___

000830

If you answered "Yes" to Question No. 1 as to Swonke, individually, and "Yes" to Question No. 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Swonke for his damages, if any, that resulted from such failure to comply?

Consider the following elements of damages, if any, and none other.

The amount Anglo-Dutch agreed to pay Swonke in the Fee Agreement for the Halliburton settlement.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Answer: $ 1,000,000.00

- 6 -

000831

If you answered "Yes" to Question No. 1 as to Greenberg Peden, and "Yes" to Question No. 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 4

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Greenberg Peden for its damages, if any, that resulted from such failure to comply?

Consider the following elements of damages, if any, and none other.

The amount Anglo-Dutch agreed to pay in the Fee Agreement for the Halliburton settlement.

Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any:

Answer: $_____☓_____

000832

## QUESTION 5

Did Swonke comply with his fiduciary duty to Anglo-Dutch?

As Anglo-Dutch's attorney, Swonke owed Anglo-Dutch a fiduciary duty. To prove that he complied with his fiduciary duty, Swonke must show:

a. The transactions in question were fair and equitable to Anglo-Dutch;

b. Swonke made reasonable use of the confidence that Anglo-Dutch placed in him;

c. Swonke acted in the utmost good faith and exercised the most scrupulous honesty toward Anglo-Dutch;

d. Swonke placed the interests of Anglo-Dutch before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Anglo-Dutch, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

e. Swonke fully and fairly disclosed all important information to Anglo-Dutch concerning the transactions.

Answer "YES" or "NO":

Answer: _Yes_

-8-

000833

If your answer to Question 5 is "NO," and you did not answer Question 3 with a dollar amount, then answer Question 6. Otherwise, do not answer Question 6.

## QUESTION 6

What was the amount of Swonke's fees, if any, under the Fee Agreement?

Answer in dollars and cents, if any.

Answer: $_____╳_____

-9-

000834

If your answer to Question 5 is "NO," then answer Question 7. Otherwise, do not answer Question 7.

You are instructed that, in order for you to answer the following question "Yes," your answer must be unanimous.

## QUESTION 7

Do you find by clear and convincing evidence that the harm to Anglo-Dutch resulted from malice or fraud?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means a specific intent by Swonke to cause substantial injury or harm to Anglo-Dutch.

Fraud occurs when –
  a. a party makes a material misrepresentation,
  b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,
  c. the misrepresentation is made with the intention that it should be acted on by the other party, and
  d. the other party relies on the misrepresentation and thereby suffers injury.

Fraud also occurs when –
  a. a party fails to disclose a material fact within the knowledge of that party,
  b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,
  c. the party intends to induce the other party to take some action by failing to disclose the fact, and
  d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

"Misrepresentation" means:
  a. a false statement of fact,
  b. a promise of future performance made with an intent, at the time the promise was made, not to perform as promised,
  c. a statement of opinion based on a false statement of fact,
  d. a statement of opinion that the maker knows to be false, or
  e. an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion.

"Special knowledge" means knowledge or information superior to that possessed by the other party and to which the other party did not have equal access.

Answer "YES" or "NO":

Answer: _X_

000835
-10-

If your answer to Question 7 is "YES," then answer Question 8. Otherwise, do not answer Question 8.

You are instructed that, in order for you to find exemplary damages, your answer to the question regarding the amount of such damages must be unanimous.

## QUESTION 8

What sum of money, if paid now in cash, should be assessed against Swonke and awarded to Anglo-Dutch as exemplary damages, if any, for the conduct found in response to Question 7?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarded exemplary damages, if any, are –

a. The nature of the wrong.
b. The character of the conduct involved.
c. The degree of culpability of Swonke.
d. The situation and sensibilities of the parties concerned.
e. The extent to which such conduct offends a public sense of justice and propriety.
f. The net worth of Swonke.

Answer in dollars and cents, if any.

Answer: $ _____

- 11 -

000835

If you answered "Yes" to Question No. 1 as to Swonke, individually, then answer the following question. Otherwise, do not answer the following question.

QUESTION NO. 9

Did Van Dyke commit fraud against Swonke?

Fraud occurs when a promise of future performance is made with an intent, at the time the promise was made, not to perform as promised.

Answer "Yes" or "No": _No_

000837                                                -12-

If your answer to Question No. 9 is "Yes," then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 10

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Swonke for his damages, if any, that resulted from such fraud?

Consider the following elements of damages, if any, and none other.

The amount Anglo-Dutch agreed to pay Swonke.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any:

Answer: $_____✗_____

000838

If you have answered "Yes" to Question No. 9, then answer the following question. Otherwise, do not answer the following question.

You are instructed that, in order for you to answer the following question "Yes," your answer must be unanimous.

## QUESTION NO. 11

Do you find by clear and convincing evidence that the harm to Swonke resulted from fraud or malice?

Answer "Yes" or "No." ____X____

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Fraud" means fraud other than constructive fraud.

"Malice" means a specific intent by Van Dyke to cause substantial injury or harm to Swonke.

- 14 -

000839

If you have answered "Yes" to Question No. 11, then answer the following question. Otherwise, do not answer the following question.

You are instructed that, in order for you to find exemplary damages, your answer to the question regarding the amount of such damages must be unanimous.

### QUESTION NO. 12

What sum of money, if any, if paid now in cash, should be assessed against Van Dyke and awarded to Swonke as exemplary damages, if any, for the conduct found in response to Question 11?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

a.    The nature of the wrong.

b.    The character of the conduct involved.

c.    The degree of culpability of Van Dyke.

d.    The situation and sensibilities of the parties concerned.

e.    The extent to which such conduct offends a public sense of justice and propriety.

f.    The net worth of Van Dyke.

Answer in dollars and cents, if any.

$_____ X _____

000840

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the presiding juror—

1.    to preside during your deliberations,

2.    to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge,

3.    to write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the judge,

4.    to vote on the questions,

5.    to write your answers to the questions in the spaces provided, and

6.    to certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the questions you are required to answer under the instructions of the judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

_____
JUDGE PRESIDING

JOHN DONOVAN

- 16 -

000841

## CERTIFICATE

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into court as our verdict.

I certify that the jury was unanimous in answering the following questions:

Answer "All" or list questions: _____2_____

PRESIDING JUROR

_Judith Valentino_

Printed Name of Presiding Juror

(If the answers to some questions were not unanimous, the jurors who agreed to those answers must certify as follows:)

We agree to the answers to the following questions:

List questions: ___1, 3, 5, 9_____

Jurors' Signatures

1. _____
2. Ronald E. Johnson
3. _____
4. _____
5. _____
6. Barbara Vaccienti
7. Lester L. Heidry

8. Linda Capp
9. Dale Watters
10. Lester E. Martinez
11. _____
12. _____

- 17 -

000842

Jurors' Printed Names:

1. Judith Valentine 1, 3, 5 & 9
2. Ronald E. Johnson 1, 3, 5, 9
3. Mashell Hurd 1, 3, 5, 9
4. Michael J Heineman 1, 3, 5, 9
5. David M. Droll 1, 3, 5, 9
6. Barbara J Vaglienti 1, 3, 5, 9
7. Lester L Gentry 1, 3, 9
8. Linda Capps 1, 3, 5, 9
9. Dale Walters 1, 3, 5, 9
10. Luis Martinez 1, 3, 5, 9
11. Pat Ljungdahl 1, 3, 5, 9
12. _____

000843

# APPENDIX C

267 S.W.3d 454
Court of Appeals of Texas,
Houston (14th Dist.).

ANGLO–DUTCH PETROLEUM INTERNATIONAL,
INC. and Anglo–Dutch (Tenge) L.L.C., Appellants

v.

GREENBERG PEDEN, P.C. and
Gerard J. Swonke, Appellees.

No. 14–07–00343–CV. | Aug. 26, 2008.

**Synopsis**

**Background:** Former client brought action seeking declaration that it did not owe attorney contingency fees. Attorney counterclaimed. The 61st District Court, Harris County, John J. Donovan, J., entered judgment on a jury verdict for attorney, and former client appealed.

**Holdings:** The Court of Appeals, William J. Boyce, J., held that:

[1] contingency fee agreement was ambiguous regarding whether the fees were owed to attorney individually or to firm in which attorney was "of counsel;"

[2] ambiguity in agreement would not be construed against attorney as the drafter;

[3] evidence was sufficient to establish that attorney did not breach his fiduciary duty when he drafted fee agreement;

[4] evidence was sufficient to establish that client owed the contingency fees to attorney rather than to firm;

[5] instructions adequately informed the jury regarding the consideration of the client's perspective of fee agreement; and

[6] trial court did not abuse its discretion by admitting evidence that investors had funded the underlying action, that former client did not pay investors their contracted amounts, and that former client did not pay legal fees owed to other law firms in unrelated actions.

Affirmed.

West Headnotes (23)

**[1]** **Appeal and Error**
⟜ Cases Triable in Appellate Court
Determining whether a contract is ambiguous is a question of law subject to de novo review on appeal.

Cases that cite this headnote

**[2]** **Contracts**
⟜ Construction as a whole

**Contracts**
⟜ Extrinsic circumstances

To determine whether a contract is ambiguous, a court looks at the agreement as a whole in light of the circumstances present when the parties entered the agreement.

Cases that cite this headnote

**[3]** **Appeal and Error**
⟜ Conduct of trial or hearing in general
An appellate court reviews a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard.

Cases that cite this headnote

**[4]** **Trial**
⟜ Authority to instruct jury in general

**Trial**
⟜ Definition or explanation of terms

A trial court enjoys wide discretion in framing a jury charge and is given broad latitude to determine the propriety of explanatory instructions and definitions.

1 Cases that cite this headnote

**[5]** **Appeal and Error**
⟜ Rulings on admissibility of evidence in general

An appellate court reviews a trial court's decision to admit or exclude evidence for abuse of discretion.

1 Cases that cite this headnote

**[6]    Trial**
⟜ Admission of evidence in general

**Trial**
⟜ Exclusion of improper evidence

A trial court abuses its discretion in admitting or excluding evidence if it acts without reference to any guiding rules and principles, or if the act complained of is arbitrary and unreasonable.

Cases that cite this headnote

**[7]    Appeal and Error**
⟜ Rulings as to evidence and instructions

An appellate court must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it.

1 Cases that cite this headnote

**[8]    Appeal and Error**
⟜ Evidence in General

**Appeal and Error**
⟜ Prejudicial Effect

A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted.

Cases that cite this headnote

**[9]    Declaratory Judgment**
⟜ Questions for jury

Contingency fee agreement former client had entered into regarding attorney's assistance in legal action was ambiguous with respect to whether attorney contracted for himself individually or for law firm, and thus issue of the parties' intent was for the jury to determine, in trial of former client's lawsuit seeking declaration that it did not owe attorney the contingency fees; though agreement was printed on law firm's stationery and attorney signed agreement under law firm's signature block, agreement's text did not reference law firm, agreement made multiple references to the attorney individually, attorney was of counsel to law firm, and law firm had refused to do any further work for former client because of unpaid legal fees.

Cases that cite this headnote

**[10]    Contracts**
⟜ Intention of Parties

A court's primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract.

Cases that cite this headnote

**[11]    Contracts**
⟜ Language of contract

A contract's language is the primary evidence of the intent of the parties to the contract.

Cases that cite this headnote

**[12]    Contracts**
⟜ Construction as a whole

When construing a contract, a court examines and considers the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.

Cases that cite this headnote

**[13]    Contracts**
⟜ Construction as a whole

**Contracts**
⟜ Extrinsic circumstances

To determine whether a contract is ambiguous, a court looks at the agreement as a whole in light of the circumstances present when the parties entered into the agreement.

Cases that cite this headnote

[14] **Contracts**

⟜ Existence of ambiguity

A contract is unambiguous if it can be given a definite or certain meaning.

Cases that cite this headnote

[15] **Contracts**

⟜ Existence of ambiguity

**Contracts**

⟜ Ambiguity in general

If a contract is subject to two or more reasonable interpretations, then the contract is ambiguous and the jury is entitled to resolve the fact issue concerning the parties' intent.

Cases that cite this headnote

[16] **Contracts**

⟜ Existence of ambiguity

An ambiguity in a contract can be patent or latent; a "patent ambiguity" is evident on the contract's face, while a "latent ambiguity" arises from a collateral matter when a contract that appears to be unambiguous on its face is applied to its subject.

Cases that cite this headnote

[17] **Attorney and Client**

⟜ Construction and Operation of Contract

Ambiguity in contingency fee agreement regarding whether attorney contracted for himself individually or for law firm would not be construed against attorney as the drafter, in trial of former client's lawsuit seeking declaration that it did not owe attorney the contingency fees, where the client was sophisticated and experienced, agreement was not presented to client on a take-it-or-leave-it basis, and agreement was instead negotiated between attorney and client after attorney's law firm told client it would not undertake the representation due to unpaid legal bills. Restatement (Third) The Law Governing Lawyers § 18.

Cases that cite this headnote

[18] **Attorney and Client**

⟜ Pleading and evidence

Evidence was sufficient to establish that attorney did not breach his fiduciary duty to client by drafting contingency fee agreement which was ambiguous in regard to whether fees were owed to attorney individually or to law firm, in trial of former client's lawsuit seeking declaration that it did not owe attorney the contingency fees; attorney testified that he had explained on many occasions his "of counsel" status at law firm, client acknowledged that law firm had refused to assist client in the underlying action due to unpaid legal bills and that attorney had referred client to a second law firm, and attorney testified that, after client had retained second law firm, client still requested attorney's personal services in the underlying action and that when agreement was negotiated he explained to client and client understood that agreement was with attorney individually and not the law firm.

Cases that cite this headnote

[19] **Attorney and Client**

⟜ Employment

Evidence was sufficient to establish that under the terms of ambiguous contingency fee agreement former client owed contingency fees to attorney individually rather than to law firm, in trial of former client's lawsuit seeking declaration that it did not owe attorney the contingency fees; though agreement was printed on law firm's stationery, agreement's text did not reference law firm, agreement made multiple references to the attorney individually, attorney testified that client understood that he was "of counsel" at law firm, client acknowledged that law firm had refused to do any further work for client because of unpaid legal fees, attorney testified that contingency fee agreement was negotiated after client requested his continued assistance on underlying action after such action had been referred to a second law firm, and

attorney testified that client understood fees were owed to him rather than law firm.

Cases that cite this headnote

**[20]  Appeal and Error**
    ⬤ Conduct of trial or hearing in general

Because a trial court enjoys wide discretion in determining which instructions should be included in the jury charge, review is limited to determining whether the court acted without reference to any guiding rules or principles.

Cases that cite this headnote

**[21]  Attorney and Client**
    ⬤ Instructions

Instructions adequately informed the jury regarding the consideration of the client's perspective of fee agreement and the fiduciary duties attorney owed client, in trial of former client's lawsuit seeking declaration that under the terms of contingency fee agreement it did not owe attorney individually the contingency fees but instead owed the fees to law firm in which attorney was "of counsel," by providing that the jury was to consider all of the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties and the conduct of the parties, and by separately instructing the jury on attorney's fiduciary duties and submitting question on whether attorney breached his fiduciary duties in regard to the fee agreement.

1 Cases that cite this headnote

**[22]  Trial**
    ⬤ Matters of law

**Trial**
    ⬤ Duty to give requested instruction; erroneous requests

Not every correct statement of the law belongs in a jury charge; a requested instruction can set forth a correct statement of the law and still be unnecessary in the charge.

Cases that cite this headnote

**[23]  Attorney and Client**
    ⬤ Evidence

**Declaratory Judgment**
    ⬤ Admissibility

**Witnesses**
    ⬤ Competency of contradictory evidence

Trial court did not abuse its discretion, in trial of former client's lawsuit seeking declaration that under terms of contingency fee agreement it did not owe attorney individually the contingency fees but instead owed the fees to firm in which attorney was "of counsel," by admitting evidence that client entered into agreements with investors to fund underlying action, testimony by one of the investors that he had to sue attorney's former client when he was asked to accept less than what he had contracted for after underlying action was settled, and evidence that former client had not paid fees it owed to other law firms in unrelated actions; evidence of the investment agreements went to attorney's individual work with respect to the investors, and evidence that former client did not pay investors their contracted amounts and did not pay bills owed to other law firms went to the credibility of client's owner when he testified that client did not owe attorney the fees.

1 Cases that cite this headnote

**Attorneys and Law Firms**

\*457 Gregory S. Coleman, Donald B. McFall, Richard B. Farrer, Austin, \*458 Kenneth R. Breitbeil, Kenneth Wayne Bullock II, Houston, TX, for appellants

Rusty Hardin, Joe M. Roden, Ryan Kees Higgins, Houston, TX, for appellees.

Panel consists of Justices FOWLER and BOYCE and Senior Justice HUDSON. [*]

**OPINION**

WILLIAM J. BOYCE, Justice.

Anglo–Dutch Petroleum International, Inc. and Anglo–Dutch (Tenge) L.L.C. (collectively, "Anglo–Dutch") appeal the trial court's judgment in favor of Greenberg Peden, P.C. and Gerard J. Swonke in connection with this fee dispute between a client and an attorney.

We affirm the trial court's judgment.

### Overview

This appeal arises from a contingency fee agreement dated October 16, 2000. It is undisputed that the client, Anglo–Dutch, entered the fee agreement. It is undisputed that Anglo–Dutch's president, Scott V. Van Dyke, signed the fee agreement on behalf of Anglo–Dutch. It is undisputed that the attorney, Swonke, also signed the fee agreement. It is hotly disputed whether Swonke signed the fee agreement on behalf of himself individually or on behalf of the Greenberg Peden law firm, where he was "of counsel" at the time.

Swonke contends he signed on behalf of himself individually and can recover fees individually. Anglo–Dutch contends Swonke signed on behalf of the law firm and cannot recover fees individually. Greenberg Peden disclaims rights to or interest in the disputed fees. The law firm assigned any interest under the October 16, 2000 fee agreement to Swonke; released Anglo–Dutch from liability to Greenberg Peden for the disputed fees; and acknowledged that Greenberg Peden is not entitled to receive money from Anglo–Dutch under the agreement.

The trial court concluded that the October 16, 2000 fee agreement is ambiguous with respect to the capacity in which Swonke signed, and submitted that issue to the jury. The jury sided with Swonke on that issue, finding that he signed the fee agreement with Anglo–Dutch on behalf of himself individually and not on behalf of Greenberg Peden. The jury further answered that Anglo–Dutch failed to comply with the fee agreement; that Swonke complied with his fiduciary duty to his client Anglo–Dutch; and that Van Dyke did not commit fraud against Swonke. The jury awarded $1 million as contract damages to Swonke for Anglo–Dutch's failure to comply with the fee agreement. The trial court signed a final judgment in conformity with the jury's findings awarding contract damages and additional statutory attorney's fees to

Swonke. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (Vernon 2008).

Anglo–Dutch assails the trial court's final judgment in favor of Swonke on multiple grounds. Resolution of Anglo–Dutch's appellate challenges requires a detailed discussion of the evidence adduced at trial and the circumstances surrounding execution of the October 16, 2000 fee agreement.

### Facts

Swonke joined Greenberg Peden as "of counsel" in 1987.[1] This status gave Swonke discretion to choose his clients and **\*459** gave Greenberg Peden a right of first refusal regarding clients and matters Swonke brought to the firm. Swonke remained as "of counsel" to Greenberg Peden until the firm dissolved in 2001.

The "of counsel" relationship between Swonke and Greenberg Peden operated under a fee sharing agreement. For matters accepted by the firm, it billed Swonke's time through the firm computer system and deducted a percentage from Swonke's fees; the size of the deduction depended on the fee agreement with a particular client. This deduction reimbursed Greenberg Peden for Swonke's use of office space, paralegals, secretaries, and parking. Clients in matters accepted by the firm paid their fees for Swonke's time directly to Greenberg Peden, which made appropriate deductions and then paid the balance to Swonke.

Swonke met Van Dyke in 1987 at a lunch with Van Dyke's father while Van Dyke was working for his father's company. Van Dyke's father asked Swonke to perform legal work for the company. Swonke already had joined Greenberg Peden as of counsel at that point. While Van Dyke was still working for his father, Van Dyke and his father later asked about Swonke's salary at Greenberg Peden because they wanted to hire Swonke as in-house counsel for the father's company. Swonke responded that as "of counsel" he did not receive a salary from the firm, but was paid only when clients paid; Swonke explained that he generated his own work and sometimes made more money than at other times. Van Dyke, his father and Swonke decided to maintain their existing relationship, under which Swonke performed legal work for the father's company as "of counsel" at Greenberg Peden. Swonke testified that he also explained his "of counsel" status to Van Dyke and Van Dyke's mother on several occasions.

Van Dyke testified that he did not recall being told Swonke was "of counsel" to Greenberg Peden.

Van Dyke left his father's company in 1988 and together with his mother formed Anglo–Dutch Petroleum International, an oil and gas exploration company. Approximately four years later, Van Dyke asked Swonke to perform legal work for Anglo–Dutch in connection with development of oil and gas properties in an area known as the Tenge Field in Kazakhstan. Swonke began performing a substantial amount of legal work for Van Dyke and Anglo–Dutch in 1993. This work focused on preparing documents addressing the participation of multiple national and international investors in Anglo–Dutch's Tenge Field project. Swonke worked with Greenberg Peden shareholder Skip Naylor to draft the elaborate documents Van Dyke requested to bring investors together and create an entity called Anglo–Dutch (Tenge) L.L.C.

In 1997, Anglo–Dutch invited Halliburton Energy Services, Inc. and Ramco Oil & Gas, Ltd. to invest in the Tenge Field project. Anglo–Dutch hoped to use funds from these new investors to buy out its existing investors. To evaluate Anglo–Dutch's proposal, Halliburton and Ramco entered into confidentiality agreements with Anglo–Dutch and received confidential data to review. Swonke negotiated and drafted the confidentiality agreements for Anglo–Dutch.

Anglo–Dutch ceased paying Greenberg Peden's bills at about this time and began accumulating a large account payable to the firm. Anglo–Dutch's unpaid legal bills prompted Greenberg Peden to stop working for Anglo–Dutch in 1999. By early 2000, Anglo–Dutch owed Greenberg Peden more than $200,000. Swonke and Greenberg Peden shareholder David Peden met with Van Dyke in 1999 or early 2000 to discuss Anglo–Dutch's unpaid legal bills. **\*460** Peden told Van Dyke that no Greenberg Peden attorney would perform legal work for Anglo–Dutch until it paid its accumulated legal bills to the firm.

A dispute arose between Anglo–Dutch, Halliburton and Ramco in early 2000 regarding breach of the Tenge Field confidentiality agreements and disclosure of Anglo–Dutch's confidential data. Van Dyke asked Swonke in February 2000 to evaluate the potential for a lawsuit against Halliburton and Ramco for breach of the confidentiality agreements. Swonke advised Van Dyke that Anglo–Dutch had viable claims against both companies. Anglo–Dutch wanted to pursue the lawsuit but lacked financial resources to pay an attorney on an hourly basis.

Pursuant to Greenberg Peden's right of first refusal, Swonke asked the firm in February or March 2000 if it wanted to represent Anglo–Dutch in a suit against Halliburton and Ramco arising from breaches of the Tenge Field confidentiality agreements. Greenberg Peden refused to represent Anglo–Dutch on an hourly or a contingency basis because of Anglo–Dutch's unpaid bills and a history of difficulty in collecting fees from Anglo–Dutch. Thereafter, Swonke told Van Dyke that Greenberg Peden would not represent Anglo–Dutch in a lawsuit against Halliburton and Ramco due to Anglo–Dutch's outstanding legal bills. The bills remained unpaid.[2] Van Dyke did not ask Swonke to represent Anglo–Dutch against Halliburton and Ramco at that time.

Because Greenberg Peden refused to represent Anglo–Dutch in a suit against Halliburton and Ramco, Swonke referred Van Dyke to several other law firms. Anglo–Dutch signed a contingency fee agreement with McConn & Williams in March 2000. That firm filed a lawsuit against Halliburton and Ramco in May 2000. *See generally Ramco Oil & Gas Ltd. v. Anglo–Dutch (Tenge) L.L.C.,* 207 S.W.3d 801 (Tex.App.-Houston [14th Dist.] 2006, pet. denied).

Van Dyke and attorneys from McConn & Williams frequently asked Swonke for advice and help with tasks in furtherance of the lawsuit against Halliburton and Ramco in the months that followed this filing. After providing unpaid legal assistance for months, Swonke decided that he wanted compensation for time spent helping Anglo–Dutch with its lawsuit against Halliburton and Ramco. Swonke informed McConn & Williams of his desire to be paid. McConn & Williams said its fee interest was not large enough for that firm to compensate him out of its interest. Van Dyke then called Swonke directly; asked him to help with the lawsuit; and offered to pay him for doing so. Van Dyke and Swonke negotiated the terms of Swonke's compensation for his participation in Anglo–Dutch's suit against Halliburton and Ramco.

Van Dyke proposed to pay Swonke based on a contingency fee agreement because Anglo–Dutch could not afford an hourly fee. When Swonke suggested a flat percentage fee, Van Dyke responded by insisting on a formula that would (1) incorporate a ratio of hours Swonke spent to hours McConn & Williams attorneys spent, and then (2) multiply the 20 percent contingency fee contained in the McConn & Williams fee

agreement by that ratio. Van Dyke thought this would be the only fair way to measure Swonke's hours. Swonke initially rejected Van Dyke's formula because he thought it was too complicated; *461 later, he acquiesced to using it with a rounding feature.

Swonke's secretary typed the contingency fee agreement negotiated by Van Dyke and Swonke on Greenberg Peden letterhead; dated it October 16, 2000; and inserted the words "Greenberg Peden, P.C." in the signature block. The letter's opening paragraph states that it "memorializes our agreement with respect to me assisting you ... and the law firm of McConn & Williams, LLP" regarding the suit against Halliburton and Ramco. In the next paragraph, the letter states that "I agree to assist Anglo–Dutch and [McConn & Williams] ... in this lawsuit...."

Swonke signed the fee agreement's signature block on October 16, 2000 and sent it to Van Dyke for signature the same day. Van Dyke signed the fee agreement on October 17, 2000 and returned it to Swonke.

Van Dyke also sent a separate transmittal letter to Swonke on October 17, 2000 with a copy of the McConn & Williams contingency fee agreement. In the transmittal letter's second paragraph, Van Dyke states that the McConn & Williams fee agreement "provides the basis for the Agreement between Greenberg Peden P.C. and Anglo–Dutch." The transmittal letter was stamped "received" by Greenberg Peden. At the time of receipt, Swonke did not respond to the transmittal letter; did not challenge its reference to a fee agreement "between Greenberg Peden P.C. and Anglo–Dutch;" and did not assert that the fee agreement was between Anglo–Dutch and Swonke individually. Swonke did not examine or respond to Van Dyke's letter at the time of receipt because the letter transmitted the McConn & Williams fee agreement that Swonke already had in his file. Swonke testified that he normally would not read a letter that refers to a document he already had in his files.

The Greenberg Peden firm dissolved on October 1, 2001. By that time, Swonke had worked 277 hours on Anglo–Dutch's suit against Halliburton and Ramco. Swonke joined McConn & Williams as "of counsel" in October 2001 and informed Anglo–Dutch that he was taking its files with him to McConn & Williams unless Anglo–Dutch objected. There was no objection. Under his contract with McConn & Williams, Swonke did not share in any McConn & Williams fees for working on the Anglo–Dutch lawsuit against Halliburton and

Ramco. McConn & Williams understood that Swonke had a separate fee agreement with Anglo–Dutch in connection with the case. Swonke worked another 1,022 hours on Anglo–Dutch's lawsuit as "of counsel" to McConn & Williams.

Several months after Swonke left Greenberg Peden and joined McConn & Williams, Van Dyke was deposed in the Halliburton and Ramco lawsuit. At the deposition, Van Dyke testified that Anglo–Dutch had two contingency fee agreements. He testified that one such agreement was with John O'Quinn, Jett Williams, and Luke McConn, and the other was with Swonke. Van Dyke did not identify any contingency fee agreement with Greenberg Peden.

Anglo–Dutch's lawsuit against Halliburton and Ramco was tried for nine weeks beginning in August 2003. Anglo–Dutch sought more than $600 million in damages. See Ramco Oil & Gas Ltd., 207 S.W.3d at 806–07. The jury found that Halliburton and Ramco breached their respective confidentiality agreements with Anglo–Dutch. The jury awarded Anglo–Dutch $64 million in lost profits for Halliburton's breach of its confidentiality agreement and $6.4 million in lost profits for Ramco's breach of its confidentiality agreement. The parties *462 stipulated to $9.8 million in reasonable and necessary attorney's fees, which included the 1,022 hours Swonke spent working on the lawsuit while at McConn & Williams.

Anglo–Dutch settled with Halliburton on April 1, 2004 for $51 million.[3] After Swonke learned of the settlement, he sent an e-mail to Van Dyke on April 7, 2004 reminding him that the October 16, 2000 fee agreement required a comparison of Swonke's hours to those billed by McConn & Williams. Swonke sent another e-mail to Van Dyke the same day setting forth the total number of hours he worked on the lawsuit. Swonke's email asserted his entitlement to three percent of the settlement amount according to Swonke's calculations. Van Dyke responded to Swonke's email on April 13, 2004. Van Dyke said he had lost his voice and agreed that he and Swonke needed to discuss Swonke's situation. Swonke replied, asking Van Dyke to call him when he felt well enough to speak and inquiring whether Van Dyke received a memorandum Swonke sent him providing examples of work Swonke performed in furtherance of the lawsuit. The record does not reflect a written response by Van Dyke to this inquiry.

The final Halliburton settlement documents were signed on April 15, 2004. At Van Dyke's request, Swonke's name was

removed from the wiring instructions given to Halliburton. Swonke e-mailed Van Dyke that afternoon to note that Swonke's wiring instructions were not included with those of other attorneys who had worked on the lawsuit. Swonke asked Van Dyke how he wanted to handle payment of Swonke's fees. In the meantime, attorneys at McConn & Williams asked Swonke to not force the fee issue with Van Dyke until after the settlement was funded and completed, fearing it could jeopardize the settlement.

On April 16, 2004, Swonke e-mailed Van Dyke to congratulate him on receiving a $30 million portion of the Halliburton settlement. Swonke asked Van Dyke to address payment of Swonke's fees. Swonke said he would fax to Van Dyke a release signed by Greenberg Peden, which Van Dyke had requested. In that document, the law firm assigned any interest under the October 16, 2000 fee agreement to Swonke and released Anglo–Dutch from liability to Greenberg Peden for fees under that agreement.

On April 19, 2004, attorneys Luke McConn and Edward Crain wrote letters to Van Dyke at Swonke's request in support of Swonke. Both stated that Swonke's assistance had been invaluable in prosecuting the suit against Halliburton, and that Swonke's submitted hours were fair and reasonable. Swonke also faxed a letter to Van Dyke on that date further explaining his hours and offering an audit of his hours. Van Dyke and Swonke set up a meeting for April 22, 2004 to discuss Swonke's fee request.

**\*463** On April 20, 2004, Van Dyke met with attorney Sandy Dow to get a "fresh look" at Swonke's fee request. Swonke subsequently met with Van Dyke and his mother as scheduled at 8 a.m. on April 22, 2004. At the April 22 meeting, Van Dyke challenged the number of hours Swonke claimed to have worked on the lawsuit and the language of the Greenberg Peden release. Van Dyke asserted at this meeting that Anglo–Dutch entered the October 16, 2000 fee agreement with Greenberg Peden—not with Swonke individually. The meeting concluded without resolution of the fee dispute.

After meeting with Van Dyke, Swonke returned to his office and sent an email at 9:08 a.m. to Van Dyke and other recipients. The email stated that Swonke no longer would represent Van Dyke or his companies.

After meeting with Swonke, Van Dyke met with attorney Sandy Dow for about two hours. Dow's billing records for April 22, 2004 describe the activity at this meeting as follows:

"Office conferences with Scott Van Dyke regarding claims of Gerard Swonke; Draft, review and revise Plaintiff's Original Petition." At 2:52 p.m. that day, Anglo–Dutch filed a suit against Swonke and Greenberg Peden seeking a declaratory judgment in connection with the October 16, 2000 fee agreement.

Anglo–Dutch asked for a declaration that the fee agreement is between Anglo–Dutch and Greenberg Peden. Anglo–Dutch also asserted that Swonke breached the fiduciary duties he owed as an attorney to client Anglo–Dutch, and requested fee forfeiture. Swonke later filed a counterclaim seeking a declaration that the fee agreement is between Anglo–Dutch and Swonke individually. Swonke also asserted claims for breach of contract against Anglo–Dutch, and for fraud against Anglo–Dutch and Van Dyke individually.

The jury returned a verdict after a two-week trial. In answer to Question 1, the jury found that the fee agreement with Anglo–Dutch was entered into on behalf of Swonke individually and not on behalf of Greenberg Peden. In answer to Question 2, the jury found that Anglo–Dutch failed to comply with the fee agreement. The jury awarded $1,000,000 to Swonke in Question 3 for his damages resulting from Anglo–Dutch's failure to comply with the fee agreement. The jury answered "yes" to Question 5 asking if Swonke complied with his fiduciary duty to Anglo–Dutch. The jury answered "no" to Question 9 asking if Van Dyke committed fraud against Swonke. [4]

The trial court signed a final judgment in conformity with the jury's verdict on January 22, 2007, ordering that Anglo–Dutch and Van Dyke take nothing from Swonke and Greenberg Peden; that Swonke and Greenberg Peden take nothing on their fraud and exemplary damages **\*464** claims from Anglo–Dutch and Van Dyke; and that Anglo–Dutch pay Swonke $1,000,000 and prejudgment interest on that amount totaling $226,924.50. As agreed by the parties, the trial court held an evidentiary hearing on the issue of attorney's fees. The trial court ordered that Anglo–Dutch pay Swonke $352,892.50 in attorney's fees for the prosecution of his breach of contract claim and for defense of the declaratory judgment claims. Following denial of its post-trial motions, Anglo–Dutch timely filed a notice of appeal from the trial court's final judgment.

On appeal, the main dispute centers on whether Anglo–Dutch contracted with Greenberg Peden or with Swonke individually when Anglo–Dutch and Swonke signed the

October 16, 2000 fee agreement. Anglo–Dutch approaches this issue from several angles, contending that (1) the fee agreement unambiguously is between Anglo–Dutch and Greenberg Peden, and should be construed that way as a matter of law; (2) any ambiguity in the fee agreement should be construed against the drafter, attorney Swonke; (3) the evidence is legally and factually insufficient to support the jury's finding that the fee agreement is between Anglo–Dutch and Swonke individually; and (4) the evidence is legally and factually insufficient to support the jury's finding that Swonke complied with his fiduciary duty. Anglo–Dutch also challenges the correctness of the trial court's jury charge and certain evidentiary rulings during trial. [5]

## Standards of Review

### A. Contract Interpretation
[1] [2] Determining whether a contract is ambiguous is a question of law subject to *de novo* review on appeal. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex.2008). To determine whether a contract is ambiguous, we look at the agreement as a whole in light of the circumstances present when the parties entered the agreement. *David J. Sacks, P.C. v. Haden*, No. 07–0472, 2008 WL 2702184, at *3 (Tex. July 11, 2008).

### B. Legal and Factual Sufficiency of the Evidence
We apply the standard and scope of review for legal sufficiency of the evidence discussed in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex.2005). After *City of Keller*, it is difficult to make general pronouncements about the scope of review for a legal sufficiency challenge. The better course is to focus on the specific type of legal sufficiency challenge that is being made; this, in turn, frames the scope of review for appeal.

*City of Keller* endorsed Chief Justice Calvert's description of legal sufficiency challenges. "No-evidence" challenges may be sustained only when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810 (citing Robert W. Calvert, *"No Evidence" and*

*"Insufficient Evidence Points of Error,"* 38 Tex. L.Rev. 361, 362–63 (1960)).

**\*465** We must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. *City of Keller,* 168 S.W.3d at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard that evidence. *Id.* "The traditional scope of review does not disregard contrary evidence in every no evidence review if there is no favorable evidence (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above)." *Id.* at 810–11. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* at 822. Accordingly, the ultimate test for legal sufficiency always must focus on whether the evidence would enable reasonable and fair-minded jurors to reach the verdict under review. *Id.* at 827. Legal sufficiency review in the proper light must credit favorable evidence if reasonable jurors could do so, and must disregard contrary evidence unless reasonable jurors could not do so. *Id.* The reviewing court cannot substitute its judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822.

In reviewing factual sufficiency, we must consider and weigh all the evidence. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.*

For both legal and factual sufficiency review, the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *City of Keller,* 168 S.W.3d at 819; *Golden Eagle Archery, Inc.,* 116 S.W.3d at 761.

### C. Charge Instructions
[3] [4] We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *Dew v. Crown Derrick Erectors, Inc.,* 208 S.W.3d 448, 456 (Tex.2006). A party is entitled to a jury question, instruction, or definition on an issue raised by the pleadings and evidence. Tex.R. Civ. P. 278; *Dew,* 208 S.W.3d at 456. The trial court enjoys wide discretion in framing a jury charge and is given broad latitude to determine the propriety of explanatory instructions and definitions. *H.E. Butt Grocery Co. v. Bilotto,* 985 S.W.2d 22, 23 (Tex.1998). A trial court's error in refusing

an instruction is reversible if that refusal probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1; *Dew,* 208 S.W.3d at 456.

## D. Admission of Evidence

[5]  [6]  [7]  [8]  We review a trial court's decision to admit or exclude evidence for abuse of discretion. *In re J.P.B.,* 180 S.W.3d 570, 575 (Tex.2005). A trial court abuses its discretion in admitting or excluding evidence if it acts without reference to any guiding rules and principles, or if the act complained of is arbitrary and unreasonable. *Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 687 (Tex.2002). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998). We will not reverse a trial court for an erroneous evidentiary ruling unless the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex.R.App. P. 44.1; *see also* *466 Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995).

### Analysis

### A. The Fee Agreement is Ambiguous

[9]  Anglo–Dutch first argues that the trial court erred by allowing the jury to interpret the fee agreement because it unambiguously is between Anglo–Dutch and Greenberg Peden—not between Anglo–Dutch and Swonke individually. We reject Anglo–Dutch's contention because we agree with the trial court's determination that the fee agreement is ambiguous with respect to whether Swonke contracted for himself individually or for Greenberg Peden.

[10]  [11]  [12]  Our primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract. *Perry Homes v. Cull,* 258 S.W.3d 580, 606 (Tex.2008). The contract's language is the primary evidence of that intent. *Id.* We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Seagull Energy*

*E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006).

[13]  [14]  To determine whether a contract is ambiguous, we look at the agreement as a whole in light of the circumstances present when the parties entered into the agreement. *David J. Sacks, P.C.,* 2008 WL 2702184, at *3 (contract for legal services was not ambiguous and unenforceable as written because it only could be reasonably interpreted as setting forth agreement that client agreed to pay law firm hourly fee and contained no cap on fees); *Enter. Leasing Co. v. Barrios,* 156 S.W.3d 547, 549 (Tex.2004). A contract is unambiguous if it can be given a definite or certain meaning. *SAS Inst., Inc. v. Breitenfeld,* 167 S.W.3d 840, 841 (Tex.2005).

[15]  [16]  If the contract is subject to two or more reasonable interpretations, then the contract is ambiguous and the jury is entitled to resolve the fact issue concerning the parties' intent. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003); *Columbia Gas Trans. Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996). An ambiguity can be patent or latent. *E.g., Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 282 n. 1 (Tex.1996). A patent ambiguity is evident on the contract's face. *Id.* at 282. A latent ambiguity arises from a collateral matter when a contract that appears to be unambiguous on its face is applied to its subject. *Id.* at 282–283.

We begin with the October 16, 2000 fee agreement, which reads in its entirety as follows:

Dear Scott:

This letter memorializes our agreement with respect to me assisting you and/or the companies which you control (Anglo–Dutch) and the law firm of McConn & Williams, LLP regarding the above-reference matter.

In that regard, you have executed a Fee Agreement with the law firm of McConn & Williams on March 25, 2000, which is incorporated herein by reference. I agree to assist Anglo–Dutch and that firm in this lawsuit for proportionately the same percentage (20%) of any benefit to McConn & Williams reflected in such agreement. However, I will not be responsible for any expenses other than those I may personally incur. Further, the proportions under which my fees *467 shall be calculated will be the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or

will spend after the date the lawsuit was filed, rounded to the next whole percentage. For example, if McConn & Williams' attorneys spend 1,000 hours on the lawsuit after the date the lawsuit was filed and I spend 90 hours of my time towards the lawsuit, then by rounding up to nearest whole number, I would be entitled to receive from you 2% (10% of 20%) of the gross revenues and other benefits recovered, if any, from this lawsuit. In addition, should the Fee Agreement be amended, you agree that I shall be entitled to the benefit of such amendment.

If this comports with your understanding of our agreement, please indicate by signing below and returning this letter to me.

If you have any questions, please contact me.

Very truly yours,

GREENBERG PEDEN P.C.

/s/

GERARD J. SWONKE

Anglo–Dutch contends the fee agreement is an unambiguous contract between Greenberg Peden and Anglo–Dutch, stressing that it is printed on Greenberg Peden letterhead. Swonke's address, telephone and fax number are not included. Swonke signed under the "Greenberg Peden P.C." signature block.

For his part, Swonke stresses that the agreement's text does not reference Greenberg Peden. The fee agreement refers five times to McConn & Williams by name but never says Greenberg Peden will perform legal services for Anglo–Dutch. Swonke also highlights multiple references to himself individually. The letter refers to "our agreement with respect to me assisting you and/or the companies which you control (Anglo–Dutch)." It continues with "I agree to assist," "I will," "I may," "my fees," "I have spent," "I spend 90 hours of my time ... I would be entitled to receive from you," "I shall be entitled," and concludes with "If this comports with your understanding of our agreement."

The circumstances surrounding formation of the fee agreement also bear on this issue. *See Enter. Leasing Co.,* 156 S.W.3d at 549. Anglo–Dutch points to the following circumstances: (1) Anglo–Dutch had a longstanding relationship with Greenberg Peden; (2) the personal pronouns used throughout the fee agreement are consistent with hiring Greenberg Peden while specifying which Greenberg Peden attorney would perform the work; and (3) Van Dyke's October 17, 2000 transmittal letter demonstrates his belief that the fee agreement was between Anglo–Dutch and Greenberg Peden.

Swonke emphasizes other circumstances surrounding execution of the fee agreement. The fee agreement was signed against a backdrop that included (1) previous explanations dating back at least a decade regarding the nature of Swonke's "of counsel" status at Greenberg Peden; (2) Greenberg Peden's refusal to perform work for Anglo–Dutch since 1999 due to unpaid legal bills; and (3) Greenberg Peden's specific refusal to represent Anglo–Dutch on an hourly or a contingency fee basis in its suit against Halliburton and Ramco, again due to unpaid legal bills. Van Dyke acknowledged that after 1999, no Greenberg Peden attorney had performed legal work for Anglo–Dutch. Van Dyke admitted that Swonke informed him of the firm's refusal to represent Anglo–Dutch in the lawsuit against Halliburton and Ramco due to Anglo–Dutch's unpaid legal bills.

**\*468** We reject Anglo–Dutch's contention that the October 16, 2000 letter agreement unambiguously establishes a contract between Anglo–Dutch and Greenberg Peden in light of the letter's content and the circumstances surrounding its execution. The use of Greenberg Peden letterhead and the inclusion of "Greenberg Peden P.C." in the signature block reasonably suggest a contract with the law firm rather than an individual attorney. But the absence of any reference to Greenberg Peden in the letter's body—combined with Swonke's exclusive use of personal pronouns in the letter after the law firm repeatedly and emphatically told Van Dyke it would not represent Anglo–Dutch—reasonably suggest a contract with Swonke individually. These circumstances render the fee agreement ambiguous and give rise to a fact issue. The trial court properly submitted that fact issue to the jury for resolution.

This conclusion should not be misconstrued as a holding that any appearance of personal pronouns in an engagement letter or fee agreement creates ambiguity about whether the client hired a law firm or an individual lawyer. It usually will be clear when a client hired a law firm with an expectation that particular lawyers at the firm would work on a particular matter. However, an ambiguity exists in this case due to conflicting indications on the fee agreement's face combined with the law firm's prior express refusals to represent Anglo–Dutch, which refusals were communicated directly to Van

Dyke. Regardless of whether the ambiguity is characterized as "patent" or "latent," an ambiguity exists.

Anglo–Dutch cannot change this conclusion by pointing to the October 17, 2000 transmittal letter Van Dyke sent to Swonke. As noted earlier, the transmittal letter states as follows: "This fee agreement with McConn & Williams, LLP provides the basis for the Agreement between Greenberg Peden P.C. and Anglo–Dutch." Even assuming for argument's sake that a separate letter signed *after* execution of the fee agreement can be considered as part of the circumstances existing *when* the fee agreement was executed, the transmittal letter merely underscores the existence of an ambiguity in the fee agreement.

After examining the fee agreement as a whole and the circumstances present when the parties signed it, we hold that the fee agreement is ambiguous and that the trial court properly submitted a question asking the jury to determine the identity of the contracting parties.

We overrule Anglo–Dutch's first issue.

## B. Determining Which Parties Entered the Ambiguous Fee Agreement

Anglo–Dutch next argues that the trial court should have construed the fee agreement against Swonke because (1) any ambiguities in attorney-drafted fee agreements should be construed strictly against the attorney-drafter; and (2) there is legally and factually insufficient evidence to support the jury's finding that Swonke is a party to the fee agreement and Greenberg Peden is not.

The fact finder usually is tasked with weighing evidence of the parties' intent and choosing among competing interpretations of an ambiguous contract. *See Columbia Gas Transmission Corp.,* 940 S.W.2d at 589. However, ambiguities sometimes are construed in favor of one contracting party over another to address disparities in negotiating power or to promote public policy goals. *See, e.g., Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 746 (Tex.2006) (if an exclusion in an insurance contract has more than one reasonable **\*469** interpretation, it will be construed in favor of the insured).

Anglo–Dutch acknowledges that Texas has not adopted a blanket rule construing all ambiguities in contingency fee agreements against the attorney and in favor of the client.

Anglo–Dutch nevertheless invites this court to construe the ambiguous October 16, 2000 fee agreement against Swonke.

## 1. Should the ambiguous fee agreement be construed against Swonke?

### a. *Contra proferentem*

Anglo–Dutch invokes the doctrine of *contra proferentem* to advocate strict construction of the fee agreement against Swonke. Under this doctrine, an ambiguous contract will be interpreted against its drafter. *See, e.g., Evergreen Nat'l Indem. Co. v. Tan It All, Inc.,* 111 S.W.3d 669, 677 (Tex.App.-Austin 2003, no pet.) (if insured's interpretation of ambiguous policy provision is reasonable, it will be adopted even if insurer's interpretation is objectively more sensible, as long as insured's construction is not unreasonable). Courts employ this doctrine as a device of last resort when construing ambiguous contracts; it essentially operates as a tie-breaking device to prevent arbitrary decisions. *Id.*

Anglo–Dutch acknowledges that Texas case law has not applied this doctrine in blanket fashion to all ambiguities in attorney-client fee agreements. Anglo–Dutch nonetheless argues that recent Texas Supreme Court decisions suggest a preference for strictly construing ambiguities in fee contracts against the attorney and in favor of the client. We analyze the cases cited by Anglo–Dutch in light of its assertion.

In *Hoover Slovacek LLP v. Walton,* 206 S.W.3d 557, 559 (Tex.2006), Walton hired attorney Parrott of Hoover Slovacek to recover royalties from oil and gas companies operating on his ranch. Under the fee agreement, Hoover Slovacek was entitled to a 30 percent contingent fee for all claims on which collection was achieved. *Id.* The fee agreement also included a provision stating that, in the event the firm was discharged before completing the representation, Walton immediately had to pay a fee equal to the present value of the firm's interest in Walton's claim. *Id.*

Parrott negotiated settlements with Texaco and El Paso Natural Gas, and Walton paid the firm its contingent fee. Parrott then turned to Walton's claims against Bass Enterprises Production Company, and Walton authorized Parrott to settle for $8.5 million. *Id.* Parrott's initial settlement demand was for $58.5 million. A month later, Bass offered $6 million not only to settle Walton's claims, but also to acquire surface estates of eight sections of Walton's ranch. *Id.* Walton refused to sell, authorized Parrott to settle Walton's claims for unpaid royalties for $6 million, and expressed his discontent

with Parrott for not consulting Walton before making the $58.5 million settlement demand. *Id.* at 559–60. When Parrott responded by urging Walton to sell part of his ranch, Walton discharged Parrott and hired Andrews & Kurth LLP. *Id.* at 560. That firm settled Walton's claims against Bass for $900,000. *Id.* In the meantime, Hoover Slovacek demanded that Walton pay $1.7 million under the fee agreement. Hoover Slovacek contended that Bass's $6 million offer and Walton's subsequent authorization to settle for that amount established the present value of Walton's claims at the time of discharge. *Id.*

The court examined whether the termination fee provision was contrary to public policy. *Id.* at 561–66. It concluded that the firm's provision penalized Walton for changing counsel; granted the firm an **\*470** impermissible proprietary interest in Walton's claims; shifted the risks of representation almost entirely to Walton's detriment; and subverted several policies underlying the use of contingent fees. *Id.* at 566. Thus, the court determined that it was unenforceable because it was unconscionable as a matter of law, severed the termination provision, and held the remainder of the fee agreement was enforceable. *Id.*

In *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 859 (Tex.2000), the Lopezes hired Munoz, Hockema & Reed to represent them in a wrongful death suit against Westinghouse Electric Corporation. Their contingency fee agreement assigned 40 percent of any recovery to the firm, and 45 percent if the case "is appealed to a higher court." *Id.* After a $25 million jury verdict in favor of the Lopezes, the parties began settlement negotiations. *Id.* The parties tentatively agreed to a settlement, but Westinghouse filed a cash deposit in lieu of a cost bond with the trial court to perfect an appeal in case the settlement fell through. *Id.* When the firm met with the Lopezes to discuss the settlement and the firm's fees, the firm explained that its fee would be 45 percent of the recovery. No one objected at the time. *Id.* at 859–60. The Lopezes signed a settlement statement reflecting the firm's 45 percent fee and the funds were distributed. *Id.* at 860.

Three years later, the Lopezes sent the firm a letter asking the firm to refund the additional five percent fee. *Id.* When the firm refused, the Lopezes sued the firm alleging a breach of contract claim. *Id.* They argued that the phrase "appealed to a higher court" was ambiguous and should be construed against its drafter, the firm. *Id.* However, the court held that the contract language is unambiguous because it can be given

a definite legal meaning and it is not reasonably susceptible to more than one meaning. *Id.* at 861. By filing a cash deposit to perfect an appeal, the court found that an appeal had been "taken" and the appellate court's jurisdiction had been invoked under a plain reading of the appellate rules. *Id.* The court concluded that the unambiguous contract would be enforced as written. *Id.* at 862. Accordingly, because the case was appealed to a higher court when Westinghouse perfected its appeal, the firm did not breach the contract by charging the additional appeal fee. *Id.*

Justice Gonzales dissented in *Lopez* and argued that the phrase "appealed to a higher court" is ambiguous and should have been construed against the attorneys. *Id.* at 865. Justice Gonzales acknowledged that, when the objective meaning of a contract term is ambiguous, the parties' subjective meaning of the term becomes a fact question. *Id.* Nonetheless, he advocated that the special relationship between an attorney and client as well as the attorney's superior understanding of contract terms generally require an ambiguous contract to be construed against the attorney-drafter. *Id.* at 866.

Finally, in *Levine v. Bayne, Snell & Krause, Ltd.*, 40 S.W.3d 92, 93 (Tex.2001), the Levines agreed to pay their attorneys "one-third of any amount received by settlement or recovery from their lawsuit" for foundation damage. The Levines' $243,644 award was offset to extinguish their mortgage obligation, giving them clear title and resulting in a net recovery of $81,792.62. *Id.* A dispute arose regarding computation of fees before or after the offset. *Id.* The court sided with the Levines and held that "any amount received" meant net recovery. *Id.* at 95. The court reasoned that, because the attorney is better able to predict and provide for fee arrangements, the burden should **\*471** fall on the attorney to express in the agreement with the client whether the contingent fee will be calculated on non-cash benefits as well as money damages. *Id.* In *Levine*, there was no contract ambiguity and the court did not discuss or apply the doctrine of *contra proferentem*.

These cases do not establish that Texas law requires an ambiguity concerning the identity of parties to a fee agreement to be resolved against the attorney.

*Hoover Slovacek* does not apply here because it addresses whether a fee agreement's termination provision is unconscionable and unenforceable. *Hoover Slovacek*, 206 S.W.3d at 559. It did not decide whether *contra proferentem*

should be applied to construe an ambiguous fee agreement against the attorney-drafter.

In *Lopez,* Justice Gonzales argued in dissent that the fee agreement was ambiguous and should be construed against the attorney-drafter because of the special relationship between attorney and client. *Lopez,* 22 S.W.3d at 866. No subsequent Texas Supreme Court case has acted on the *Lopez* dissent's urging to adopt a broad *contra proferentem* rule for attorney-client fee contracts.

*Levine* placed a burden on attorneys to express clearly the contemplated computation in fee agreements. 40 S.W.3d at 95. That decision did not address an ambiguity concerning the identity of parties to a fee agreement, and it did not adopt a *contra proferentem* rule for all ambiguities in all attorney-client fee agreements.

Given the absence of definitive teaching from the Texas Supreme Court, we look for guidance on this issue from comment h to section 18 of the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS........ Both sides invoke comment h in favor of their respective positions. Comment h provides in pertinent part:

> Construction of client-lawyer contracts. Under this Section, contracts between clients and lawyers are to be construed from the standpoint of a reasonable person in the client's circumstances. The lawyer thus bears the burden of ensuring that the contract states any terms diverging from a reasonable client's expectations. The principle applies to fee terms ... as well as other terms.

\* \* \*

> Many tribunals have expressed the principle as a rule that ambiguities in client-lawyer contracts should be resolved against lawyers. That formulation can be taken to mean that the principle comes into play only when other means of interpreting the contract have been unsuccessful. Under this Section, the principle that the contract is construed as a reasonable client would understand it governs the construction of the contract in the first instance. However, this Section does not preclude reliance on the usual resources of contractual interpretation such as the language of the contract, the circumstances in which it was made, and the client's sophistication and experience in retaining and compensating lawyers or lack thereof. The contract

is to be construed in light of the circumstances in which it was made, the parties' past practice and contracts, and whether it was truly negotiated. When the reasons supporting the principle are inapplicable—for example, because the client had help of its own inside counsel or another lawyer in drafting the contract—the principle should be correspondingly relaxed.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18 cmt. h (1998). Comment h identifies multiple factors that may influence interpretation of an ambiguous attorney-client \*472 agreement, and it guides our disposition here.

[17] Comment h does not mandate that ambiguities in attorney-client contracts always must be construed against the attorney. Rather, comment h contemplates reliance on the customary resources used for contract interpretation, including consideration of the contract language and surrounding circumstances; the client's sophistication and experience; the parties' past practice; and whether the contract terms were truly negotiated or instead were imposed unilaterally. This approach encompasses multiple factors and encourages sensitivity to the particular circumstances of a particular case. Comment h ultimately grounds the analysis on this question: What would "a reasonable person in the client's circumstances" understand or expect?

The "client's circumstances" in this case do not involve an unsophisticated individual whose lawyer presented an already-drafted agreement on a take-it-or-leave-it basis. To the contrary, this case involves a sophisticated and experienced client who vigorously negotiated the fee agreement with an individual attorney after being told the law firm would not take the case. The evidence in this case establishes that (1) Van Dyke is an experienced businessman who had been instrumental in drafting complex contracts and setting up complex business ventures with national and international investors; (2) the fee agreement was created through a collaborative process between Van Dyke and Swonke; (3) the fee agreement's terms were vigorously negotiated; (4) all provisions Van Dyke insisted upon were included in the contract; (5) Van Dyke had experience in retaining attorneys; (6) Greenberg Peden previously told Van Dyke it no longer would represent Anglo–Dutch due to unpaid legal bills; and (7) Swonke told Van Dyke that Greenberg Peden specifically refused to represent Anglo–Dutch in the lawsuit against Halliburton and Ramco.

These circumstances make the present case an inappropriate vehicle for applying the doctrine of *contra proferentem*—

either broadly with respect to all ambiguities that may arise in connection with attorney-client agreements, or specifically with respect to the particular ambiguity at issue here regarding the identity of Anglo–Dutch's contracting counterpart. Construing the October 16, 2000 fee agreement from the standpoint of a reasonable client in the circumstances of Anglo–Dutch's Van Dyke, there is ample basis for concluding that such a client would understand Anglo–Dutch had contracted with an individual lawyer rather than the law firm. At a minimum, a triable issue of fact is presented regarding the parties' intent.

### b. Breach of fiduciary duty

Anglo–Dutch tries to bolster its argument for applying *contra proferentem* by linking that doctrine to Swonke's asserted breach of his fiduciary duty.

Anglo–Dutch argues that the ambiguous fee agreement should be construed against Swonke because he breached his fiduciary duty. Anglo–Dutch contends that Swonke breached his fiduciary duty by mistakenly drafting an ambiguous fee agreement and then failing to disclose to Van Dyke his own interpretation of that agreement as an individual contract, which diverged from Van Dyke's stated belief that Anglo–Dutch contracted with Greenberg Peden rather than Swonke individually.

[18] Anglo–Dutch's argument is hampered by the jury's finding that Swonke complied with his fiduciary duty. Anglo–Dutch's linkage of *contra proferentem* and Swonke's asserted breach of fiduciary duty makes it appropriate at this juncture to address Anglo–Dutch's contention that legally **\*473** and factually insufficient evidence supports the jury's finding in favor of Swonke on this issue.

Jury Question 5 asked:

Did Swonke comply with his fiduciary duty to Anglo–Dutch?

As Anglo–Dutch's attorney, Swonke owed Anglo–Dutch a fiduciary duty. To prove that he complied with his fiduciary duty, Swonke must show:

A. The transactions in question were fair and equitable to Anglo–Dutch;

B. Swonke made reasonable use of the confidence that Anglo–Dutch placed in him;

C. Swonke acted in the utmost good faith and exercised the most scrupulous honesty toward Anglo–Dutch;

D. Swonke placed the interests of Anglo–Dutch before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Anglo–Dutch, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

E. Swonke fully and fairly disclosed all important information to Anglo–Dutch concerning the transactions.

Answer "YES" or "NO":

Answer: YES

It is worth noting that the jury did not answer "no" to a question asking whether Swonke breached his fiduciary duty. In other words, the jury's answer is not merely a failure to find actionable conduct in answer to a question that put the burden of proof on Anglo–Dutch. *Cf. Blizzard v. Nationwide Mut. Fire Ins. Co.,* 756 S.W.2d 801, 806 (Tex.App.-Dallas 1988, no writ) ("the jury's negative answer does not establish the contrary of the question asked;" it establishes only that the party with the burden of proof failed to meet that burden). Rather, the jury here answered "yes" to a question that put the burden of proof on Swonke. It is an affirmative finding in Swonke's favor establishing that he complied with all facets of his fiduciary duty to Anglo–Dutch—including his duty to "fully and fairly disclose[ ] ... all important information to Anglo–Dutch concerning the transactions."

We conclude that the evidence is legally and factually sufficient to support the jury's "yes" answer to Question 5.

Anglo–Dutch asserts that it conclusively established Swonke's breach of fiduciary duty because the evidence is undisputed that Swonke failed to (1) clarify the nature of the fee agreement when the parties signed it, or explain his view of the terms governing his entitlement to a fee; (2) respond to Van Dyke's October 17, 2000 transmittal letter, which set forth Van Dyke's divergent view of the fee agreement's meaning; (3) inform Anglo–Dutch about his interpretation of the fee agreement after he left Greenberg Peden and about the repercussions his move would have; (4) inform Anglo–Dutch of a conflict of interest Swonke created when he began working at McConn & Williams while considering himself to be exempt from the fee agreement Anglo–Dutch

had with McConn & Williams; (5) consult with Anglo–Dutch regarding the assignment of rights he negotiated with Greenberg Peden at the time he negotiated the release; and (6) act with the strictest fairness and honesty with respect to his fee because he sought to recover a fee five times the amount Anglo–Dutch reasonably expected to pay.

As stated above, when conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. We will credit favorable evidence if reasonable jurors could do so and disregard contrary evidence unless reasonable jurors could **\*474** not do so. *City of Keller,* 168 S.W.3d at 822, 827. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to decide the issue. *Id.* at 822. Under the governing standard and scope of review, we consider the following evidence in assessing Anglo–Dutch's contention that the evidence was undisputed and conclusively established Swonke's breach of fiduciary duty.

Swonke testified that he explained his "of counsel" status to Van Dyke on several occasions, although Van Dyke claimed to have no recollection of these explanations. Swonke testified—and Van Dyke acknowledged—that Greenberg Peden refused to represent Anglo–Dutch in the lawsuit against Halliburton and Ramco because of unpaid legal fees. Swonke testified—and Van Dyke acknowledged—that Swonke continued to provide services in furtherance of the lawsuit after Swonke referred Anglo–Dutch to McConn & Williams without receiving compensation from Anglo–Dutch. Swonke testified—and Van Dyke acknowledged—that Van Dyke approached Swonke asking for Swonke's help.

Van Dyke proposed a contingency fee agreement. Swonke testified that he wanted a flat fee, but Van Dyke insisted on computing the fee based on the hourly formula stated in the fee agreement. After negotiations, Swonke acquiesced to Van Dyke's formula but added a rounding-up feature. Swonke testified that he and Van Dyke discussed the rounding feature, and that Van Dyke understood it. Van Dyke testified that he recommended the fee agreement be based on the hourly formula and that Swonke proposed the rounding-up feature.

According to Swonke, the parties achieved a meeting of the minds when they entered the fee agreement after Van Dyke specifically called Swonke and requested his personal services. Swonke testified that Van Dyke knew the fee agreement was Swonke's personal contract with Anglo–

Dutch; knew that no one at Greenberg Peden would do any more work for Anglo–Dutch; and knew that no one at Greenberg Peden had done any work for Anglo–Dutch since 1999. Swonke testified that Van Dyke absolutely and without a doubt understood that Swonke would be paid individually when he moved to McConn & Williams; Anglo–Dutch had been with Swonke for 15 years and Greenberg Peden had severed ties with Anglo–Dutch earlier. Further, when Swonke joined McConn & Williams as "of counsel," he sent Van Dyke a letter informing Van Dyke of his move and his intent to take the clients' files to McConn & Williams absent objections. Van Dyke did not object to Swonke taking Anglo–Dutch's files with him to McConn & Williams.

Swonke also testified that he complied with his fiduciary duty to Anglo–Dutch. Swonke stated that he (1) was perfectly honest with Van Dyke about any fee arrangements; (2) did not engage in any self-dealing; (3) did not do anything concerning the fee agreement that was to his advantage but to Anglo–Dutch's disadvantage; (4) never received any benefit for the work he performed on behalf of Anglo–Dutch in the lawsuit; (5) acted with absolute candor and honesty, and without any concealment or deception toward Anglo–Dutch; (6) provided Anglo–Dutch his undivided loyalty; (7) never failed to inform Van Dyke of matters material to the representation; and (8) never believed there was a conflict of interest in this case.

This evidence entitled the jury to conclude that the transaction was fair and equitable to Anglo–Dutch, and that Swonke fully and fairly disclosed all important information regarding the terms of the fee agreement. The jury was entitled **\*475** to conclude that Van Dyke knew the fee agreement was between Anglo–Dutch and Swonke individually, and that no further disclosure was necessary. Further, the testimony entitled the jury to find that Swonke acted with fairness, loyalty, and honesty toward his client Anglo–Dutch, and that he did not create any conflict of interest when he moved to McConn & Williams; his move had no effect on the parties' relationship because the fee agreement was between Anglo–Dutch and Swonke individually, and would follow him wherever he chose to practice as of counsel.

Additionally, Swonke testified that he did not respond to Van Dyke's October 17, 2000 transmittal letter because he did not see it. Swonke testified that he normally would not read a letter that refers to a document he already had in his files. Swonke stated that he would have responded to the letter if he had seen it and had thought Van Dyke was contending the fee agreement was with Greenberg Peden. Swonke

testified that Van Dyke's assertion of a fee agreement between Greenberg Peden and Anglo–Dutch was suspicious because both knew that the fee agreement was between Anglo–Dutch and Swonke individually. According to Swonke, it is not possible that Van Dyke was simply expressing his belief in the transmittal letter because Van Dyke had continued calling Swonke for help with the Halliburton lawsuit. When Swonke became tired of helping Van Dyke without compensation, Van Dyke asked Swonke for help and proposed the fee agreement without anyone at Greenberg Peden knowing about it.

This evidence entitled the jury to conclude that Swonke never saw the October 17, 2000 letter and, therefore, did not have to take further steps to disclose information to Anglo–Dutch regarding its contracting counterpart.

Swonke also testified that when he told Van Dyke he wanted to be included on the settlement distribution list, Van Dyke asked Swonke to obtain a release from Greenberg Peden. According to Swonke, Van Dyke insisted that Swonke get a release to prevent the law firm from making a claim against Anglo–Dutch because the fee agreement was printed on Greenberg Peden letterhead. Swonke drafted a release and assignment to address Van Dyke's request. Swonke explained that he was acting as Anglo–Dutch's attorney and was trying to draft exactly what Van Dyke requested. Swonke testified that there was nothing in the release document to cause concern to an attorney representing Anglo–Dutch.

This evidence entitled the jury to conclude that Swonke obtained the Assignment and Release Agreement at Van Dyke's insistence; that Swonke made reasonable use of the confidence Anglo–Dutch placed in him; that he acted in the utmost good faith; and that he did not use the advantage of his position to gain any benefit for himself at the expense of Anglo–Dutch.

Having reviewed the evidence and considered that the jury is the sole judge of the credibility of the witnesses, we conclude that the evidence is legally sufficient because it would enable reasonable and fair-minded people to find that Swonke complied with his fiduciary duty to Anglo–Dutch.

Alternatively, Anglo–Dutch argues that the evidence in this case is factually insufficient to support the jury's finding that Swonke complied with his fiduciary duty.

In addition to the evidence discussed above, Anglo–Dutch relied on testimony from a fiduciary duty expert, Robert Schuwerk. He testified that Swonke had a duty to clarify who the contracting parties **\*476** were because the fee agreement was on Greenberg Peden letterhead and contained the firm's signature block. Schuwerk opined that Swonke owed a fiduciary duty to clear up any misunderstanding regarding who the contracting parties were—if he received the October 17, 2000 transmittal letter from Van Dyke. Schuwerk could not point to any case or treatise establishing that an attorney breaches his fiduciary duty by not acting on a document he never saw or read. Schuwerk declined to opine on whether Swonke breached his fiduciary duty if he had not seen or read the October 17, 2000 transmittal letter.

Schuwerk also testified that Swonke owed a duty to write a new contract when he left Greenberg Peden for McConn & Williams, and to explain how the move might affect Anglo–Dutch's obligation to pay legal fees. He opined that Swonke should have redone the fee agreement even if Swonke and Van Dyke both knew the fee agreement was an individual contract. Swonke testified that it would have been "ludicrous" to redo the fee agreement because it was Swonke's individual agreement.

Having reviewed all the evidence before us and considered that the jury is the sole judge of the credibility of the witnesses, we conclude that the jury's "yes" answer to Question 5 was supported by factually sufficient evidence. Accordingly, we conclude that the evidence was legally and factually sufficient to support the jury's finding that Swonke complied with his fiduciary duty.

In light of the jury's amply supported answer to Question 5, we reject Anglo–Dutch's argument that Swonke's asserted breach of fiduciary duty justifies applying *contra proferentem* and construing the ambiguous October 16, 2000 fee agreement against Swonke. The finding that Swonke complied with his fiduciary duty reinforces our decision to forego reliance on *contra proferentem* and to refrain from automatically construing the ambiguous fee agreement against Swonke. The trial court properly left this issue to the jury's resolution.

### 2. Evidence supports the finding that Swonke contracted individually

[19]    We now turn to Anglo–Dutch's argument that legally and factually insufficient evidence supports the jury's finding

that the fee agreement is between Anglo–Dutch and Swonke individually.

Question 1 asked and instructed the jury as follows:

> Do you find that the Fee Agreement with Anglo–Dutch (Plaintiffs' Exhibit 1) was entered into on behalf of Greenberg Peden, or on behalf of Swonke, individually?
>
> You must decide the agreement's meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.
>
> As to your two choices below, you must answer "YES" as to only one, and "NO" as to the other
>
> Answer: NO on behalf of Greenberg Peden
>
> YES on behalf of Swonke, individually

Anglo–Dutch argues that the evidence does not support the jury's answer to Question 1. As noted above, we will sustain no evidence challenges when the record discloses: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more **\*477** than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller,* 168 S.W.3d at 810. Ultimately, our review will focus on whether the evidence would enable reasonable and fair-minded jurors to find that the fee agreement was entered on behalf of Swonke individually. *Id.* at 827.

Anglo–Dutch first contends that "[t]he only evidence offered at trial by Swonke in support of the alleged ambiguity amounts to no evidence." This argument appears to correspond to situation (b) identified above. Anglo–Dutch asserts that the use of personal pronouns in the fee agreement is no evidence because the fee agreement is unambiguous —an argument we already have rejected. Anglo–Dutch also contends that Van Dyke's deposition testimony in the Halliburton lawsuit, in which he stated that he had a fee contract with Swonke, does not support or create an ambiguity and thus constitutes no evidence because it related to a different topic—the number and rough identity of the fee contracts that Anglo–Dutch had at the time. We reject this contention because the jury was entitled to consider this testimony and its context; that context does not prevent reasonable and fair-minded jurors from relying upon it to answer "yes" as to Swonke in response to Question 1.

Anglo–Dutch next contends that the only competent evidence in the record conclusively shows that the fee agreement always was intended to be between Anglo–Dutch and Greenberg Peden. This argument corresponds to situation (d) set out above because it asserts that the evidence conclusively establishes the opposite of a vital fact.

Under this challenge, Anglo–Dutch asserts that the Assignment and Release Agreement obtained from Greenberg Peden on April 16, 2004 reveals the parties' true intent. That assignment and release says Swonke signed the fee agreement on behalf of the law firm; that the firm assigned any interest under the fee agreement to Swonke; and that the firm released Anglo–Dutch from liability to Greenberg Peden for fees under the fee agreement. Anglo–Dutch argues that Swonke would not have needed an assignment of rights if he believed he had an individual fee agreement with Anglo–Dutch and the rights already belonged to him. Anglo–Dutch contends that Greenberg Peden shareholder Skip Naylor acknowledged that the fee agreement was executed on behalf of the firm.

Anglo–Dutch also stresses that other contingency fee agreements Swonke signed in his individual capacity were printed on Swonke's own letterhead. It further argues that Swonke's outward appearance and behavior indicated he was employed by Greenberg Peden while working on Anglo–Dutch matters; this included his billing practices, recording time on the firm's system, using the firm's paralegals, and using the firm to bill Anglo–Dutch for expenses relating to the Halliburton lawsuit. Anglo–Dutch contends that its execution of a promissory note in favor of Greenberg Peden— and not Swonke individually—for the outstanding legal fees it owed confirms that Swonke worked on Anglo–Dutch matters through the firm and not individually. Additionally, Swonke's letter informing Anglo–Dutch of his move to McConn & Williams stated that his legal services had been provided "through [his] association with Greenberg Peden P.C."

Van Dyke further suggested in his testimony that Anglo–Dutch agreed to the rounding feature in the formula for calculating the fee only as a reward to Greenberg Peden for its forbearance on prior unpaid legal bills. He also pointed to the October 17, 2000 transmittal letter he sent **\*478** to Swonke, which he portrays as confirmation the parties intended the fee agreement to be between Anglo–Dutch and Greenberg Peden.

Lastly, Anglo–Dutch contends that, after Swonke moved to McConn & Williams, he maintained every appearance of acting as a McConn & Williams attorney using the firm office space, letterhead, e-mail account and billing system. According to Anglo–Dutch, this gave Anglo–Dutch no reason to believe Swonke was employed individually under the terms of the October 16, 2000 fee agreement.

This evidence does not rise to the level of allowing "only one logical inference" in favor of a finding that Anglo–Dutch contracted with Greenberg Peden. *See City of Keller*, 168 S.W.3d at 822. Swonke's testimony provided contrary evidence and established that more than one inference was permissible in this case. The choice between these competing narratives belonged to the jury. We will not disturb that choice.

Swonke testified that the Assignment and Release Agreement was drafted only because of Van Dyke's "hypersensitivity" and concern that Greenberg Peden would attempt to assert a right to fees under the October 16, 2000 fee agreement. When Swonke told Van Dyke that he wanted to be included on the settlement distribution list, Van Dyke insisted that Swonke first obtain a release from Greenberg Peden because the fee agreement was on firm letterhead and Van Dyke was worried that the firm would make a claim against Anglo–Dutch. Swonke and Greenberg Peden shareholder Skip Naylor drafted a release and assignment to address Van Dyke's request. Swonke testified that he prepared a release and an assignment because an assignment had to occur before there could be a release, and Swonke and Naylor were trying to draft a document that would give Van Dyke the comfort he sought. Swonke testified that the release implicitly required an assignment of rights to place Swonke and Anglo–Dutch in the position Van Dyke, Swonke and Greenberg Peden believed they should occupy. Naylor explained that the language in the document was there to assure Van Dyke that, when Anglo–Dutch paid Swonke, it would owe Greenberg Peden nothing.

Swonke's practice was to use his personal letterhead whenever he entered into an individual contingency fee agreement with a new client, and Anglo–Dutch was not a new client. Further, Swonke testified that Van Dyke knew he was "of counsel" to Greenberg Peden because he explained the meaning of his "of counsel" status to him on several occasions, including once while Van Dyke worked at his father's company in the late 1980s. Swonke's work as "of counsel" was billed through Greenberg Peden's billing system; under the fee sharing arrangement between Swonke and Greenberg Peden, the firm would deduct a certain percentage of the fees the clients paid to reimburse Greenberg Peden, among others, for using office space, paralegals, secretaries, and parking.

Swonke told Van Dyke he generated his own work, did not get a salary from the firm, and was paid only when the clients paid. Swonke told Van Dyke he was not part of the firm, despite appearances that Swonke had "all the trappings of the firm." Further, Naylor testified that sending Anglo–Dutch a bill for Halliburton lawsuit expenses was simply a mistake on Greenberg Peden's part.

Additionally, Swonke testified that Van Dyke proposed a contingency fee agreement. Although Swonke suggested his usual flat percentage fee, Van Dyke insisted on the formula stated in the fee agreement. Swonke initially rejected the formula because he thought it was too **\*479** complicated, but later acquiesced to it because Van Dyke thought this would be the only fair way to measure Swonke's hours. Swonke added a rounding feature because he knew Van Dyke had a propensity for "putting decimals out there to a long degree."

According to Swonke, Van Dyke absolutely and without a doubt knew that Swonke would be paid individually when he moved from Greenberg Peden to McConn & Williams. Swonke also sent Van Dyke a letter informing him of Swonke's move to McConn & Williams as "of counsel" and Swonke's intention to take Anglo–Dutch's files with him unless Anglo–Dutch objected.

Finally, Swonke testified that he did not see the October 17, 2000 transmittal letter because it transmitted the McConn & Williams contingency fee agreement, which Swonke already had in his file. Normally, Swonke would not read a letter that refers to a document he already had in his files. Swonke stated that he would have responded to the letter if he had thought Van Dyke was contending the fee agreement was not with Swonke individually.

From this evidence, the jury was entitled to conclude that Van Dyke knew the implications of Swonke's "of counsel" status at Greenberg Peden and McConn & Williams because Swonke had explained the meaning of his status before they signed the October 16, 2000 fee agreement. The jury also was entitled to conclude that executing the promissory note in favor of Greenberg Peden was consistent with the "of counsel" arrangement Swonke had with the firm.

The jury could conclude that the fee agreement's rounding feature was included to not as a reward for Greenberg Peden's forbearance, but as a means of addressing Van Dyke's propensity for "putting decimals out there to a long degree." The jury could further conclude that Swonke never saw Van Dyke's October 17, 2000 transmittal letter until after the dispute arose. Finally, the jury was entitled to conclude that Swonke obtained the Assignment and Release Agreement only at Van Dyke's insistence to calm his fear that Greenberg Peden would assert an interest in the fee agreement, and that Swonke was willing to satisfy all of Van Dyke's demands to get paid under the fee agreement.

Therefore, the evidence does not conclusively establish that the parties always intended the fee agreement to be between Anglo–Dutch and Greenberg Peden; and Anglo–Dutch cannot assert a successful legal sufficiency challenge based on this argument.

Lastly, we conclude that Anglo–Dutch cannot prevail on a no evidence challenge described in situations (a) and (c) under Chief Justice Calvert's formulation applied above in *City of Keller*. The vital fact at issue here is whether the parties intended the fee agreement to be between Anglo–Dutch and Greenberg Peden, or between Anglo–Dutch and Swonke individually.

More than a scintilla of evidence supports the jury's answer to Question 1. This evidence includes consistent use of personal pronouns throughout the fee agreement against a backdrop of undisputed evidence that Van Dyke repeatedly was told Greenberg Peden would not represent Anglo–Dutch due to unpaid legal bills. These circumstances give the choice of personal pronouns added significance, and the jury was entitled to consider these circumstances.

This evidence also includes Van Dyke's 2002 deposition testimony in the Halliburton lawsuit. Van Dyke testified that Anglo–Dutch had two contingency fee contracts: one with John O'Quinn, Jett *480 Williams, and Luke McConn, and the other with Swonke. Van Dyke did not mention Greenberg Peden in his deposition testimony. Van Dyke's deposition testimony reasonably can be read to conflict with his trial testimony; deciding the credibility of witnesses and the weight to be given to conflicting testimony is left to the jury's discretion. *See City of Keller*, 168 S.W.3d at 819. There is more than a scintilla of evidence to support the jury's finding that Anglo–Dutch contracted with Swonke individually when

it agreed to pay attorney's fees and Swonke agreed to work on the Halliburton lawsuit.

Further, on the record before us, Anglo–Dutch cannot show a complete absence of evidence establishing the vital fact that Anglo–Dutch and Swonke intended to contract for payment of Swonke's individual services rather than the services of Greenberg Peden. Evidence establishing this vital fact constitutes much more than a scintilla and includes the following.

In 1999 or early 2000, Swonke and David Peden had a meeting with Van Dyke at which Peden expressly told Van Dyke that Greenberg Peden no longer would perform legal work for Anglo–Dutch due to unpaid legal bills. No one at Greenberg Peden had performed legal work for Anglo–Dutch since 1999.

In February or March of 2000, Greenberg declined to represent Anglo–Dutch in the Halliburton lawsuit on an hourly and contingency fee basis due to the unpaid bills. Van Dyke admitted that Swonke informed him of Greenberg Peden's refusal. Swonke testified that, after Anglo–Dutch signed a contract with McConn & Williams, he did not want to be involved with the Halliburton lawsuit but Van Dyke and McConn & Williams attorneys continued to call him for advice and help.

When Swonke became weary of providing legal services without compensation, Van Dyke called him and asked for his personal services. Swonke testified that Van Dyke knew no one at Greenberg Peden would help him, and that Van Dyke intended to hire Swonke individually. Van Dyke proposed the fee agreement and the parties negotiated the terms. Swonke also testified that the use of firm letterhead and signature block made no difference because he, Van Dyke and Greenberg Peden all knew that Anglo–Dutch was contracting with Swonke individually.

Swonke consistently maintained that he was working for Anglo–Dutch individually and consistently demanded payment for his legal work on that basis. This was also evident from Swonke's e-mails and other written correspondence with Van Dyke and others after the Halliburton lawsuit was settled. Swonke testified that, before the meeting on April 24, 2002, Van Dyke never mentioned that he thought the fee agreement was with Greenberg Peden.

In addition to this testimony from Swonke, there is other evidence the jury could have relied upon in determining the parties' intent.

Naylor and Peden both testified that the fee agreement was between Anglo–Dutch and Swonke individually. Naylor stated that the Greenberg Peden letterhead does not determine the identity of parties to the fee agreement because the firm had refused to be involved in the Halliburton lawsuit and Van Dyke knew that; therefore, the fee agreement described how Swonke individually would assist Anglo–Dutch in the Halliburton lawsuit and not how the firm would assist Anglo–Dutch. Naylor reiterated that, despite the use of firm letterhead, Van Dyke knew the firm would not represent Anglo–Dutch and Swonke would do so.

The jury also heard testimony from Nancy Strong, a McConn & Williams attorney, **481** who worked on the Halliburton lawsuit. She testified that she became aware that Anglo–Dutch resisted paying Swonke because Van Dyke was not taking Swonke's calls or calling him back after having talked to him on a daily basis for years. She told Swonke that Van Dyke would try to renegotiate his contract and pay less than what he bargained for as he had done with all the other people he dealt with, including McConn & Williams in a previous matter and the Anglo–Dutch investors.

Based on our review of the record, we conclude that the evidence in this case is legally sufficient because it would enable reasonable and fair-minded jurors to find that Anglo–Dutch contracted with Swonke individually. *See City of Keller,* 168 S.W.3d at 827. The evidence also is factually sufficient to support the jury's answer to Question 1. After considering and weighing all the evidence, we conclude that the evidence is not so weak and the finding that the parties intended the fee agreement to be between Anglo–Dutch and Swonke individually is not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

We overrule Anglo–Dutch's second and fifth issues.

**C. Jury Instructions**

In its third issue, Anglo–Dutch seeks reversal and a new trial on grounds that the trial court erroneously refused Anglo–Dutch's requests for additional instructions to accompany Question 1. Anglo–Dutch contends that the trial court should have submitted additional instructions applicable to Question 1 identifying the relevant fiduciary duties an attorney owes to a client, along with "a generally applicable instruction on the 'presumption of unfairness' that automatically arises when an attorney contracts with an existing client."

Anglo–Dutch asked the trial court to include "general" instructions applicable to Questions 1, 2, and 3. This cluster of questions pertained to the identity of the contracting parties, failure to comply with the fee agreement, and contract damages. Anglo–Dutch requested the following "general" instructions:

> You are instructed that a law firm and its lawyers, including any "Of Counsel" lawyers who provide services for clients of that firm, owe a fiduciary duty to the client. A lawyer who works as an "Of Counsel" to a law firm is treated under the law as an employee of that firm.
>
> A lawyer owes a fiduciary duty to a client and must act with integrity and fidelity and in the best interest of his client. Some of the fiduciary duties a lawyer owes his client include the:
>
> 1. duty to be strictly and perfectly honest about fee arrangements and to refrain from self-dealing;
>
> 2. duty to act with absolute candor, openness, honesty, and without any concealment or deception;
>
> 3. duty to represent the client with undivided loyalty, keeping the client's best interest in mind;
>
> 4. duty to inform the client of matters material to representation;
>
> 5. duty to provide the client at the outset with a clear and accurate explanation of the basis or rate of the fee to be charged under the fee agreement and how it is to be calculated;
>
> 6. duty to timely inform the client of a conflict of interest.
>
> You are further instructed that, with regard to the fee agreement in question, it is the attorney's and law firm's burden to provide that the attorney and law firm acted with perfect fairness, adequacy, **482** and equity with regard to the client. Where self-dealing on the part of the attorney and/or the law firm is alleged by the client, a presumption of unfairness automatically arises and it is the attorney's and law firm's burden to prove (a) that the questioned transaction was made in good faith, (b) for a fair consideration, and (c) after full and complete disclosure of all material information to the client.

You are further instructed that attorneys, law firms, and attorneys performing services as "Of Counsel" to a law firm have a duty, at the beginning of representation of a client on a contingency fee matter, to inform that client of the basis or rate of the contingency fee. Also, the attorney must inform the client about the implication of a contingency fee agreement.

Anglo–Dutch also asked the trial court include the following instructions as part of Question 1:

In answering this question, you are instructed that the agreement must be construed as a reasonable person in the circumstances of the client would have construed it.

You are further instructed that the obligation of clarifying attorney-client contracts falls on the attorney because of the attorney's greater knowledge and experience with respect to fee arrangements and because of the trust the client has placed in the attorney.

The trial court refused Anglo–Dutch's requests.

[20] Because a trial court enjoys wide discretion in determining which instructions should be included in the jury charge, our review is limited to determining whether the court acted without reference to any guiding rules or principles. *See Tex. A & M Univ. v. Chambers*, 31 S.W.3d 780, 783 (Tex.App.-Austin 2000, pet. denied). A trial court's asserted error in refusing an instruction is reversible only if it probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1; *Dew*, 208 S.W.3d at 456.

[21] We conclude that the trial court acted within its discretion when it refused Anglo–Dutch's requested additional instructions. Further, any asserted error in refusing the requested instructions was harmless.

[22] With respect to the construction placed upon the fee agreement by a reasonable person in the client's circumstances, Question 1 already included a broad instruction that told the jury to "[c]onsider all of the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties." The existing instruction encompassed the client's perspective of the fee agreement, and the trial court was not obligated to provide further instructions tailored to a particular litigant's liking. Similarly, the trial court acted within its discretion by rejecting the requested instruction

pertaining to treatment of an "of counsel" attorney as a firm employee. Even assuming for argument's sake that this is a correct statement of the law, not every correct statement of the law belongs in the jury charge. A requested instruction can set forth a correct statement of the law and still be unnecessary in the charge. *See Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex.1984); *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex.App.-Houston [1st Dist.] 1996, no writ). The trial court acted within its discretion when it refused to include this unnecessary additional statement.

The remaining requested instructions pertain to Swonke's fiduciary duty. Anglo–Dutch's **\*483** request to include "general" fiduciary duty instructions applicable to Question 1 is another manifestation of Anglo–Dutch's larger effort to link the contract interpretation issue with its contention that Swonke breached his fiduciary duties.

We already have concluded that Swonke's asserted breach of his fiduciary duty does not influence the manner in which the fee agreement is interpreted in this case. The trial court submitted a separate fiduciary duty question and accompanying instructions describing the facets of that duty in Question 5. The jury answered "yes" to Question 5, which (a) asked whether Swonke complied with his fiduciary duty to Anglo–Dutch, and (b) placed the burden on Swonke to justify his conduct and establish his compliance with his fiduciary duty. Legally and factually sufficient evidence supports the jury's "yes" answer to Question 5. The instructions accompanying Question 5 describe the fiduciary duty that Anglo–Dutch sought to apply to Question 1 via its requested instructions. The trial court acted within its discretion in submitting fiduciary duty instructions as part of Question 5, and in refusing to submit another set of fiduciary duty instructions applicable to Question 1.

In any event, the asserted charge error in refusing to include fiduciary duty instructions applicable to Question 1 was harmless because fiduciary duty instructions were submitted as part of a separate question that the jury answered adversely to Anglo–Dutch. *See Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206, 214 (Tex.App.-Houston [14th Dist.] 1991, no writ) (omission of requested instructions was harmless in light of separate question that applied requested legal standard and was answered adversely to party seeking the instructions).

We overrule Anglo–Dutch's third issue.

## D. Admission of Evidence

In its fourth issue, Anglo–Dutch asserts that a new trial is required because the trial court erroneously admitted evidence regarding other litigation involving Anglo–Dutch. Specifically, Anglo–Dutch challenges the trial court's admission of evidence relating to (1) "investor lawsuits," "lawsuit funding agreements," or "Anglo–Dutch's payment, nonpayment, or attempts at resolving any claims related thereto;" (2) investor Michael Lore's testimony; and (3) any unpaid fees to McConn & Williams or any other law firm.

Because we review a trial court's admission of evidence for abuse of discretion, *In re J.P.B.*, 180 S.W.3d at 575, we must uphold the evidentiary ruling if there is any legitimate basis in the record to support it. *Owens–Corning Fiberglas Corp.*, 972 S.W.2d at 43. We will not reverse a trial court for an erroneous evidentiary ruling unless the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex.R.App. P. 44.1; *see also Gee*, 765 S.W.2d at 396.

[23]    We conclude that the trial court acted within its discretion in admitting the challenged evidence. A key issue at trial focused on the parties' intent in signing the fee agreement in light of the surrounding facts and circumstances. Those facts and circumstances included the challenged evidence, which related in significant part to the parties' sophistication and intent. We cannot say that the trial court abused its discretion in admitting evidence relating to the lawsuit funding agreements and investor lawsuits, or investor Michael Lore's testimony.

*484 Additionally, any error in admitting the challenged evidence was harmless because it was introduced at different stages of the trial without objection by Anglo–Dutch. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex.2004) (error in admission is deemed harmless if the objecting party permits the same or similar evidence to be introduced without objection).

The trial court admitted evidence that Anglo–Dutch had entered into lawsuit funding agreements with investors to offset Anglo–Dutch's expenses during prosecution of the Halliburton lawsuit. The trial court reasoned that this evidence tended to show Swonke's individual legal work with respect to Anglo–Dutch's investors. Evidence regarding these same lawsuit funding agreements was later admitted by the trial court without objection when Van Dyke testified that he instructed Swonke to draft releases for investors to encourage

them to take less than they agreed to in their lawsuit funding agreements so that the Halliburton lawsuit could be settled. Van Dyke also testified without objection that he did not pay any of the 33 investors the amounts contracted for in the funding agreements. Further, the trial court admitted evidence that investors in the Halliburton lawsuit had sued Anglo–Dutch because it did not pay them the amounts for which they had contracted. Without objection, the jury was later again informed of these investor lawsuits.

With respect to Michael Lore's testimony, the trial court found that it was admissible for the limited purpose of stating that he was an investor; of impeaching Van Dyke's testimony in which he claimed the investors were happy with the payment they had received from Anglo–Dutch; and in rebuttal to McConn's assertion that Van Dyke was a fine man. Lore testified that he was displeased when Van Dyke asked him to accept less than he contracted for; that he didn't sign the release Van Dyke requested; that he was never told the Halliburton settlement amount by Van Dyke; that he sued Anglo–Dutch to recover the amount originally contracted for; that and he did not think Van Dyke was a fine man. Only during cross-examination by Anglo–Dutch's attorney did Lore answer more particular questions regarding his investor lawsuit.

Nancy Strong testified without objection that a dispute arose between Van Dyke and McConn & Williams because he failed to pay the entire legal bill after the firm had successfully represented Van Dyke in an unrelated lawsuit against OPIC, one of Anglo–Dutch's Tenge Field project partners. Strong also testified that Van Dyke owed the law firm of Looper Reed legal fees for its work in the lawsuit against OPIC. [6] Swonke testified without objection that Van Dyke could not hire the Looper Reed law firm to represent Anglo–Dutch in the Halliburton lawsuit because "as it turn[ed] out, he owed Looper Reed quite a bit of money, too."

Finally, Anglo–Dutch has not established on this record that the verdict turned on the challenged evidence. *See City of Brownsville*, 897 S.W.2d at 753–54. This trial was in significant part a credibility battle based on the jury's assessment of Swonke and Van Dyke. Both testified at length. Anglo–Dutch has not demonstrated that the admission of evidence regarding collateral agreements and disputes during a lengthy trial featuring voluminous evidence likely caused the rendition of an improper judgment.

We overrule Anglo–Dutch's fourth issue.

## *485 Conclusion

We hold that the October 16, 2000 fee agreement was ambiguous with respect to whether Anglo–Dutch contracted with Swonke individually or with Greenberg Peden. The trial court properly refused to construe the ambiguous fee agreement against Swonke and properly submitted this issue to the jury. Legally and factually sufficient evidence supports the jury's finding that Swonke individually is a party to the fee agreement with Anglo–Dutch, and that Greenberg Peden is not. Legally and factually sufficient evidence supports the jury's finding that Swonke complied with his fiduciary duty to Anglo–Dutch. Anglo–Dutch's charge and evidentiary complaints provide no basis for reversal.

We affirm the trial court's judgment.

Footnotes

\*      Senior Justice J. Harvey Hudson sitting by assignment.

1      Swonke in fact joined a predecessor firm, which changed its name and composition from time to time. Because these changes do not affect the disposition of this appeal, we refer to "Greenberg Peden" throughout this opinion.

2      In June 2001, Anglo–Dutch signed a promissory note in favor of Greenberg Peden for $231,749.16. Anglo–Dutch paid the note with interest in December 2003, about two years after Greenberg Peden had dissolved.

3      This settlement spawned a separate series of lawsuits and appeals involving investors who signed litigation funding agreements in return for a portion of Anglo–Dutch's recovery from the lawsuit against Halliburton and Ramco. After the jury returned its verdict against Halliburton and Ramco, Anglo–Dutch sought to reduce amounts it owed to investors who financed the lawsuit and a number of those investors sued Anglo–Dutch. *See Anglo–Dutch Petroleum Int'l, Inc. v. Smith,* 243 S.W.3d 776 (Tex.App.-Houston [14th Dist.] 2007, pet. filed); *Anglo–Dutch Petroleum Int'l, Inc. v. Littlemill Limited,* No. 14–06–00921–CV, 2007 WL 2826900 (Tex.App.-Houston [14th Dist.] Oct. 2, 2007, pet. filed); *Case Funding Network, L.P. v. Anglo–Dutch Petroleum Int'l, Inc.,* 264 S.W.3d 38 (Tex.App.-Houston [1st Dist.] 2007, pet. filed); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell,* 193 S.W.3d 87 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). Anglo–Dutch's judgment against Ramco was reversed on appeal. *See Ramco Oil & Gas Ltd.,* 207 S.W.3d at 827.

4      The jury did not answer Question 4, asking what sum of money would compensate Greenberg Peden for its damages that resulted from Anglo–Dutch's failure to comply with the fee agreement, because it was conditioned on finding that the fee agreement was entered into on behalf of Greenberg Peden and not Swonke individually. The jury did not answer Question 6, asking the jury to determine the amount of Swonke's fees under the fee agreement, because Question 6 was conditioned on the jury answering Question 5 in the negative and not answering Question 3 with a dollar amount. Further, the jury did not answer Question 7, asking if clear and convincing evidence showed that Anglo–Dutch's harm resulted from malice or fraud, because it was conditioned on the jury answering Question 5 in the negative. Lastly, the jury did not answer Question 8, addressing exemplary damages against Swonke for the harm Anglo–Dutch suffered from Swonke's conduct, because it was conditioned on the jury answering Question 7 in the affirmative.

5      Anglo–Dutch does not challenge on appeal the jury's finding that it breached the fee agreement; the amount of contract damages awarded for that breach; or the separate statutory fee award for litigating Swonke's contract claim under the disputed fee agreement, which the parties opted to try to the court. Anglo–Dutch also does not challenge the rendition of a take-nothing judgment in favor of Greenberg Peden.

6      Anglo–Dutch objected to this testimony only on hearsay grounds.

End of Document          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX D

352 S.W.3d 445
Supreme Court of Texas.

ANGLO–DUTCH PETROLEUM INTERNATIONAL,
INC., and Anglo–Dutch (Tenge) L.L.C., Petitioners,

v.

GREENBERG PEDEN, P.C., and
Gerard J. Swonke, Respondents.

No. 08–0833.  |  Argued Sept. 14,
2010.  |  Decided Aug. 26, 2011.
|  Rehearing Denied Dec. 16, 2011.

**Synopsis**
**Background:** Former client brought action seeking declaration that it did not owe attorney contingency fees. Attorney counterclaimed. The 61st District Court, Harris County, John J. Donovan, J., entered judgment on a jury verdict for attorney, and former client appealed. The Court of Appeals, William J. Boyce, J., 267 S.W.3d 454, affirmed. Former client petitioned for review which was granted.

**[Holding:]** The Supreme Court, Hecht, J., held that agreement was between client and law firm for which attorney was of counsel, rather than with attorney individually.

Reversed and remanded.

Wainwright, J., concurred in part, dissented in part, and filed opinion.

Lehrmann, J., dissented and filed opinion in which Medina, and Green, JJ., joined.

West Headnotes (10)

**[1]** **Contracts**
 Construction as a whole
**Contracts**
 Extrinsic circumstances
**Contracts**
 Ambiguity in general

Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.

13 Cases that cite this headnote

**[2]** **Attorney and Client**
 Dealings Between Attorney and Client
Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized.

3 Cases that cite this headnote

**[3]** **Attorney and Client**
 Dealings Between Attorney and Client
Part of the lawyer's duty is to inform the client of all material facts with regard to contract between attorney and client; so that this responsibility is not a mere and meaningless formality, the lawyer must be clear.

3 Cases that cite this headnote

**[4]** **Attorney and Client**
 Dealings Between Attorney and Client
Only reasonable clarity as to material facts with regard to contract between attorney and client is required, not perfection; not every dispute over the contract's meaning must be resolved against the lawyer.

1 Cases that cite this headnote

**[5]** **Attorney and Client**
 Dealings Between Attorney and Client
Object of imposing duty on attorney to inform the client of all material facts with regard to contract between attorney and client is that the client be informed; thus, whether the lawyer has been reasonably clear must be determined from the client's perspective.

4 Cases that cite this headnote

**[6]** **Contracts**

⟜ Language of contract

**Contracts**

⟜ Extrinsic circumstances

**Evidence**

⟜ Showing Intent of Parties as to Subject-Matter

Understanding the context in which an agreement was made is essential in determining the parties' intent as expressed in the agreement, but it is the parties' expressed intent that the court must determine; extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated.

8 Cases that cite this headnote

**[7]    Attorney and Client**

⟜ Construction and operation

Legal fee agreement for contingency fee representation was between client and law firm for which attorney was of counsel, rather than with attorney individually, although agreement used personal pronouns to refer to attorney, where personal pronouns did not suggest that only the individual attorney, to the exclusion of other firm attorneys, would be working on the matter, one use of the word "I" clearly referred to firm, client had never been individual attorney's non-firm client, and agreement was written on firm letterhead, and signed on the firm's behalf.

2 Cases that cite this headnote

**[8]    Attorney and Client**

⟜ Construction and operation

Extrinsic evidence of attorney's and client's intent could not be used to show the parties' motives or intentions apart from the fee agreement; it could only provide the context in which the agreement was reached.

3 Cases that cite this headnote

**[9]    Attorney and Client**

⟜ Construction and operation

Construing client-attorney agreements from the perspective of a reasonable client in the circumstances imposes a responsibility of clarity on the attorney that should preclude a determination that an agreement is ambiguous in most instances; attorneys appreciate the importance of words and are more able than most clients to detect and repair omissions in client-attorney contracts.

Cases that cite this headnote

**[10]    Attorney and Client**

⟜ Construction and operation

**Attorney and Client**

⟜ Questions for jury

A client's best interests, which its attorney is obliged to pursue, do not include having a jury construe their attorney-client fee agreements.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*446**  Gregory S. Coleman, Richard Bernard Farrer, Yetter Coleman LLP, Craig T. Enoch, Enoch Kever PLLC, Mike A. Hatchell, Charles R. 'Skip' Watson Jr., Locke Lord Bissell & Liddell, LLP, Austin, TX, Donald B. McFall, Kenneth R. Breitbeil, McFall, Breitbeil & Smith, P.C., Brian K. Tully, Jesse R. Pierce & Associates, P.C., Houston, TX, for Anglo–Dutch Petroleum International, Inc.

Rusty Hardin, Joe M. Roden, Ryan Kees Higgins, Rusty Hardin & Associates, P.C., Robert M. 'Randy' Roach Jr., Daniel William Davis, Roach & Newton, L.L.P., Houston, TX, Amy J. Schumacher, Roach & Newton, L.L.P., Austin, TX, for Greenberg Pede, P.C.

Linda Eads, Dedman School of Law, Dallas, TX, pro se.

Christopher S. Johns, Dawson Sodd Ellis & Hodge LLP, Austin, TX, for Amicus Curiae Abrams Scott & Bickley, L.L.P.

## Opinion

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice JOHNSON, Justice WILLETT, and Justice GUZMAN joined.

The parties dispute whether an attorney fee agreement is ambiguous. The client contends that an agreement on law firm letterhead, signed by a lawyer on behalf of the firm, is with the firm, not with the lawyer personally. The lawyer counters that his use of personal pronouns in the agreement, as well as surrounding circumstances, create an ambiguity that must be resolved by a jury. We agree with the client and therefore reverse the judgment of the court of appeals. [1]

## I

Scott V. Van Dyke, president of Anglo–Dutch Petroleum International, Inc., asked Gerard J. Swonke, a lawyer "of counsel" with the firm of Greenberg Peden, P.C., to represent Anglo–Dutch as plaintiff[2] in a **\*447** suit against Halliburton Energy Services, Inc. and Ramco Oil & Gas, Ltd. for disclosing confidential information concerning the development of oil and gas prospects in the Tenge Field in Kazakhstan. Greenberg Peden had represented Anglo–Dutch on various matters for years and had drafted the confidentiality agreement that would be central to the suit. Swonke had been responsible for Anglo–Dutch's initial engagement as a firm client and had done much of its work. He and Van Dyke were friends.

The Tenge Field case was expected to be protracted and difficult, and Anglo–Dutch could not afford to pay Greenberg Peden's hourly rates, as it had done in the past, so it proposed a 20% contingent fee. The firm declined. Anglo–Dutch had fallen behind in its obligations to the firm, and the firm had decided not to accept further business from Anglo–Dutch until it became current. Plus Greenberg Peden believed that it lacked the resources needed to prosecute the case on a contingent-fee basis. Swonke referred Van Dyke to another firm, McConn & Williams, which took the case.

But Swonke's continued counsel, based on his involvement in the events leading up to the litigation, was still needed, and Van Dyke asked him to assist McConn & Williams, again for a contingent fee. Swonke's arrangement with Greenberg Peden required him to offer new business to

the firm; if the firm refused, Swonke could undertake the representation individually. Swonke used personal stationery —"Law Offices of Gerard J. Swonke Attorney at Law"—and signed individually when representing clients who were not also clients of the firm. Even in those situations, the firm sent the bills and retained ten percent of the fees. Swonke agreed to Van Dyke's proposal and dictated the following agreement ("the Fee Agreement"), which his secretary prepared on firm letterhead and he signed on its behalf:

GREENBERG PEDEN P.C.

TELEPHONE: (713) 627–2720

FACSIMILE: (713) 627–7057

WEBSITE: www.gpsolaw.com

ATTORNEYS AND COUNSELORS AT LAW

TENTH FLOOR, 12 GREENWAY PLAZA HOUSTON, TEXAS 77046

**October 16, 2000**

Mr. Scott V. Van Dyke

Anglo–Dutch Petroleum International, Inc.

Eight Greenway Plaza, Suite 900

Houston, Texas 77046

**Re: Cause No.2000–22588; *Anglo–Dutch (Tenge) et al. v. Ramco, et al.;* In the 151st Judicial District of Harris County, Texas.**

Dear Scott:

This letter memorializes our agreement with respect to me assisting you and/or the companies which you control (Anglo–Dutch) and the law firm of McConn & Williams, LLP regarding the above-referenced matter.

In that regard, you have executed a Fee Agreement with the law firm of McConn & Williams on March 25, 2000, which is incorporated herein by reference. I agree to assist Anglo–Dutch and that firm with this lawsuit for proportionately the same percentage (20%) of any benefit to McConn & Williams reflected in such agreement. However, I will not be responsible for any expenses other than those I may personally incur.

Further, the proportions under which my fees shall be calculated will be the ratio **\*448** of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage. For example, if McConn & Williams' attorneys spend 1,000 hours on the lawsuit after the date the lawsuit was filed and I spend 90 hours of my time towards the lawsuit, then by rounding up to the nearest whole number, I would be entitled to receive from you 2% (10% of 20%) of the gross revenues and other benefits recovered, if any, from this lawsuit. In addition, should the Fee Agreement be amended, you agree that I shall be entitled to the benefit of such amendment.

If this comports with your understanding of our agreement, please indicate by signing below and returning this letter to me.

If you have any questions, please contact me.

Very truly yours,

GREENBERG PEDEN P.C.

/s/ *G.J. Swonke*

GERARD J. SWONKE

AGREED TO:

SCOTT V. VAN DYKE, PRESIDENT OF

ANGLO–DUTCH PETROLEUM INTERNATIONAL, INC.

DATED:_____

The next day, Van Dyke signed the agreement and returned it to Swonke. He also wrote Swonke the following letter:

ANGLO–DUTCH PETROLEUM INTERNATIONAL

EIGHT GREENWAY PLAZA, SUITE 900

HOUSTON, TEXAS 77046

UNITED STATES

TEL: (713) 993–9303

FAX: (713) 993–9011

email@anglo-dutch.com

October 17, 2000

Mr. Gerard J. Swonke

Greenberg Peden P.C.

Tenth Floor

12 Greenway Plaza

Houston, TX 77046

### Re: McConn & Williams, LLP
### Attorney's Employment Agreement

Dear Jerry:

Pursuant to our Fee Agreement dated October 16, 2000, please find enclosed a copy of the executed Attorney's Employment Agreement with McConn & Williams, LLP related to Cause No.2000–2258; *Anglo–Dutch (Tenge) et al. Vs. Ramco, et al.;* in the 151st Judicial District of Harris County Texas.

This fee agreement with McConn & Williams, LLP provides the basis for the Agreement between Greenberg Peden P.C. and Anglo–Dutch.

Very truly yours,

/s/ *Scott Van Dyke*

Scott V. Van Dyke

President

Of significance is Van Dyke's reference to the Fee Agreement as "the Agreement between Greenberg Peden P.C. and Anglo–Dutch." Swonke received the letter but did not read it and thus did not respond.

Swonke continued to work on the case, and as provided by the Fee Agreement, Greenberg Peden invoiced Anglo–Dutch for expenses. But a year later, Greenberg Peden dissolved, and Swonke moved to McConn & Williams, again in an "of counsel" relationship. In a letter to Van Dyke, Swonke wrote that he would not take the Anglo–Dutch files with him if Van Dyke **\*449** objected.[3] Van Dyke did not. Swonke continued to work on the Tenge Field case at McConn & Williams as did other lawyers, including two who were also "of counsel".

As the litigation wore on, Anglo–Dutch and McConn & Williams decided to retain additional counsel, and they hired John M. O'Quinn & Associates. McConn & Williams reduced its 20% fee to 16–2/3%, and Anglo–Dutch agreed to pay O'Quinn 20%, for a total contingent fee of 36–2/3%. Still later, Anglo–Dutch agreed to pay the fee net of expenses. The case was tried to a plaintiffs' verdict and then settled for $51 million. Anglo–Dutch's legal fees and expenses totaled slightly over $20 million.

A few days before the settlement was funded, Swonke told Van Dyke that he expected to be paid under the Fee Agreement not only for the 277 hours he worked while at Greenberg Peden but also for the 1,022 hours he worked at McConn & Williams. All the other lawyers at McConn & Williams were to be paid under the firm's agreement with Anglo–Dutch. Greenberg Peden assigned its interest in the Fee Agreement to Swonke. The assignment, which Swonke prepared and signed, recited that "Swonke executed [the Fee Agreement] on behalf of (and while affiliated with) Greenberg Peden as an Of Counsel". Van Dyke offered to pay $293,338.85 for Swonke's work on the case while at Greenberg Peden but refused to pay for the time spent by Swonke at McConn & Williams.

Anglo–Dutch sued for a declaration that the Fee Agreement was with Greenberg Peden, not Swonke personally. It also sued Swonke for breach of fiduciary duty. Swonke counterclaimed for breach of contract, asserting that he personally was party to the agreement. Swonke also alleged that Van Dyke had defrauded him. Based on Swonke's testimony that his use of firm letterhead and the firm signature block, and his characterization of the agreement in the assignment, were mistakes, and extrinsic evidence of the parties' relationship, the trial court concluded that the agreement was ambiguous and submitted the parties' dispute to the jury. The jury found that the Fee Agreement was with Swonke, that Swonke had complied with his fiduciary duty to Anglo–Dutch, and that his damages were $1 million. The jury failed to find that Van Dyke had defrauded Swonke. The trial court rendered judgment on the verdict, and the court of appeals affirmed.[4]

We granted Anglo–Dutch's petition for review.[5]

## II

We begin by considering what standards to apply in construing lawyer-client contracts. We then apply those standards to the Fee Agreement, first to its text, and then to the circumstances surrounding its execution.

## A

[1]  [2]  [3]  " 'Whether a contract is ambiguous is a question of law that must be **\*450** decided by examining the contract as a whole in light of the circumstances present when the contract was entered.' "[6] One such circumstance is the existence of a lawyer-client relationship between the parties.[7] Because a lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are closely scrutinized.[8] Part of the lawyer's duty is to inform the client of all material facts.[9] And so that this responsibility is not a mere and meaningless formality, the lawyer must be clear.

Clarity in fee agreements is certainly important to clients. In an amicus brief supporting Anglo–Dutch, Professor Linda Eads explains:

> [Clients] need to know they can depend on the firm they thought they hired to represent their interests. When there is uncertainty about a firm's or attorney's responsibility for a matter, there is a real risk that loyalty to that client will become watery. And if disputes arise about fees or other issues, clients need to know who has ultimate authority to negotiate the issue, firm management or just the attorney working on the matter.[10]

Clarity is also important to lawyers. Professor Eads continues:

> Law firms need to know whether they are entitled to fees in order to budget their expenses and organizational strategy; firms need to know how much, and what scope of, malpractice insurance to purchase; they need to know who their clients are in order to analyze potential conflicts of interest; and firms need to know what matters are theirs in order to staff them appropriately and ensure their clients' interests are protected.

\* \* \*

[Individual] lawyers will want the certainty that their law firm stands behind them, that the firm's malpractice carrier will defend them if necessary, and that the fee agreements they draft will be interpreted to avoid readings that would involve violations of the rules of discipline. Further, in cases in which the existence of an ambiguity appears to **\*451** favor the lawyer, allowing a lawyer initially to benefit from the ambiguity might not be a good thing, even for the lawyer. By suing a former client, the lawyer's reputation often suffers. And if the ambiguity was drafted by the lawyer, Texas courts will have to decide how to handle malpractice claims based on poor draftsmanship of the fee agreement. [11]

A number of law firms also appearing as amicus curiae endorse these views. [12]

[4] [5] Only reasonable clarity is required, not perfection; not every dispute over the contract's meaning must be resolved against the lawyer. But the object is that the client be informed, and thus whether the lawyer has been reasonably clear must be determined from the client's perspective. Accordingly, we agree with the *Restatement (Third) of the Law Governing Lawyers* that "[a] tribunal should construe a contract between client and lawyer as a reasonable person in the circumstances of the client would have construed it." [13]

[6] Other circumstances surrounding the execution of a contract may inform its construction, but "[t]here are limits." [14] We have said:

An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. Only where a contract is ambiguous may a court consider the parties' interpretation and "admit extraneous evidence to determine the true meaning of the instrument." [15]

Understanding the context in which an agreement was made is essential in determining the parties' intent *as expressed in the agreement,* but it is the parties' expressed intent that the court must determine. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated. [16]

### \*452 B

[7] On its face, the Fee Agreement is plainly one with Greenberg Peden, not Swonke personally. The clear indicia of the firm letterhead and signature on the firm's behalf are not contradicted by the personal pronouns in the text. Swonke's uses of "I", "me", and "my" indicate that he would himself be working on the matter, which Anglo–Dutch certainly intended, but none suggests that other attorneys and staff at Greenberg Peden would be excluded from the case any more than they had been from other Anglo–Dutch matters. Since the fee was contingent on recovery and therefore not based on any attorney's hourly rate, it would presumably make no difference to Anglo–Dutch who besides Swonke worked on the case as long as the fee was computed on his hours. One use of "I" clearly included the firm: "I will not be responsible for any expenses". The firm, not Swonke, invoiced the clients for expenses, on firm letterhead. Moreover, the second-person pronouns show that the word "you" refers sometimes only to Van Dyke individually ("you and/or the companies which you control"), sometimes only to Anglo–Dutch ("I would be entitled to receive from you"), and sometimes to Van Dyke and his companies ("you have executed" the McConn & Williams fee agreement—Van Dyke signing for his companies). In sum, the pronouns indicate only inexact drafting; none says that despite the firm letterhead and firm signature, the agreement could only have been with Swonke personally.

Nor does the fee calculation, based solely on the hours Swonke spent individually, suggest that others at Greenberg Peden were excluded from the work. Taking Swonke's time into account provided a way of limiting the fee. If anything, the rounding-up feature of the calculation might suggest a means of providing additional compensation for others who did work on the case. Anglo–Dutch was to reimburse expenses, which were billed by Greenberg Peden, not by Swonke individually.

Even if the Fee Agreement had expressly provided that only Swonke would render the legal services required, the representation could still have been a firm matter. Anglo–Dutch was already a Greenberg Peden client and had been for years. Although Swonke had first engaged Anglo–Dutch as a client and had been responsible for most of its work, Anglo–Dutch had never been Swonke's non-firm client. From Anglo–Dutch's perspective, nothing in the Fee Agreement

reasonably suggested that its relationship with its lawyers was changing.

## C

[8] The trial court having determined the Fee Agreement to be ambiguous, the parties offered extensive extrinsic evidence of their intent in the ten-day trial. Given our conclusion that the agreement was not ambiguous, this evidence is of limited relevance. It cannot be used to show the parties' motives or intentions apart from the Fee Agreement; it can only provide the context in which the agreement was reached.

Van Dyke was not an unsophisticated client; indeed, it was he, not Swonke, who proposed the terms of the Fee Agreement. But for years Anglo–Dutch had been a client of Greenberg Peden, not Swonke personally. Van Dyke knew Greenberg Peden was concerned that Anglo–Dutch was delinquent in its payments to the firm, but the Tenge Field representation was on a contingent-fee basis. He also knew that the firm had refused to be lead counsel in the case, but the firm certainly had sufficient resources for a consulting role. Nothing about the parties' relationship preceding the Fee Agreement required *453 Van Dyke to recognize that though the agreement purported to be with Greenberg Peden, it was really with Swonke.

Events following the Fee Agreement do not cast the situation in a different light. The day he signed the Fee Agreement for Anglo–Dutch, Van Dyke wrote Swonke that the agreement was with Greenberg Peden. When the firm dissolved a year later and Swonke moved to McConn & Williams, he treated all of Anglo–Dutch's files as having belonged to Greenberg Peden. Even after the Tenge Field case settled and the present controversy began to emerge, Swonke stated that he had signed the Fee Agreement on behalf of Greenberg Peden and obtained an assignment of its interest.

In sum, the circumstances in which the Fee Agreement was executed do not suggest that the parties must have intended something different from what they plainly stated. We hold that the agreement was between Anglo–Dutch and Greenberg Peden.

## III

[9] [10] Construing client-lawyer agreements from the perspective of a reasonable client in the circumstances imposes a responsibility of clarity on the lawyer that should preclude a determination that an agreement is ambiguous in most instances. Lawyers appreciate the importance of words and "are more able than most clients to detect and repair omissions in client-lawyer contracts."[17] A client's best interests, which its lawyer is obliged to pursue, do not include having a jury construe their agreements.

The judgment of the court of appeals is reversed, and the case is remanded to the trial court for further proceedings.

Justice WAINWRIGHT filed an opinion concurring in part and dissenting in part.

Justice LEHRMANN filed a dissenting opinion, in which Justice MEDINA and Justice GREEN joined.

Justice WAINWRIGHT, concurring in part and dissenting in part.

Scott Van Dyke, president of Anglo–Dutch Petroleum International, Inc., and his attorney Gerald Swonke signed an engagement letter, dated October 16, 2000, in which attorney Swonke agreed to represent Van Dyke's company, Anglo–Dutch, in litigation with Halliburton Energy Services, Inc. Swonke was "of counsel" at the law firm of Greenberg Peden P.C. Anglo–Dutch contends that under the terms of the letter, Swonke also bound Greenberg Peden to represent Anglo–Dutch in the Halliburton litigation. The letter contains Swonke's references to expenses he would "personally incur", fees that "I would be entitled to receive", the agreement for "me" to assist you in the so-called Halliburton litigation, but it is drafted on Greenberg Peden letterhead. Swonke contends this was an oversight. Swonke testified that for a couple of years prior to the Halliburton litigation, he had individually represented Anglo–Dutch under his "of counsel" arrangement at Greenberg Peden. Notwithstanding this evidence, the Court disagrees with the trial court and concludes that the engagement letter is unambiguous and as a matter of law bound the Greenberg Peden firm to represent Anglo–Dutch. I therefore agree with JUSTICE LEHRMANN'S dissent that the engagement letter is ambiguous and with her other departures from the Court's opinion. I write to explain another basis for my disagreement with the Court's position.

*454 The Court holds the two parties to an agreement that neither of them entered in October 2000, as their trial

testimony indicates. Van Dyke testified that he knew at the time of the engagement letter that Greenberg Peden would not represent Anglo–Dutch in any new matters, such as the Halliburton litigation. Why? Van Dyke explained. Anglo–Dutch was over $200,000 behind in paying Greenberg Peden, and Greenberg Peden was not interested in further exposure on contingency fee cases. The exchange on this point during Van Dyke's testimony at trial is unequivocal, as Swonke told him in February 2000 that Greenberg Peden was not his law firm.

> Attorney: Mr. Van Dyke, my question was a more limited one, and you can say, "No, he didn't tell me that," if you want.
>
> I'm just asking: Did he [Swonke] not tell you from the beginning that Greenberg Peden wouldn't represent you in any lawsuit here, no matter whether it was contingency or hourly at all until you—because you hadn't paid off that debt.
>
> Van Dyke: Yes.

Furthermore, Van Dyke knew that no Greenberg lawyers would work on his files from that time forward. Harlan Naylor, Greenberg's managing partner, explained to the jury that the firm's lawyers were instructed not to work for Anglo–Dutch—"neither the shareholders nor the associates were going to do any more work for Mr. Van Dyke on that case." This testimony from Van Dyke and Naylor is undisputed. Swonke explained to the jury that Greenberg had essentially terminated Van Dyke as a client.

> > Greenberg Peden had told him in my presence they wouldn't do any more work for him. I had been doing work for him individually in my own capacity for—I don't know—two years, with Greenberg Peden not having involvement at all.

The uncontested testimony at trial establishes that Greenberg Peden's name partner (David Peden) told Van Dyke before he signed the engagement letter that the Greenberg Peden firm would not represent Anglo–Dutch in any new matter, whether contingency or hourly, because it was delinquent in paying the firm over $200,000 in legal fees. Swonke was present at that meeting. Nevertheless, Anglo–Dutch contends that the engagement letter signed after the meeting bound Greenberg Peden to represent it in the Halliburton litigation. This is

quite a turnabout for Anglo–Dutch as its litigation position contradicts the knowledge of its president, who signed the engagement letter. Knowing that Greenberg Peden refused to represent Anglo–Dutch in the Halliburton litigation, Van Dyke now asserts that the engagement letter unambiguously did just that.

The jury heard all about the dispute from all four sides —Swonke, Van Dyke, Greenberg Peden and another law firm Anglo–Dutch engaged (McConn & Williams)—and found that the two signers of the engagement letter intended that Swonke, not Greenberg Peden, would represent Anglo–Dutch.

I agree with the Court that attorneys owe fiduciary duties to their clients in this context that include: exercising the utmost good faith and most scrupulous honesty toward clients; ensuring that engagement letters are clear to the clients; fully and fairly disclosing all important information to clients concerning the transactions; and explaining material changes in the arrangement, such as moving from one law firm to another. Ambiguity in the fee agreement should be construed against the lawyer-drafter of the agreement. The **\*455** Court and amici set these duties out in some detail.[1] I do not conclude, however, that application of these duties to this case means that an ambiguous contract should be designated clear and then enforced to a result that neither signer intended at the time he signed it. At base, our task here is to enforce the parties' agreement. The duties and presumptions of counsel in such cases should help determine what the contractual obligations are, not override the agreement they entered.

I therefore agree with the arguments in JUSTICE LEHRMANN'S dissent. However, because I agree that the judgment should remand the case to the trial court, I concur in the Court's judgment, while respectfully dissenting from its reasoning. Unlike the Court, I would remand for a new trial and instruct the jury to be guided by the lawyer's fiduciary duties in interpreting the ambiguous engagement letter.

Justice LEHRMANN, joined by Justice MEDINA, and Justice GREEN, dissenting.

I agree that a court should review an attorney-client agreement from the perspective of a reasonable person in the client's circumstances when deciding whether it is subject to two or more reasonable interpretations. I disagree, however, with the Court's assumption that an agreement on firm letterhead unambiguously creates an agreement with the firm.

The use of letterhead must be viewed in light of clear evidence that the client understood the firm had refused to represent him in the case due to large unpaid legal bills, the lawyer's testimony that his secretary mistakenly used firm stationery, and the fact that the agreement referred solely to the individual lawyer and contemplated a fee structure where only that lawyer's time would be compensated. I therefore am compelled to respectfully express my dissent. I would affirm the court of appeals' judgment and hold that the trial court correctly determined the agreement was ambiguous and properly submitted the agreement's meaning to the jury.

## I. BACKGROUND

Scott Van Dyke, the president of Anglo–Dutch, and Swonke, the attorney, had a long-standing relationship that began when Van Dyke worked at another company. Swonke was "of counsel" at the law firm of Greenberg Peden when the subject agreement was executed in 2000. One of the firm's founders testified at trial that Greenberg Peden understood Swonke sometimes contracted with clients the firm did not want to represent, and it was understood these were Swonke's "side deals". Greenberg Peden had the right of first refusal for all of Swonke's potential clients.

In 1997, when Anglo–Dutch committed to develop an oil field in Kazakhstan with two business partners, Halliburton and Ramco, Van Dyke contacted Swonke to prepare the necessary documents. It is undisputed that the parties understood that Greenberg Peden, not Swonke individually, took on the representation at that time. No formal fee agreement was signed. The joint project ended in early 2000 when Halliburton and Ramco allegedly *456 breached the parties' confidentiality agreement and disclosed Anglo–Dutch's confidential data to third parties. Van Dyke consulted with Swonke, who advised him that Anglo–Dutch had viable claims against Halliburton and Ramco.

Around the same time, Anglo–Dutch ceased paying Greenberg Peden's bills and began accumulating a large account payable to the firm. Anglo–Dutch's unpaid legal bills prompted Greenberg Peden to stop working for Anglo–Dutch in 1999. By early 2000, Anglo–Dutch owed Greenberg Peden more than $200,000. It is undisputed that Van Dyke asked if Greenberg Peden would represent Anglo–Dutch in the lawsuit against Ramco and Halliburton, but the firm refused to take on any more work for Anglo–Dutch because of Anglo–

Dutch's unpaid bills and a history of difficulty in collecting fees from Anglo–Dutch.

Unable to retain Greenberg Peden, Anglo–Dutch, based on Swonke's recommendation, hired the law firm of McConn & Williams under a twenty percent contingency fee arrangement. As the Halliburton lawsuit progressed, Van Dyke asked Swonke to serve as an advisor to McConn & Williams because of his familiarity with the underlying contracts. After initially consulting for free, Swonke requested compensation as his involvement in the case became more substantial. McConn & Williams declined to pay Swonke because the firm's contingency fee interest was not large enough, so Van Dyke called Swonke directly and offered to pay him for the work. It is undisputed that Van Dyke and Swonke negotiated the terms of Swonke's representation and that Swonke finally agreed to accept compensation in the form of a fraction of the total recovery calculated based on the hours he worked, divided by the total hours billed by the McConn & Williams attorneys.

Swonke dictated the body of the one-page agreement and his secretary printed it on Greenberg Peden letterhead, with a Greenberg Peden signature block. Swonke signed his name under the Greenberg Peden signature block and sent the agreement to Van Dyke, who signed and returned it the next day. Swonke testified he did not notice the letterhead or the signature block and did not think to correct them at any point because he and Van Dyke both knew the agreement was personal to him.

The day he signed the agreement, Van Dyke also drafted and sent Swonke a separate transmittal letter attaching a copy of the McConn & Williams contingency fee agreement. The letter said that the McConn & Williams document "provides the basis for the Agreement between Greenberg Peden P.C. and Anglo–Dutch." At trial, Swonke questioned Van Dyke's motives for sending the letter separately from the main agreement, and for sending it at all as Van Dyke had previously given him the McConn & Williams agreement. Swonke testified that he did not read the letter, and would not normally read a transmittal letter referring to a document he already had in his files.

Swonke worked on the Halliburton lawsuit for 277 hours while at Greenberg Peden. After Greenberg Peden dissolved in 2001, Swonke joined McConn & Williams as "of counsel". McConn & Williams and Swonke agreed that he would not share in the firm's fees from the Halliburton lawsuit, but

did not relay that agreement to Anglo–Dutch. Swonke did inform Anglo–Dutch of his move to McConn & Williams, and told Anglo–Dutch he planned to take his client files with him unless Anglo–Dutch objected. Receiving no objection, Swonke worked 1,022 hours on the matter at McConn & Williams.

**\*457** Anglo–Dutch won a $70.5 million verdict against Halliburton and the parties stipulated to $9.8 million in attorney's fees. The verdict was appealed and Halliburton ultimately settled the case for $51 million in 2004. A few days before Halliburton was going to wire the attorneys' fees portion of the settlement to individuals and firms involved in the case, Swonke's name was removed from the wiring instructions at Van Dyke's request. Noting the change, Swonke e-mailed Van Dyke asking how he wanted to handle his compensation. Prior to discussing payment, Van Dyke requested that Greenberg Peden assign any interest under the Anglo–Dutch agreement to Swonke, purportedly to avoid any possible problems with multiple claims for attorney's fees. Swonke contacted Greenberg Peden, and the no-longer operating firm's representatives agreed to the assignment in exchange for a ten percent fee from all amounts collected by Swonke from Anglo–Dutch, an amount consistent with their original agreement that he would pay the firm a flat ten percent to cover overhead for matters handled by Swonke individually.

Soon after obtaining the assignment letter, Van Dyke informed Swonke that he'd consulted lawyers and determined that Anglo–Dutch's contract was with Greenberg Peden and not with Swonke individually. Accordingly, Van Dyke refused to include the hours billed after Swonke left Greenberg Peden in the contingency ratio, a position that would reduce Swonke's total compensation due by over a million dollars. Swonke asserted that the agreement was personal to him and that he should be paid for all of the work he performed for Anglo–Dutch. It is undisputed that had the trial court determined that the agreement was with Greenberg Peden, Anglo–Dutch would be able to calculate the compensation ratio based solely on the 277 hours Swonke billed while at Greenberg Peden. Anglo–Dutch argued that the 1,022 hours Swonke billed at McConn & Williams were covered by that firm's contingency percentage.

## II. APPLICABLE STANDARDS

I agree with the standards the Court applies in determining whether this attorney-client agreement is ambiguous. Ambiguity is determined by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). When an agreement's language is ambiguous in light of the circumstances present when the parties entered into it, its meaning becomes an issue for the fact-finder. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003); *see Columbia Gas*, 940 S.W.2d at 589.

I also agree that there are limits. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981). Parol evidence will not be received to create an ambiguity or to give a contract a meaning different from that imparted by its language. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex.2008) (citations omitted). Courts may not consider the parties' interpretation or "admit extraneous evidence to determine the true meaning of the instrument" if the express language of the agreement may be interpreted in only one way. *Id.* at 450 (quoting *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995)). Ambiguity likewise does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 866 (Tex.2000); *Nat'l Union Fire Ins.*, 907 S.W.2d at 520.

**\*458** Further, as the Court observes and Anglo–Dutch and amici [1] contend, clarity is obviously critical, and courts should therefore view the agreement from the perspective of a reasonable client to determine if it is susceptible to more than one reasonable interpretation. Such a rule will protect clients from unscrupulous attorneys, reduce disputes, and create a predictable rule that is in the best interest of the legal system, individual clients, lawyers, and law firms.

And it is beyond dispute that attorney-client agreements are subject to heightened scrutiny by the courts because of the fiduciary nature of the attorney-client relationship. *See Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 560 (Tex.2006). The attorney, unlike a commercial party to an agreement, bears a duty to ensure the client understands the terms of the representation because of the trust the client places in the attorney. *See Levine v. Bayne, Snell & Krause, Ltd.*, 40 S.W.3d 92, 95 (Tex.2001). To fulfill this duty, the lawyer must be clear.

Like the Court, I believe that the approach set out in the Restatement of the Law Governing Lawyers is workable. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18, cmt. h. Under this approach, such agreements should be viewed from the perspective of a reasonable client, taking into consideration the parties' relative bargaining power and other circumstances surrounding the agreement. *See id.* A reasonable client to whom this standard is applied is "a reasonable person in the client's circumstances." *Id.* I do not agree, however, that any potential ambiguities should be resolved against the attorney.

## III. ASSESSING AMBIGUITY IN ATTORNEY–CLIENT AGREEMENTS

The evaluation of whether an agreement is subject to multiple reasonable interpretations should be made from the perspective of a reasonable person in the client's circumstances. This does not mean, as Anglo–Dutch and the Court presume, that the individual client's interpretation prevails. Instead, the reasonableness of potential interpretations will be viewed from the reasonable client's perspective, taking into consideration the circumstances surrounding the agreement's formation, such as the parties' past dealings, their relative bargaining power, and the client's experience negotiating such agreements to determine whether the agreement was "truly negotiated". *See id.* If the court determines, as a matter of law, that the agreement is subject to more than one reasonable interpretation from a reasonable client's perspective, construction of the agreement becomes a fact issue for the judge or jury to resolve.

The Court claims not to construe the agreement against the attorney. *See Levine,* 40 S.W.3d at 94; *Lopez,* 22 S.W.3d at 860–61. However, in concluding that the circumstances surrounding the agreement do nothing to negate the letterhead on which the agreement was printed, the Court does just that. The Restatement emphasizes that in applying the reasonable client standard, courts should not ignore "the usual resources of contractual interpretation such as the language of the contract, the circumstances in which it was **\*459** made, and the client's sophistication and experience in retaining and compensating lawyers or lack thereof." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18, cmt. h. An agreement should be "construed in light of the circumstances in which it was made, the parties' past practice and contracts, and whether it was truly negotiated." *Id.*

Undoubtedly, Swonke's use of the Greenberg Peden letterhead in this case contributed to the agreement's ambiguity. But in times of increasing fluidity in the legal profession, the solution the Court implements—to construe agreements based on the letterhead regardless of the parties' understanding of their terms—could lead to unnecessarily harsh results: a lawyer who made a mistake in choosing stationery—or even used the only stationery available—would lose. *See* Milton C. Regan, Jr. & Palmer T. Heenan, *Supply Chains and Porous Boundaries: The Disaggregation of Legal Services,* 78 FORDHAM L.REV. 2137, 2191 (2010) (noting that the economic downturn marks a "transition for law firms less because of its immediate financial impact and more because it has highlighted and accelerated the trend toward the disaggregation of legal services that had begun before it"). While the entire Court would hold lawyers to a standard of reasonable clarity, perfection is not required. The Court's analysis of the agreement should focus on the terms as negotiated and agreed to, not on interpretations that the parties (and, at times, their counsel) have subsequently adopted in light of the changed circumstances. While giving due weight to a lawyer's fiduciary obligations, we should do so from a reasonable, not predatory, client's perspective.

### 1. Reasonableness of alternative interpretations

The Court holds that, even applying the Restatement's approach, a reasonable client would only interpret the agreement to be with Greenberg Peden. I disagree with that mechanical approach: application of the factors outlined in the Restatement leads me to conclude that the agreement is subject to multiple reasonable interpretations under the circumstances and thus ambiguous. The express terms of the Anglo–Dutch agreement cast doubt that it could only be understood to form a contract with Greenberg Peden from a reasonable client's perspective.

The Anglo–Dutch agreement invites more than one reasonable interpretation of the parties' intentions in spite of the fact that it was printed on Greenberg Peden letterhead and signed under a Greenberg Peden signature block. First, the body of the agreement did not reference Greenberg Peden while it referred to McConn & Williams by name five separate times. It defined the client as "you and/ or the companies which you control (Anglo–Dutch)" but exclusively used personal pronouns throughout to refer to Swonke. The one-page document repeatedly used language such as "I agree to assist Anglo–Dutch and [McConn &

Williams] for proportionately the same percentage (20%) of any benefit to McConn & Williams;" "the proportions under which my fees shall be calculated will be the ratio of the hours I have spent ... relative to the hours [of McConn & Williams attorneys];" "if ... I spent 90 hours of my time towards the lawsuit, ... I would be entitled to receive;" "I shall be entitled to the benefit of any amendment;" "I will not be responsible for any expenses other than those I may personally incur;" and the like.

Second, the fee structure contemplated by Anglo–Dutch and Swonke, which based Swonke's compensation solely on the hours he individually billed, creates an ambiguity, **\*460** especially when compared to other firm fee agreements. The applicable provision states that:

> the proportions under which my fees shall be calculated will be the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage.

The four corners of the Anglo–Dutch agreement indicate that Anglo–Dutch and Swonke negotiated a contingency fee based solely on the hours Swonke (and no other Greenberg Peden attorneys or support staff) worked on the lawsuit, divided by the total hours billed by "the attorneys at McConn & Williams."[2] It is helpful to contrast this fee structure with the structure of the law firm agreement in *Sacks,* which likewise contained personal pronouns:

> My ... rate for this particular matter will be $200.00 per hour. The other lawyers in my firm range from $150.00 to $200.00 per hour, and paralegals range from $50.00 to $100.00 per hour. You are responsible for all costs and expenses in the case as incurred. These expenses include, but are not limited to, copies; binding; fax transmissions; travel; lodging; parking; etc.
>
> *Sacks,* 266 S.W.3d at 448–49.

While the Anglo–Dutch agreement stated Swonke would not be responsible for expenses, it did not anticipate compensation beyond one attorney's billable hours. *Compare Anglo–Dutch,* 267 S.W.3d at 460–61 *with Sacks,* 266 S.W.3d at 448–49; *In re Inslaw, Inc.,* 97 B.R. 685, 688 (Bankr.D.D.C.1989) (discussing an hourly law firm agreement stating that "[m]y partner ... will be billed at $170

and all other attorney or paralegal time will be billed at this law firm's normal rate for that person"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.,* 586 F.Supp.2d 732, 767 and n. 32 (S.D.Tex.2008) (recognizing that law firm contingent fees take resources into account by holding that "in light of the complexity and difficulty of the litigation, the fee percentage would have to be sufficient to create adequate incentives for the firm to dedicate the substantial resources, possibly over a long period of time"). The agreement's compensation ratio and the use of personal pronouns throughout, in conjunction with its use of Greenberg Peden letterhead and the Greenberg Peden signature block, make it open to more than one reasonable interpretation. Accordingly, it must be read in light of surrounding circumstances. *See Columbia Gas,* 940 S.W.2d at 589; *Sun Oil,* 626 S.W.2d at 731.

### 2. Circumstances surrounding the agreement

It is undisputed that Van Dyke knew Greenberg Peden had refused to represent Anglo–Dutch in the Halliburton lawsuit due to the large amount of unpaid legal bills and the history of difficulty in collecting fees from Anglo–Dutch. Van Dyke admitted that he knew that Anglo–Dutch's account payable exceeded $200,000, and that Greenberg Peden therefore wanted to play no part in the lawsuit against Halliburton. Given this admission, it is difficult to see how a reasonable client in Anglo–Dutch's position could have believed that the agreement was with the firm, rather than with Swonke.

Moreover, it is undisputed that the contract in this case arose in the context of genuine negotiations between Swonke and the client, both of whom had previous experience **\*461** negotiating such agreements. Van Dyke testified that negotiating agreements was a significant portion of his job. He testified that Anglo–Dutch retained other counsel prior to switching to Greenberg Peden and had another attorney draft a demand letter to Halliburton prior to retaining McConn & Williams. Further, Van Dyke testified that he and Swonke had many discussions about contract drafting over the years, and Swonke had even given Van Dyke advice on best practices when drafting agreements.

Concerns that an attorney could exercise undue influence over an existing client are valid, but they are minimized here because this agreement was truly negotiated. The agreement was not suggested by Swonke to an uninformed and agreeable client—to the contrary, Van Dyke proposed it to ensure that he would continue to receive the benefit of Swonke's experience when McConn & Williams refused to

compensate Swonke for his services. Although the Anglo–Dutch agreement is only one page, both Van Dyke and Swonke testified that they negotiated its terms. Significantly, there is undisputed evidence that Van Dyke, not Swonke, suggested the unusual compensation ratio that Swonke initially resisted, requesting a flat percentage fee instead.

Viewing the agreement from a reasonable client's perspective, I disagree that Anglo–Dutch's interpretation is the only reasonable one. Certainly, the use of personal pronouns in an engagement letter does not alone create an ambiguity as to whether the client hired a law firm or an individual lawyer. To be reasonable, an alternative interpretation must be one a client could reasonably understand from the agreement's language and the circumstances of the negotiation between the parties. Yet the negotiations between the parties demonstrate an understanding that the law firm of Greenberg Peden was uninterested in future work for Anglo–Dutch, and Swonke negotiated the compensation for himself individually. The Court is persuaded by the letterhead on which the agreement was printed after its terms were already negotiated and accepted by both parties, and by the language of a Greenberg Peden assignment of interest letter, signed years after the agreement was reached. Neither one bears on the parties' understanding at the time they reached their agreement.

I would hold that the language of the agreement, as shown by the compensation ratio, the use of personal pronouns, the use of Greenberg Peden letterhead and the Greenberg Peden signature block, together with the circumstances surrounding the agreement's formation, made it open to multiple interpretations. The use of the letterhead could lead a reasonable client to believe the agreement was with the law firm. However, it was every bit as reasonable, given Greenberg Peden's repeated refusal to do more business with Anglo–Dutch, for the client to understand that it was a personal agreement with Swonke. Van Dyke's undisputed testimony that the firm declined all further representation of Anglo–Dutch highlights the ambiguity resulting from the circumstances surrounding the agreement's formation. His one-paragraph letter to Swonke, describing it as the agreement between "Anglo–Dutch and Greenberg Peden," showed only Anglo–Dutch's self-serving interpretation of the agreement, not whether it would unmistakably be understood that way by a reasonable client given the scope of the agreement. Moreover, because the letter is external to the contract's formation, it is not properly considered in determining whether the agreement is ambiguous.

Consideration of the language of the actual contract and the circumstances surrounding *462 its formation lead me to conclude that the fee agreement was ambiguous as a matter of law. Accordingly, I would hold that the trial court properly submitted the agreement's construction to the jury. Because the Court effectively construes the agreement against the lawyer, I am compelled to respectfully express my dissent.

**Parallel Citations**

54 Tex. Sup. Ct. J. 1669

Footnotes

1    267 S.W.3d 454 (Tex.App.-Houston [14th Dist.] 2008).

2    An affiliate, Anglo–Dutch (Tenge) L.L.C., was also a plaintiff and is a petitioner here, wholly aligned with Anglo–Dutch Petroleum International, Inc.

3    Swonke wrote to Van Dyke on November 6, 2001: "For many years, I have had the pleasure of representing you and your interests through my association with Greenberg Peden, P.C. However, recently Greenberg Peden, P.C. has decided to dissolve. As a result, I will have the pleasure of continuing to represent your interests as 'Of Counsel' with the law firm of McConn & Williams, L.L.P.... I am planning to take your files with me to my new firm. If you do not wish for me to take your files, please contact me as soon as possible so that we can make arrangements for you to take possession of them."

4    267 S.W.3d 454.

5    53 Tex.Sup.Ct.J. 758 (May 28, 2010).

6    *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 451 (Tex.2008) (per curiam) (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996)).

7    *See Hoover Slovacek LLP v. Walton,* 206 S.W.3d 557, 560 (Tex.2006) ("When interpreting and enforcing attorney-client fee agreements, it is 'not enough to simply say that a contract is a contract. There are ethical considerations overlaying the contractual relationship.' " (quoting *Lopez v. Muñoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 868 (Tex.2000) (Gonzales, J., concurring and dissenting))).

8     *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 20 S.W.3d 692, 699 (Tex.2000) ("Contracts between attorneys and their clients negotiated during the existence of the attorney-client relationship are closely scrutinized."); *Archer v. Griffith,* 390 S.W.2d 735, 739 (Tex.1964) ("Although an attorney is not incapacitated from contracting with his client for compensation during the existence of the relation of attorney and client, and a fair and reasonable settlement of the compensation to be paid is valid and enforceable, if executed freely, voluntarily, and with full understanding by the client, the courts, because of the confidential relationship, scrutinize with jealousy all contracts between them for compensation which are made while the relation exists." (internal quotation marks omitted)); *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18, cmt. e (2000) ( "Client-lawyer fee contracts entered into after the matter in question is under way are subject to special scrutiny....").

9     *Keck,* 20 S.W.3d at 699 (citing *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 175 (Tex.1997)).

10     Brief of Amicus Curiae Linda S. Eads, Associate Professor of Law, Dedman School of Law, Southern Methodist University, in Support of Petitioner at 21.

11     *Id.* at 20–21.

12     Brief of Amici Curiae Abrams Scott & Bickley, L.L.P., Arnold & Itkin LLP, Caddell & Chapman, Cornell, Smith & Mierl, LLP, Dawson, Sodd, Ellis & Hodge LLP, Law Office of James M. McCormack, and Quilling, Selander, Cummiskey & Lownds, P.C., in Support of Petitioner at 11–12. These firms describe themselves as follows: "Some ... are larger firms with multiple offices and dozens of attorneys practicing before the Texas bar; others are small firms with just a few attorneys. Some represent primarily defendants, some represent primarily plaintiffs, and some represent plaintiffs and defendants on a regular basis. The *amici curiae* are thus in a balanced position to address the interpretation of fee agreements between lawyers and their clients." *Id.* at 1.

13     RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18(2).

14     *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981) ("If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. There are limits.").

15     *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450–451 (Tex.2008) (per curiam) (citation omitted) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995) (per curiam), and citing *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951)).

16     *See Gannon v. Baker,* 818 S.W.2d 754, 755–756 (Tex.1991) (per curiam) ("The parol evidence rule applies only to contractual or jural writings evidencing the creation, modification, termination or securing of a particular right or obligation. *Brannon v. Gulf States Energy Corp.,* 562 S.W.2d 219, 222 (Tex.1977). The rule does not apply to mere statements or recitals of past facts.").

17     RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18 cmt. h.

1     *See* Brief of Amicus Curiae Linda S. Eads, Associate Professor of Law, Dedman School of Law, Southern Methodist University, in Support of Petitioner at 21. *See* Brief of Amici Curiae Abrams Scott & Bickley, L.L.P., Arnold & Itkin LLP, Caddell & Chapman, Cornell, Smith & Mierl, LLP, Dawson, Sodd, Ellis & Hodge LLP, Law Office of James M. McCormack, and Quilling, Selander, Cummiskey & Lownds, P.C., in Support of Petitioner. The law firm *amici* state that they "are not suggesting that lawyers and law firms should always lose a fee dispute." *Id.* at 8.

1     Two amicus briefs were submitted in support of Anglo–Dutch: one by Linda Eads, Associate Professor of Law at the Dedman School of Law and another by the law firms of Abrams Scott & Bickley, L.L.P.; Arnold & Itkin LLP; Caddell & Chapman; Cornell, Smith & Mierl, LLP; Dawson, Sodd, Ellis & Hodge LLP; Law Office of James M. McCormack; and Quilling, Selander, Cummiskey & Lownds, P.C.

2     Anglo–Dutch's agreement with McConn & Williams provided for a flat 20 percent contingency fee, later reduced to 16 and 2/3 percent.

---

End of Document                 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX E

CAUSE NO. 2004-20712



| | | |
|---|---|---|
| ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. et al. Plaintiffs, | § § § § | IN THE DISTRICT COURT OF |
| vs. | § § | HARRIS COUNTY, TEXAS |
| GREENBERG PEDEN, P.C., et al. Defendant. | § § | 61ST JUDICIAL DISTRICT |

FILED
Chris Daniel
District Clerk
MAY 15 2012
Harris County, Texas
Time: _____
By _____ Deputy

## ORDER

The Court has been asked to determine the correct calculation of the attorneys' fees provision under the October 16, 2000, Fee Agreement signed by Gerald Swonke and Scott V. Van Dyke of Anglo-Dutch Petroleum International, Inc. On this issue the Court relies on the following guidance:

(i)     October 16, 2000, Fee Agreement;

(ii)    *Anglo-Dutch Petroleum Int'l, Inc. et al. v. Greenberg Peden, P.C.,* 352 S.W.3d 445 (Tex. 2011).

In addition, the Court has reviewed the briefs and heard the oral arguments of the respective parties on this issue.

As to the threshold question, "Who are the parties to the Fee Agreement?" the Texas Supreme Court has unequivocally answered that question. The Supreme Court, after extensive briefing and oral arguments, has stated the Fee Agreement was "between Anglo-Dutch and Greenberg Peden." *Anglo-Dutch Petroleum Int'l, Inc.,* 352 S.W.3d at 453. As such, only Swonke's work while at Greenberg Peden is covered by the Fee Agreement.

From that starting point, the Court looks to the Fee Agreement to determine the appropriate formula for calculating the attorneys' fees. The Fee Agreement spells outs the following:

> I [Greenberg Peden] agree to assist Anglo-Dutch and that firm [McConn & Williams] in this lawsuit [Cause No. 2000-22588; *Anglo-Dutch (Tenge) et al. v. Ramco et al.,* In the

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

524

151st Judicial District Court of Harris County, Texas] for proportionately the same percentage (20%) of any benefit to McConn & Williams reflected in such agreement. However, I will not be responsible for any expenses other than those I may personally incur. Further, the proportions under which my fees shall be calculated will be the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage.

Fee Agreement, page 1. [not in original]

The Court reads the above recitals to result in the following formula:

Greenberg Peden Hours/McConn Williams Hours = X (rounded up to the next whole percentage) (X1). X1 x 20% = X2.

The Fee Agreement goes on to say that the factor X2 will be applied to "gross revenues and other benefits received" to determine the attorneys' fees.

We know "gross revenues" to be $51,000,000.00 which represents the amount of the negotiated settlement. In addition, the parties have agreed that Swonke spent 277 hours on the representation while at Greenberg Peden and that McConn Williams spent 11,652 on the representation. Hence, the Court makes the following calculation under the guidance of the Texas Supreme Court, the Fee Agreement, and the undisputed evidence:

277 Hours/11,652 Hours = 2.37% (rounded to 3%). 3% x 20% = .006%. .006 x $51,000,000.00 = $306,000.00

Thus, under the Fee Agreement the Court determines that the attorneys' fees due to Greenberg Peden (and now Swonke by way of assignment) are $306,000.00. This determination will be applied to and will be used to resolve all outstanding issues remaining in the above captioned case.

Signed ___MAY 1 5 2012___

_____
JUDGE PRESIDING

525

# APPENDIX F

CAUSE NO. 2004-20712

| | | |
|---|---|---|
| ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. and ANGLO-DUTCH (TENGE), LLC, | § § § § | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| GREENBERG PEDEN, P.C. and GERARD J. SWONKE, | § § § | |
| DEFENDANTS. | § § | 61st JUDICIAL DISTRICT |

FILED
Chris Daniel
District Clerk
MAY 28 2013
Harris County, Texas
Time: _____ By _____

## ORDER

The Court has considered Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge) LLC's Motion for Interlocutory Summary Judgment (the "Motion"). After considering the Motion, the responses and replies thereto, if any, and the arguments of counsel, if any, the Court is of the opinion that the Motion is meritorious and should be GRANTED in all respects. It is therefore,

ORDERED that Defendant Gerard J. Swonke TAKE NOTHING on his Breach of Contract Counterclaim. It is further,

ORDERED that Defendant Gerard J. Swonke TAKE NOTHING on his request for attorneys' fees pursuant to Tex. Civ. Prac. & Rem Code § 38.001 et seq. It is further,

ORDERED that Defendant Gerard J. Swonke TAKE NOTHING on his Declaratory Judgment Counterclaim. It is further,

ORDERED that Defendant Gerard J. Swonke is precluded, as a matter of law, from recovering attorneys' fees under Tex. Civ. Prac. & Rem Code § 37.009. It is further,

ORDERED that Anglo-Dutch is entitled to attorneys' fees as are equitable and just pursuant to Tex. Civ. Prac. & Rem Code § 37.009. It is further,

668

ORDERED that Defendant, Greenberg Peden, P.C., recover $4,063.70 prejudgment interest through September 28, 2012. It is further,

ORDERED that Defendant, Greenberg Peden, P.C. recover prejudgment interest at the rate of $1.73 per day from September 28, 2012, through the date of the entry of the judgment.

Signed this _____ day of **MAY 2 3 2013** _____, 2013.

_____
PRESIDING JUDGE

-2-

669



APPENDIX G



CAUSE NO. 2004-20712

| | | |
|---|---|---|
| ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. et al. Plaintiffs, | § § § § | IN THE DISTRICT COURT OF |
| vs. | § § § | HARRIS COUNTY, TEXAS |
| GREENBERG PEDEN, P.C., et al. Defendant. | § § § | 61ST JUDICIAL DISTRICT |

## FINAL JUDGMENT

The parties to this final judgment are Anglo-Dutch Petroleum International, Inc., Anglo-Dutch (Tenge), LLC (collectively "Anglo-Dutch"), Greenberg Peden, P.C. ("Greenberg Peden"), and Gerald J. Swonke ("Swonke").

### Trial

On January 13, 2014, this case was called for trial. All parties appeared and announced ready for trial. A jury was impaneled and sworn; it heard the evidence and arguments of counsel. In response to the Charge of the Court, the jury made findings that the Court received, filed, and entered of record on January 15, 2014. The questions submitted to the jury and the jury's findings are attached as Exhibit A and incorporated by reference.

### Post-Trial

Swonke and Greenberg Peden moved the Court to rule as a matter of law that Anglo-Dutch waived its trial, appellate, and post-remand attorneys' fees and costs claims. The Court denied that motion. Swonke and Greenberg Peden also moved the Court to disregard the jury's findings to Questions 2(2) and 4(B). The Court initially denied that motion, but upon reconsideration has agreed to that motion. Specifically, after considering the evidence introduced at trial, the jury's verdict, and the entire record, the Court finds that an award of attorneys' fees or costs to Anglo-Dutch would not be equitable or just.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Anglo-Dutch moved for a judgment notwithstanding the verdict. The Court denied that motion.

## Judgment Decrees

Based upon the Court's pretrial rulings, the jury's verdict, and the post-verdict arguments of counsel, the judgment should be and is now hereby RENDERED as set forth below:

1. As requested in Plaintiffs' First Amended Petition at page 7, ¶ 23(a), the Court DECLARES that the Fee Agreement is between Anglo-Dutch and Greenberg Peden, and not between Anglo-Dutch and Swonke individually.

2. As requested in Plaintiffs' First Amended Petition at 7 ¶ 23(c), the Court DECLARES that: (1) the numerator in the hours ratio in the fee formula in the Fee Agreement is the hours Greenberg Peden worked on the Halliburton Lawsuit and does not include the hours Swonke worked on the Halliburton Lawsuit while of counsel to McConn & Williams; and (2) the hours Swonke worked on the Halliburton Lawsuit while of counsel to McConn & Williams are included in the denominator in the fee formula in the Fee Agreement.

3. The Court DECLARES that the fee owed under the Fee Agreement is based on Anglo-Dutch's gross recovery in the Halliburton Lawsuit.

4. As requested in Plaintiffs' First Amended Petition at 7-8 ¶ 23(d), the Court DECLARES that the rounding up to the next whole percentage that is required by the Fee Agreement occurs after the hours ratio is determined before, not after, the hours ratio is multiplied by 20%.

5. Based on the parties' stipulations that (a) Anglo-Dutch's gross recovery in the Halliburton Lawsuit was $51,000,000, (b) Swonke worked on the Halliburton Lawsuit for 277 hours while of counsel to Greenberg Peden, and (c) McConn & Williams' attorneys, and Swonke

while of counsel to McConn & Williams, worked on the Halliburton Lawsuit for a total of 11,652 hours, the Court DECLARES that Greenberg Peden (and now Swonke by way of assignment) is owed $306,000.00 under the Fee Agreement.

6. The Court ORDERS Anglo-Dutch, jointly and severally, to pay Swonke $306,000.00.

7. The Court ORDERS that Swonke take nothing on his breach of contract counterclaim.

8. The Court ORDERS that Swonke take nothing on his request for attorneys' fees pursuant to Texas Civil Practice and Remedies Code § 38.001 *et seq.*

9. The Court ORDERS that Swonke take nothing on his declaratory judgment counterclaim.

10. The Court ORDERS that Swonke take nothing on his fraud and exemplary damages claims.

11. The Court ORDERS that Swonke is precluded, as a matter of law, from recovering attorneys' fees under Texas Civil Practice and Remedies Code § 37.009.

12. The Court ORDERS that Swonke take nothing on his request for attorneys' fees pursuant to Texas Civil Practice and Remedies Code § 37.009.

13. The Court ORDERS that Anglo-Dutch, jointly and severally, pay Swonke $42,127.40 in prejudgment interest.

14. The Court ORDERS that Anglo-Dutch take nothing from Swonke or Greenberg Peden on Angle-Dutch's claims for trial, appellate, and post-remand attorneys' fees and costs.

15. The Court (as required by T.R.C.P. 131) ORDERS that Swonke and Greenberg Peden, jointly and severally, pay all costs of court expended or incurred in this action by Anglo-Dutch.

16.    The Court ORDERS that Anglo-Dutch, jointly and severally, to pay post-judgment interest on the amount of $348,127.40 at the rate of 8.25% per annum, compounded annually, from the date of the Original Final Judgment until paid.

17.    The Court ORDERS execution to issue for this judgment.

**Finality of Judgment**

All relief not expressly granted in this Final Judgment is hereby DENIED. This judgment is final, disposes of all claims and parties, and is appealable.

SIGNED this _____ day of _____ MAY 1 3 2014 _____, 201__.

_____
JUDGE PRESIDING

CAUSE NO. 2004-20712

| | | |
|---|---|---|
| ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. and ANGLO-DUTCH (TENGE), LLC | § § § § | IN THE DISTRICT COURT |
| vs. | § § | HARRIS COUNTY, TEXAS |
| GREENBERG PEDEN, P.C. and GERARD J. SWONKE | § § | 61ST JUDICIAL DISTRICT |

**FILED**
Chris Daniel
District Clerk
JAN 1 6 2014
Time:_____
Harris County, Texas
By_____ Deputy

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you

CONFIRMED FILE DATE. 1/16/2014

Certified Document Number: 59278419 - Page 1 of 12

## EXHIBIT A

are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

   The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

# EXHIBIT A

Certified Document Number 59278419 - Page 2 of 12

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

# EXHIBIT A

Certified Document Number: 59278419 - Page 3 of 12

1308

**QUESTION NO. 1:**

What are the fees for the services of Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC's attorneys, stated in dollars and cents?

You are instructed to include only fees for services that relate to Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC's declaratory judgment claims.

You are further instructed that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make unrecoverable fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated. A party, however, may recover attorney's fees incurred in overcoming defenses or counterclaims to a claim for which attorney's fees are recoverable.

You are further instructed to exclude from your answer any attorney's fees that relate solely to claims for breach of fiduciary duty, fraud, negligence, and gross negligence.

Answer with an amount for each of the following:

For representation in the trial court for the original trial.

Answer: _____ $0 _____

**EXHIBIT A**

Certified Document Number. 59278419 - Page 4 of 12

1309

## QUESTION NO. 2:

What is a reasonable fee for the necessary services of Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC's attorneys, stated in dollars and cents?

You are instructed to include only reasonable fees for necessary services that relate to Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC's declaratory judgment claims.

You are further instructed that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make unrecoverable fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated. A party, however, may recover attorney's fees incurred in overcoming defenses or counterclaims to a claim for which attorney's fees are recoverable.

You are further instructed to exclude from your answer any attorney's fees that relate solely to claims for breach of fiduciary duty, fraud, negligence, and gross negligence.

Factors to consider in determining a reasonable fee include—

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly.

2. The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.

3. The fee customarily charged in the locality for similar legal services.

4. The amount involved and the results obtained.

5. The time limitations imposed by the client or by the circumstances.

6. The nature and length of the professional relationship with the client.

7. The experience, reputation, and ability of the lawyers or lawyers performing the services.

Page 5 of 12

# EXHIBIT A

1310

8. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

1. For representation for the prior appeal to the court of appeals.

Answer: _____ #0 _____

2. For representation for the prior appeal to the Supreme Court of Texas.

Answer: _____ #50,000 _____

# EXHIBIT A

Certified Document Number: 59278419 - Page 6 of 12

1311

**QUESTION NO. 3:**

What is a reasonable fee for the necessary services of Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC's attorneys, stated in dollars and cents?

You are instructed to include only reasonable fees for necessary services that relate to Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC's declaratory judgment claims.

You are further instructed that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make unrecoverable fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated. A party, however, may recover attorney's fees incurred in overcoming defenses or counterclaims to a claim for which attorney's fees are recoverable.

You are further instructed to exclude from your answer any attorney's fees that relate solely to claims for breach of fiduciary duty, fraud, negligence, and gross negligence.

Factors to consider in determining a reasonable fee include

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly.

2. The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.

3. The fee customarily charged in the locality for similar legal services.

4. The amount involved and the results obtained.

5. The time limitations imposed by the client or by the circumstances.

6. The nature and length of the professional relationship with the client.

7. The experience, reputation, and ability of the lawyers or lawyers performing the services.

Page 7 of 12

# EXHIBIT A

1312

8. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount, if any, for each of the following:

1. For representation in the trial court from December 16, 2011 to the present.

   Answer: _____ $0 _____

2. For representation for an appeal in the court of appeals.

   Answer: _____ $0 _____

3. For representation at the petition for review stage in the Supreme Court of Texas.

   Answer: _____ $0 _____

4. For representation at the merits briefing stage in the Supreme Court of Texas.

   Answer: _____ $0 _____

5. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

   Answer: _____ $0 _____

# EXHIBIT A

Certified Document Number: 59278419 - Page 8 of 12

1313

QUESTION NO. 4:

State the amount of reasonable and necessary costs incurred, if any, by Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC.

You are instructed to include only reasonable costs for necessary services that relate to Anglo-Dutch Petroleum International, Inc. and Anglo-Dutch (Tenge), LLC's declaratory judgment claims.

You are further instructed that if any costs relate solely to a claim for which such costs are unrecoverable, a claimant must segregate recoverable from unrecoverable costs. Intertwined facts do not make unrecoverable costs recoverable; it is only when discrete costs advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated. A party, however, may recover costs incurred in overcoming defenses or counterclaims to a claim for which costs are recoverable.

You are further instructed to exclude from your answer any costs that relate solely to claims for breach of fiduciary duty, fraud, negligence, and gross negligence.

Answer with an amount for each of the following:

a.  For representation in the original trial court and post-trial motions ending in February 2007.

Answer: _____$0_____

b.  For representation through the prior appeal to the Court of Appeals and to the Supreme Court of Texas.

Answer: _____$12,000_____

c.  For representation from the issuance of the Supreme Court of Texas' December 16, 2011, Mandate to the completion of proceedings in the trial court.

Answer: _____$0_____

Page 9 of 12

# EXHIBIT A

1314

## Presiding Juror:

1.    When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.    The presiding juror has these duties:

    a.    have the complete charge read aloud if it will be helpful to your deliberations;

    b.    preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

    c.    give written questions or comments to the bailiff who will give them to the judge;

    d.    write down the answers you agree on;

    e.    get the signatures for the verdict certificate; and

    f.    notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

### Instructions for Signing the Verdict Certificate:

1.    Unless otherwise instructed, you may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2.    If ten jurors agree on every answer, those ten jurors sign the verdict.

If eleven jurors agree on every answer, those eleven jurors sign the verdict.

If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

## EXHIBIT A

3.      All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.



JUDGE PRESIDING

**EXHIBIT A**

Certified Document Number: 59278419 - Page 11 of 12

## Verdict Certificate

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror            Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

___✓___ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

Signature                               Name Printed

1. _Darn Ming_____                  _DARIUS MIMS_____

2. _Sybil Winterslittle____              _Sybil Winters-Little_

3. _Wim Condra_____                 _William Condra_____

4. _Charles Lewis_____                 _CHARLES H. LEWIS____

5. _Donna Wilson_____                 _Donna Wilson_____

6. _Ma-Fe M Palermo_____                 _MARIAFE PALERMO_____

7. _Lynn Peter Ireland___                _LYNN Peter Ireland__

8. _Roger Andrade_____                 _Roger Andrade_____

9. _Michael Moore_____                 _Michael Moore_____

10. _Jan L.K.L_____                   _JAMES L. KILLEN_____

11. _____                   _____

_Wim Z_____                   _William Condra_____
Signature of Presiding Juror            Printed Name of Presiding Juror

Page **12** of **12**

# EXHIBIT A

1317

Certified Document Number: 59278419 - Page 12 of 12